# EXHIBIT 2

1  LINDA E. SHOSTAK (CA SBN 64599)
   LShostak@mofo.com
2  JAMES E. BODDY, JR. (CA SBN 65244)
   JBoddy@mofo.com
3  KATHRYN M. DAVIS (CA SBN 203454)
   KathrynDavis@mofo.com
4  MORRISON & FOERSTER LLP
   425 Market Street
5  San Francisco, California  94105-2482
   Telephone: 415.268.7000
6  Facsimile: 415.268.7522

7  Attorneys for Defendant
   DELOITTE & TOUCHE LLP

8

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO DIVISION

12

13  JAMES BRADY, SARAH CAVANAGH, and      Case No.   C-08-00177-SI
    IVA CHIU, individually and on behalf of all
14  others similarly situated,            **DEFENDANT DELOITTE &
                                          TOUCHE LLP'S OPPOSITION TO
15              Plaintiffs,               PLAINTIFFS' REQUEST FOR
                                          JUDICIAL NOTICE IN SUPPORT OF
16       v.                               REPLY AND SUPPLEMENTAL
                                          REQUEST FOR JUDICIAL NOTICE IN
17  DELOITTE & TOUCHE LLP, a limited liability  SUPPORT OF DEFENDANT'S
    partnership; and DOES 1-10, inclusive,  OPPOSITION TO PLAINTIFFS'
18                                        MOTION FOR CLASS
                Defendants.               CERTIFICATION**
19
                                          Date:    February 19, 2010
20                                        Time:    9:00 a.m.
                                          Dept.:   10
21                                        Judge:   The Hon. Susan Illston

22                                        Complaint filed:  February 8, 2008
                                          Trial Date:  None Set
23

24

25

26

27

28

1  **I.  INTRODUCTION**

2      Defendant Deloitte & Touche LLP ("Deloitte") hereby submits both its Opposition to

3  Plaintiffs' Request for Judicial Notice In Support of Plaintiffs' Reply re Class Certification ("Reply

4  RJN"), and its Supplemental Request for Judicial Notice.

5      With respect to its Opposition to Plaintiffs' RJN, Deloitte asks the Court to deny Plaintiffs'

6  RJN because (a) the documents attached to Plaintiffs' RJN are used by Plaintiffs to introduce new

7  legal arguments improperly raised for the first time in reply, and (b) the opinion letter attached to

8  Plaintiffs' RJN has been withdrawn by the California Department of Labor Standards Enforcement

9  ("DLSE").  With respect to its Supplemental Request for Judicial Notice, Deloitte requests that the

10 Court grant judicial notice of court and DLSE documents necessary to bring to the Court's attention:

11 (a) misstatements made in Plaintiffs Reply Memorandum regarding the content of briefing submitted

12 by the parties in the *Wirth v. Grant Thornton LLP* and *Mekhtarian v. Deloitte & Touche LLP* cases;

13 (b) the DLSE's withdrawal of the June 1992 opinion letter cited by Plaintiffs in their Reply

14 Memorandum; and (c) the February 10, 2010 Ninth Circuit order denying permission to appeal the

15 district court's November 3, 2009 order denying class certification in *Mekhtarian v. Deloitte &*

16 *Touche LLP,* a case cited by both parties.

17     For the reasons set forth below, Deloitte asks the Court to deny Plaintiffs' Reply RJN, and

18 grant Deloitte's Supplemental Request for Judicial Notice.

19 **II.  DEFENDANT'S OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL**
   **NOTICE IN SUPPORT OF REPLY**

20
21     Plaintiffs' Reply RJN seeks judicial notice of two documents: (1) a July 6, 1992 opinion letter

21 issued by the DLSE regarding the professional exemption; and (2) a copy of 17 C.F.R. § 210.2-01

22 regarding the qualifications of accountants under the Securities and Exchange Commission

23 regulations.  Plaintiffs' Reply RJN should be denied.

24     First, the documents attached to Plaintiffs' Reply RJN are used by Plaintiffs to present new

25 arguments that could have been raised in Plaintiffs' opening motion for class certification, but were

26 not.  The Court need not consider arguments raised for the first time in a reply brief.  *Zamani v.*

27 *Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  Regarding the July 6, 1992 DLSE letter (which discusses

28

DEFENDANT'S OPPOSITION TO PLS.' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF REPLY AND
SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE
CASE NO. C-08-00177-SI

1

sf-2802609

1  the profession exemption), Plaintiffs discussed the professional exemption at length in their opening

2  memorandum (*see* Motion for Class Certification at 17-18) but never cited the July 6, 1992 DLSE

3  letter until their Reply.  Similarly, Plaintiffs cite to the SEC regulations attached to their Reply RJN

4  for the first time in their Reply to argue against applicability of the administrative exemption.

5  However, this argument is one that Plaintiffs could have made, but did not, in their opening

6  memorandum, during their lengthy discussion the administrative exemption (*see* Motion for Class

7  Certification at 19-21).  Plaintiffs' new arguments, and the documents on which they rely, are

8  improper and should be disregarded.

9       Furthermore, the Court should also deny Plaintiffs' Reply RJN because the DLSE has

10  withdrawn the July 6, 1992 letter cited by Plaintiffs.  (*See* Exhibit A hereto (DLSE List of Withdrawn

11  Opinion Letters).)  A withdrawn DLSE opinion does not provide the Court with authoritative

12  guidance regarding the legal questions at issue here.  *See Ste. Marie v. Riverside County Regional*

13  *Park & Open-Space Dist.*, 46 Cal. 4th 282, 292 (2009) (weight of authority to be provided to DLSE

14  opinion letters depends in part on whether the "administrative interpretation" is "long-standing and

15  has been consistently maintained").

16       For these reasons, Plaintiffs' Reply RJN should be denied.

17  **III.    DEFENDANT'S SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE**

18       In addition, to correct misstatements made by Plaintiffs in their Reply and inform the Court of

19  a relevant February 10, 2010 Ninth Circuit order, Deloitte requests that the Court take judicial notice

20  of the following documents, true and correct copies of which are attached hereto:

21      Exhibit A:    California Department of Labor Standards Enforcement, List of Withdrawn
22                  Opinion Letters (as of 5/28/2009), posted at
                http://www.dir.ca.gov/dlse/OpinionLetters-Withdrawn.htm

23      Exhibit B:    Motion for Class Certification, Opposition to Class Certification, and Reply
24                  Motion submitted in *Wirth v. Grant Thornton, LLP*, No. 09-00832 RGK
25                  (related to Central District of California's July 29, 2009 order denying class
                certification(which was submitted to the Court on December 24, 2009 as
26                  Exhibit 4 to Defendant's Request for Judicial Notice))

27      Exhibit C:    Supplemental Points and Authorities In Support of Class Certification and
                Opposition to Supplemental Points and Authorities In Support of Class
28                  Certification submitted in *Mekhitarian v. Deloitte & Touche, LLP*, No. 07-

0412 DSF (related to Central District of California's Nov. 3, 2009 order denying class certification (which was submitted to the Court on December 24, 2009 as Exhibit 5 to Defendant's Request for Judicial Notice))

Exhibit D:       Order in *Mekhitarian v. Deloitte & Touche, LLP*, No. 09-80171 (9th Circuit, Feb. 10, 2010) (order denying petition for permission to appeal the district court's November 3, 2009 order denying class action certification(which was submitted to the Court on December 24, 2009 as Exhibit 5 to Defendant's Request for Judicial Notice))

Federal Rule of Evidence 201 authorizes judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  The above-referenced exhibits, attached hereto, satisfy this requirement. Accordingly, judicial notice is mandatory "if requested by a party and [the court is] supplied with the necessary information."  Fed. R. Evid. 201(d).

**DLSE List of Withdrawn Opinion Letters.**  Exhibit A hereto contains a copy of the California Department of Labor Standards Enforcement List of Withdrawn Opinion Letters, which is posted on the DLSE's website.  This document is publicly available, and "not subject to reasonable dispute."  Records of a state agency that are "not subject to reasonable dispute" should be judicially noticed. *City of Sausalito v. O'Neill,* 386 F.3d 1186, 1224 n.2 (9th Cir. 2004).  The Court should take judicial notice of this list.

**Court Records In Other Cases.**  The *Wirth v. Grant Thornton, LLP* briefing (Exhibit B hereto) and the *Mekhitarian v. Deloitte & Touche, LLP* briefing (Exhibit C hereto) was filed by the parties in those actions in the Central District of California; Exhibit D is an order issued by the Ninth Circuit on February 10, 2010.  The *Wirth* and *Mekhitarian* briefing is being submitted because Plaintiffs incorrectly state in their Reply Memorandum that certain issues were raised by the *Wirth* and *Mekhitarian* parties in their class certification briefing when they were not.  Courts may take judicial notice of documents contained in their own file, as well as documents filed in other courts and tribunals. *Biggs v. Terhune,* 334 F.3d 910, 916 n.3 (9th Cir. 2003) ("[m]aterial[] from a proceeding in another tribunal are appropriate for judicial notice").  Accordingly, the Court should also take judicial notice of these documents.

DEFENDANT'S OPPOSITION TO PLS.' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF REPLY AND
SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE
CASE NO. C-08-00177-SI                                                                                               3

sf-2802609

**CONCLUSION**

For the foregoing reasons, Deloitte respectfully requests that the Court deny Plaintiffs'

Request for Judicial Notice in support of Plaintiffs' Reply re Class Certification, and grant Deloitte's

Supplemental Request for Judicial Notice.

Dated: February 16, 2010

LINDA E. SHOSTAK
JAMES E. BODDY, JR.
KATHRYN M. DAVIS
MORRISON & FOERSTER LLP


By:    /s/ Linda E. Shostak
LINDA E. SHOSTAK

Attorneys for Defendant
DELOITTE & TOUCHE LLP

DEFENDANT'S OPPOSITION TO PLS.' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF REPLY AND
SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE
CASE NO. C-08-00177-SI

4

sf-2802609

**EXHIBIT A**

Case3:08-cv-00177-SI   Document118-2   Filed02/16/10   Page8 of 140

Welcome to the California
# DEPARTMENT OF INDUSTRIAL RELATIONS

Division of Labor Standards Enforcement (DLSE)

## DLSE opinion letters - withdrawn

*Revised 5/28/2009*

### WITHDRAWN OPINION LETTERS

\* Withdrawn by order of the State Labor Commissioner pursuant to Executive Order S-2-03

| Letter No. | Manual Reference/Action |
|---|---|
| 2003.11.03 | Withdrawn 12/20/04 |
| 2003.06.11 | Withdrawn 12/20/04 |
| 2002.12.06 | Withdrawn 11/29/05 |
| 2002.12.04 | Withdrawn 7/6/06 |
| 2002.06.14 | Withdrawn 12/20/04 |
| 2002.08.30 | Withdrawn 5/31/05 |
| 2002.08.14 | Withdrawn 3/20/07 |
| 2002.01.21 | 56.27 (eliminated 1/30/07) Withdrawn 5/28/09 |
| 2001.04.02 | Withdrawn 12/20/04 |
| 2001.03.19 | 45.2.6 Withdrawn 3/20/07 |
| 1999.07.19 | Withdrawn 7/6/06 |
| 1998.11.06 | Withdrawn 3/1/06 |
| 1996.05.29 | 6.1 Withdrawn 11/22/05 |
| 1995.05.10 | Withdrawn 12/28/06 |
| 1993.05.25-1 | 56.23.8 Withdrawn 12/28/06 |

| 1993.05.17 | 15.1.4; 15.1.4.1; 15.1.8 Withdrawn 11/22/05 |
| 1993.02.16 | Withdrawn 11/22/05 |
| 1993.02.16-1 | 15.1.4 Withdrawn 11/22/05 |
| 1992.07.06 | 54.8.5 Withdrawn 12/28/06 |
| 1991.11.01 | Withdrawn 12/28/06 |
| 1991.10.31 | Withdrawn 11/22/05 |
| 1991.04.11 | Withdrawn 11/22/05 |
| 1991.04.10 | 56.23.8 Withdrawn 12/28/06 |
| 1991.02.25 | 15.1.9 Withdrawn 3/20/07 |
| 1990.02.22 | Withdrawn 11/22/05 |
| 1988.08.31 | 56.23.8 Withdrawn 12/28/06 |
| 1988.08.31-1 | 15.1.10 Withdrawn 3/1/06 |
| 1988.04.01 | Withdrawn 11/22/05 |
| 1987.01.14 | 15.1.10 Withdrawn 3/1/06 |
| 1987.01.13 | Withdrawn 3/1/06 |

Conditions of Use | Privacy Policy
Copyright © 2010 State of California

# EXHIBIT B

William A. Kershaw, State Bar No. 057486
Lyle W. Cook, State Bar No. 148914
Stuart C. Talley, State Bar No. 180374
**KERSHAW, CUTTER, & RATINOFF LLP**
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 448-9800
Facsimile:  (916) 669-4499

Attorneys For Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL WIRTH, an individual, | Case No.: CV09-0832 RGK SSx |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| vs. | |
| GRANT THORNTON LLP, an Illinois limited liability company; and DOES 1-10, inclusive, | Date:  July 20, 2009<br>Time: 9:00 a.m.<br>Location: Courtroom 850<br>Hon. R. Gary Klausner, United States District Judge |
| Defendants. | |

# **TABLE OF CONTENTS**

Page(s)

I.  INTRODUCTION ........................................................................ 1

II. STATEMENT OF FACTS ......................................................... 2

    A. GT's Job Classifications And Timekeeping ............................ 2

    B. The Work Of GT Associates And Senior Associates Is Regulated By
       Professional Standards ................................................................ 3

    C. GT Has Enacted Policies And Procedures To Ensure Class Members'
       Work Is "Controlled and Supervised" ...................................... 5

III. LEGAL ARGUMENT ............................................................... 6

    A. This Action Satisfies All of the Requirements Of Rule 23(a). ........ 6

    B. This Action Satisfies the Certification Requirements of Rule 23(b)(3) .... 9

       1. Common Issues Predominate .............................................. 9

          a. *GT has a Uniform and Unvarying Policy Classifying all its
             Unlicensed Associates the Same* .......................................... 10

          b. *The Professional Exemption Presents Common Issues* ........... 10

          c. *The Administrative Exemption Present Common Issues* .......... 12

          d. *Common Proof is Capable of Establishing that GT's Unlicensed
             Associates do not Customarily and Regularly Exercise Discretion
             and Independent Judgment on Matters of Significance* .......... 14

          e. *Common Proof is Capable of Establishing the Right to be Paid
             Overtime and Class Wide Evidence can be Used to Calculate
             Each Class Members Damages* ............................................. 15

          f. *Common Issues of Fact and Law Predominate on the Claims for
             Relief Under California Labor Code Section 226.7* ............... 16

          g. *Common Issues of Fact and Law Predominate on the Claims for
             Relief Under California Labor Code Section 226* .................. 17

          h. *Common Issues of Fact and Law Predominate on the Claims for
             Relief Under California Labor Code Section 203* .................. 17

       2. Class Resolution Is Superior To Other Methods ................. 18

IV. CONCLUSION ......................................................................... 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page(s)

*Abron v. Black & Decker (U.S.), Inc.*,
 654 F.2d 951, 973 (4th Cir. 1981)................................................................ 18

*Alba v. Papa John's USA, Inc.*,
 2007 WL 953849 at 13 (C.D. Cal. 2007)................................................. 10,17

*Amchem Products, Inc. v. Windsor*,
 521 U.S. 591, 623 (1997) .......................................................................... 9,19

*Armstrong v. Davis*,
 275 F.3d 849, 868 (9th Cir. 2001)................................................................. 7

*Bates v. United Parcel Service*,
 204 F.R.D. 440, 444 (N.D. Cal. 2001) .......................................................... 6

*Bratt v. City of Los Angeles*,
 912 F.2d 1066, 1070 (9th Cir. 1990)........................................................... 13

*Chavez v. IBP, Inc.*,
 2002 WL 31662302, *3 (E.D. Wa. 2002) ...................................................... 7

*Cornn v. United Parcel Service, Inc.*,
 2005 WL 588431 *7 (N.D. Cal. 2005).......................................................... 7,8

*Dalheim v. KDFW-TV*,
 918 F.2d 1220, 1231 (5th Cir. 1990)........................................................... 13

*Hanlon v. Chrysler Corp.*,
 150 F.3d 1011, 1022 (9th Cir. 1998)....................................................*passim*

*In re Seagate Technology II Securities Litigation*,
 843 F. Supp. 1341, 1352 (N.D. Cal. 1994) ............................................. 19,20

*In re Sugar Industry Antitrust Litigation*,
 73 F.R.D. 322, 358 (E.D. Pa. 1976) ............................................................ 20

# TABLE OF AUTHORITIES, Cont.

Page(s)

*Klay v. Humana, Inc.*,
    382 F.3d 1241, 1272 (11th Cir. 2004)......................................................19,20

*McFarland v. Memorex*,
    96 F.R.D. 357, 363-64 (N.D. Cal. 1982).........................................................9

*Newsome v. Up-To-Date Laundry, Inc.*,
    219 F.R.D. 356, 365 (D. Md. 2004).................................................................9

*Romero v. Producers Dairy Foods, Inc.*,
    235 F.R.D. 474, 490 (E.D. Cal. 2006) ....................................................1,9,10

*Scott v. Aetna Services, Inc.*,
    210 F.R.D. 261, 268 (D. Conn. 2002)........................................................18,19

*Staton v. Boeing Co.*,
    327 F.3d 938, 953 (9th Cir. 2003)............................................................6,7,8

*Tierno v. Rite Aid Corp.*,
    2006 WL 2535056 at *9 (N.D. Cal. 2006)................................................1,9,10

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227, 1234 -1235 (9th Cir. 1996) ...............................................18,20

*Wang v. Chinese Daily News, Inc.*,
    231 F.R.D. 602, 614 (C.D. Cal. 2005) ........................................................9,10

*Westways World Travel, Inc. v. AMR Corp.*,
    218 F.R.D. 223, 235 (C.D. Cal. 2003) ...........................................................8

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180, 1186 (9th Cir. 2001).........................................................6,19

## STATE CASES

*Cal. Manufacturers Assn. v. Industrial Welfare Com.*,
    109 Cal. App. 3d 95, 114-115 (1980) ...........................................................16

Case 8:09-cv-00887-RGK-DSS Document 16-2 Filed 02/05/10 Page 15 of 26

## TABLE OF AUTHORITIES, Cont.

Page(s)

*Cicairos v. Summit Logistics, Inc.*,
    133 Cal. App. 4th 949, 954-955, 960-961 (2005) .................................... 16,17

*Gentry v. Superior Court*,
    42 Cal. 4th 443, 456 (2007) ...................................................................... 19

*Ghory v. Al-Lahham*,
    209 Cal. App. 3d 1487, 1492 (1989) ...................................................... 15,18

*Nordquist v. McGraw-Hill Broadcasting Co.*,
    32 Cal. App. 4th 555, 562 (1995) ............................................................ 12

*Prince v. CLS Transportation, Inc.*,
    118 Cal. App. 4th 1320, 1328 (2004) ....................................................... 9

## STATUTES

California Business & Professions Code
    Section 5033 ........................................................................................... 14
    Section 5033.1 ........................................................................................ 14
    Section 5050 ........................................................................................... 4
    Section 5051 ........................................................................................ 4,14
    Section 5053 ........................................................................................ 4,14
    Section 5092 ........................................................................................... 4
    Section 5093 ........................................................................................... 4

California Labor Code
    Section 203 ......................................................................................... 17,18
    Section 226 ........................................................................................... 17
    Section 226.7 ......................................................................................... 16
    Section 512 ........................................................................................... 16
    Section 515 .................................................................................... 10,14,15
    Section 1194 .......................................................................................... 15

Federal Rule of Civil Procedure
    Rule 23 ............................................................................................ *passim*

# TABLE OF AUTHORITIES, Cont.

Page(s)

California Code of Regulations, Title 8,
    Section 11040 ........................................................................................ *passim*
    Section 11090 ........................................................................................ 16,17

Code of Federal Regulations,
    Section 541.205 .................................................................................... 12,13
    Section 541.202 ...................................................................................... 15
    Section 541.207 ...................................................................................... 14

# I.     **INTRODUCTION**

Defendant Grant Thornton LLP ("GT") is a large public accountancy firm with six offices in the state of California. In these offices, GT employs hundreds of unlicensed "associates" and "senior associates" to assist its licensed professionals ("CPAs") in providing public accountancy services to its clients in its audit services division. These unlicensed audit associates (the proposed class members) are expected to work long hours and regularly put in hundreds of hours of overtime each year. Although class members do not have a professional license and must, by law, be "supervised and controlled" by a licensed CPA, GT has classified all of them as exempt from California wage and hour laws. As a result, no class member has received overtime pay or other benefits that an employer is required to provide to non-exempt employees under California wage and hour law.

In this case, Plaintiff Russell Wirth, seeks to certify a class defined as:

> All persons employed by Grant Thornton in California, from February 3, 2005 until the time when class notice may be given, who: (1) worked as associates or senior associates in Grant Thornton's audit services division, (2) were not licensed by the State of California as certified public accountants during some or all of this time period, and (3) were classified as exempt employees.

The question of whether GT has misclassified all of its unlicensed associates as exempt employees is a common and predominating question that justifies class treatment. Courts have recognized that in misclassification cases "[w]here a central common defense may bar each of plaintiff's claims, class action treatment is particularly apt." *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 490 (E.D. Cal. 2006). Courts also recognize that when an employer, like GT, has determined that all class members' jobs were "sufficiently similar" such that they could all be treated "as one homogenous group for purposes of the California Labor Code," it cannot persuasively contend that individual variation defeats class treatment. *Tierno v. Rite Aid Corp.*, 2006 WL 2535056 at *9 (N.D. Cal. 2006).

## II.    STATEMENT OF FACTS

GT is one of largest public accountancy partnership in the world and employees thousands of individuals throughout the United States.  It maintains six offices in California and at those offices employs approximately four to five hundred associates and senior associates in its audit services division.  (Declaration of Stuart C. Talley filed herewith ("Talley Dec."), Ex. 1 at 12:15-23, 72:16-73:5.)

### A.    GT's Job Classifications And Timekeeping

Within it's audit services division, GT uses job titles to organize the duties of its workforce.  The titles it utilizes are: Associates, Senior Associates, Managers, Senior Managers, and Partners.  (Talley Dec., Ex. 1 at 14:13-15:5.)  Most of the individuals employed as "associates" are recent college graduates who have just entered the work force.  (Talley Dec., Ex. 1 at 21:23-22:3.)  The "senior associate" position is typically filled by unlicensed associates who have more experience.  (Declaration of Russell Wirth filed herewith ("Wirth Dec.") at ¶ 5.)  Associates and senior associates in the audit services division spend the vast majority of their time assisting CPAs performing audits of their clients.  (Talley Dec., Ex. 1 at 74:2-21; 75:14-76:2.)  It is extremely rare for associates to have obtained a CPA license, since California law requires two years of actual work experience before an individual can obtain a CPA.  (Wirth Dec. at ¶ 5.)  Some senior associates may have obtained the required work experience necessary for a license, but a substantial percentage of senior associates are unlicensed.  (*Id*.)  In contrast, the positions of Manager, Senior Manager, and Partner are restricted to individuals with a CPA license.  (*Id*.)  Here, the proposed class includes only associates and senior associates in GT's audit services division who have not obtained a CPA license.

During the class period, the named plaintiff, Russell Wirth, worked as an associate and senior associate in GT's audit services division at its San Francisco office.  (*Id.* at ¶ 2.)  His duties primarily consisted of assisting CPAs in the labor intensive tasks of performing audits.  (*Id.* at ¶ 6.)

-2-

GT associates and senior associates are expected to regularly work a certain number of overtime hours each year. (Talley Dec., Ex. 1 at 73:14-74:7.) To determine whether they are meeting these requirements, all associates are required to keep detailed time records showing the number of hours they worked on a daily basis. (Talley Dec., Ex. 1 at 74:2-21; 75:14-76:2.) GT bills its clients for the hours worked by associates and senior associates. (*Id.*) Employees were specifically instructed to exclude from the recorded hours any time spent taking breaks or meals. (Wirth Dec at ¶ 12.) GT never paid any associates overtime pay for these hours at either a straight time or overtime rate. (*Id.*)

**B.  The Work Of GT Associates and Senior Associates Is Regulated By Professional Standards.**

As a public accounting firm, GT is required to comply with various professional rules and regulations promulgated by the American Institute of Certified Public Accountants ("AICPA"). (Declaration of Michael G. Ueltzen filed herewith ("Ueltzen Dec.") at ¶¶ 20-23.) These rules, which are known as the Code of Professional Conduct, set minimum standards that all public accounting firms must meet. To comply with these rules of conduct, accounting firms, including GT, must manage their engagements and supervise their non-CPA employees in a very specific way. (*Id.* at ¶¶ 8, 24-44.) These rules of professional conduct also set forth exactly what tasks must be supervised, controlled, and approved by a CPA. (*Id.*) As one might expect, the rules provide that virtually any matter of significance in connection with the provision of accountancy services must be reviewed and approved by the CPA in charge of the engagement, who must at all times supervise the unlicensed associates who work on the engagement. (*Id.* at ¶¶ 8, 24-44.)

/ / /

/ / /

/ / /

Many of the most important rules of conduct concerning this litigation can be found in the California Business and Professions Code.[1]  Specifically, Business and Professions Code section 5050 provides that no person shall engage in the practice of "public accountancy" without first obtaining a license from the state of California.  However, Section 5053 recognizes that unlicensed persons may be employed to *assist* CPAs in the performance of public accountancy.  Specifically, this code provision provides that nothing shall preclude an individual "who is not a certified public accountant from serving as an employee of, or an assistant to, a certified public accountant . . . or partnership . . . if the employee or assistant works under the *control and supervision* of a certified public accountant, . . . and if the employee or assistant does not issue any statement over his or her name."  (Emphasis added.)  GT's unlicensed associates and senior associates are the statutory assistants referred to in Section 5053.

Pursuant to these professional standards, unlicensed associates cannot customarily and regularly exercise independent judgment and discretion on matters of significance.  (Ueltzen Dec. at ¶ 46-53.)  The many prescriptions limiting independent judgment by unlicensed associates, and the strict review and supervision that give effect to these rules, apply equally to all members of the proposed class.  As described below, GT's policies do not allow for individual exceptions to the core limitations it imposes on the work of unlicensed associates and does not (and cannot by law) distinguish between the positions of associate and senior associate.  These rules ensure that, while GT's unlicensed associates use skill in applying techniques, procedures and specific standards in their work, they do not regularly and customarily exercise discretion and independent judgment on matters of significance.

---

[1]  Plaintiff's expert, Mr. Ueltzen, was involved in developing the Business and Professions Code Sections defining the scope of services of a CPA and the requirements to become a CPA in California (Business and Professions Code sections 5051, 5053, 5092 and 5093).  (Ueltzen Dec. at ¶ 4.)

**C.   GT Has Enacted Policies And Procedures To Ensure Class Members' Work Is "Controlled and Supervised."**

To comply with the various professional standards referenced above, GT has adopted uniform policies and procedures to ensure that associates are appropriately supervised. (Talley Dec., Ex. 1 at 88:2-11.) These policies and procedures are taught to associates and senior associates through a uniform national training seminar and are enforced through the use of software that is utilized in every audit performed by GT. (Wirth Dec. at ¶¶ 3 and 6; Talley Dec., Ex. 1 at 34:5-21; 32:14-33:17.)

Essentially all audits performed within GT's audit services division are performed the same way. (Talley Dec., Ex. 1 at 78:3-21; 79:13-24; Wirth Dec at ¶ 6.) Each audit is staffed with an audit team and each member of the team is assigned various tasks that are spelled out in a detailed "audit plan" that is specifically adopted and approved by the CPA responsible for the engagement. (Talley Dec., Ex. 1 at 38:25-39:24; 33:18-22; 69:2-14; Wirth Dec at ¶ 6.) The "audit plan" is contained on a computerized database and contains a list of "audit steps" that are designed to test the accuracy of a client' financial statement items. (*Id.*) Typically the "audit steps" involve the time consuming task of analyzing the client's underlying documentation to ensure that various financial statement items are accurate. (*Id.*) For example, an audit associate who is assigned the task of "checking cash" would be responsible for determining whether the "cash" listed on the client's balance sheet was accurate. To do this, the audit plan would specifically direct the associate to pull and review the client's bank statements to ensure that the amount of cash was accurately reflected.

All audit plans must be developed and approved by the CPA on the audit team – usually a partner. (Talley Dec., Ex. 1 at 33:18-22; 69:2-14.) Once the audit plan is approved, associates and senior associates must carry out their assigned tasks and have no discretion to deviate from the plan without the express approval of a supervisor. (Wirth Dec. at ¶ 9.) All of the associates' and senior associates' work must be highly documented in "work papers" that are attached directly to the computerized database.

-5-

(*Id.* at ¶ 7; Talley Dec., Ex. 1 at 40:15-25; 41:1-8.) The purpose for documenting this work is to allow for a detailed review of the work by a supervisor. (*Id.*) *All* work performed by an associates or senior associate on an audit must be reviewed for accuracy and appropriateness. (Wirth Dec. at ¶ 7; Talley Dec., Ex. 1 at 41:9-18; 43:2-7.) If the work was not performed properly, the reviewer writes "review notes" to the associate or senior associate advising them that the work was not performed properly and how it should be corrected. (Talley Dec., Ex. 1 at 44:16-45:9; 66:16-67:3.) Once all the audit steps are completed and reviewed, they are then reviewed again by a final reviewer. (Talley Dec., Ex. 1 at 104:5-14.) The final reviewer is always a CPA. (*Id.*)

With respect to providing advice to GT's clients, GT's policies and procedures prohibit associates and senior associates from providing advice on matters of significance unless that advice is expressly approved by a CPA before it is given. (Talley Dec., Ex. 1 at 52:8-22; 53:19-54:1; 59:8-12; Ueltzen Dec. at ¶¶ 59-63.)

## III. **LEGAL ARGUMENT**

### A. **This Action Satisfies All of the Requirements Of Rule 23(a).**

In moving for class certification, plaintiffs must establish the four prerequisites of Federal Rule of Civil Procedure 23(a) and at least one of the alternative requirements of Rule 23(b). *See* Fed. R. Civ. P. 23(b); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). The four prerequisites under Rule 23(a) are: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a); *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003). Plaintiff examines each of these requirements in turn.

**Numerosity:** Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Although a specific number is not required for numerosity, a putative class made up of hundreds of employees readily satisfies this requirement. *See Bates v. United Parcel Service*, 204 F.R.D. 440, 444 (N.D. Cal. 2001) (460 employees). Here, the estimated number of class members is believed to exceed several hundred. A class of this size easily satisfies the numerosity requirement of Rule

23. The precise number of class members can easily be identified from GT's records.

**Commonality:** Rule 23(a)(2) requires that there are questions of law or fact common to the class. "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient." *Hanlon v. Chrysler*, 150 F.3d 1011, 1019 (9th Cir. 1998). Here, there are numerous common legal and factual questions that must be addressed in determining whether GT's uniform and unvarying policy and practice of treating unlicensed associates as exempt violated various provisions of California labor law. Commonality is readily satisfied where a "lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001). The many common questions of fact and law in this case will be discussed in greater detail in connection with the predominance inquiry under Rule 23(b)(3). For purposes of Rule 23(a)(2), the existence of the many common questions of fact or law in this case easily satisfies the commonality requirement. *See Hanlon*, 150 F.3d at 1019.

**Typicality:** Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The Ninth Circuit has consistently held that "[u]nder the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Staton*, 327 F.3d at 957, quoting *Hanlon*, 150 F.3d at 1020. The requirement for typicality is satisfied where the challenged conduct is a policy or practice that affects all class members. *Armstrong,* 275 F.3d at 868-869.[2] All job categories do not need a class representative to satisfy the typicality requirement. *See Staton*, 327 F.3d at 957; *see also Cornn v. United Parcel Service, Inc.*, 2005 WL 588431 *7 (N.D.Cal. 2005).

---

[2] *See also Chavez v. IBP, Inc.,* 2002 WL 31662302 at *2 (E.D. Wash. 2002) (finding allegations that employer violated wage and hour laws by timekeeping and payroll practices that operated to systematically avoid payment for work were sufficient to satisfy typicality requirement).

The claims of the proposed class representative, Russell Wirth, are reasonably coextensive with those of class members because he is challenging the same uniform course of employer conduct, is proceeding on the same legal theories as the putative class, and seeks the same remedies. The claims of the class representative are, therefore, typical of other class members. *See Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 235 (C.D. Cal. 2003).

**Adequacy:** The final requirement under Rule 23(a) is that the person representing the class must be able to fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The determination of adequacy depends on the answers to two questions: "(1) [d]o the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton*, 327 F.3d at 957 (citations omitted).

Plaintiffs' attorneys are members in good standing of the California state bar and have extensive background in prosecuting complex litigation and class actions in state and federal courts, including large wage and hour cases.[3] Plaintiffs' counsel satisfy each of the specific factors set forth in Federal Rule of Civil Procedure 23(g)(1)(C), because they have diligently identified and investigated potential claims in this litigation, have extensive experience in prosecuting class cases, have demonstrated an adequate understanding of applicable law, and have the necessary resources to fully represent the class throughout this litigation. *See Cornn*, 2005 WL 588431 at *9.

The proposed class representative, like his counsel, has and will continue to vigorously prosecute this action on his own behalf and on behalf of the proposed class. Plaintiff is proceeding under the same legal theories as the class and seeks full payment for all alleged violations. Under these circumstances, no conflict will arise between plaintiff and the class he seeks to represent, and plaintiff will adequately represent the

---

[3] Information concerning counsels' relevant class action and complex litigation experience is presented in the accompanying declaration of Stuart C Talley. (Talley Dec. at ¶¶ 14-15 and Ex. 5.)

entire class.

### B.    This Action Satisfies the Certification Requirements of Rule 23(b)(3).

To qualify for certification under Rule 23(b)(3), a class must satisfy two conditions in addition to the Rule 23(a) prerequisites. "Common questions must 'predominate over any questions affecting only individual members' and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Hanlon,* 150 F.3d at 1022, quoting Fed. R. Civ. P. § 23(b)(3).

### 1.    Common Issues Predominate

Predominance is satisfied where common questions, facts, and legal remedies present a "significant aspect" of the case and can be resolved for all class members in a single adjudication. *Hanlon,* 150 F.3d at 1022. "The mere presence of potential individual issues does not defeat the predominance of common questions." *Westways*, 218 F.R.D. at 239, *quoting McFarland v. Memorex,* 96 F.R.D. 357, 363-64 (N.D. Cal. 1982). The question is whether the proposed class is sufficiently cohesive to warrant adjudication by representation. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Class actions that focus on common employer practices (rather than individual employee responses) are appropriate for class certification under Rule 23(b)(3). *See, e.g., Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 365 (D. Md. 2004). "[W]age and hour disputes (and others in the same general class) routinely proceed as class actions." *Prince v. CLS Transportation, Inc.*, 118 Cal. App. 4th 1320, 1328 (2004). "Courts recognize that employer practices and policies with regard to wages and hours often have an impact on large numbers of workers in ways that are sufficiently similar to make class-based resolution appropriate and efficient." *Tierno*, 2006 WL 2535056 at *10, quoting *Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602, 614 (C.D. Cal. 2005). Courts have specifically recognized that in misclassification cases, "[w]here a central common defense may bar each of plaintiff's claims, class

-9-

1  action treatment is particularly apt." *Romero*, 235 F.R.D. at 490.

### a. GT has a Uniform and Unvarying Policy Classifying all its Unlicensed Associates the Same.

The first overarching common question is whether all members of the proposed class have been classified the same. "[T]he question of whether [class members] are 'exempt' is a common defense for [the employer] in this case, which supports class adjudication." *Alba v. Papa John's USA, Inc.*, 2007 WL 953849 at *13 (C.D. Cal. 2007), citing *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 490 (E.D. Cal. 2006). In this case, GT has a uniform and unvarying policy and practice of treating all its unlicensed associates and senior associates as exempt.

Courts have found it "unpersuasive" for a defendant employer to argue that determination of exempt or non-exempt status is inevitably an individualized inquiry when the defendant has uniformly classified an entire ascertainable group of its employees as exempt. *See Wang*, 231 F.R.D. at 613. Where, as here, the employer has "sufficient confidence" that the jobs are similar and has "historically treated all [class members] as one homogenous group for purposes of the California Labor Code," the contention that class members "must now be individually assessed to determine whether the position can be categorized as exempt or non-exempt rings hollow." *Tierno*, 2006 WL 2535056 at *9; *see also Alba*, 2007 WL 953849 at *13.

### b. The Professional Exemption Presents Common Issues.

California Labor Code section 515 states, "[t]he Industrial Welfare Commission may establish exemptions from the requirement that an overtime rate of compensation be paid." The regulation for the professional exemption is found in IWC Order No. 4-2001, which governs "PROFESSIONAL, TECHNICAL, CLERICAL, MECHANICAL AND SIMILAR OCCUPATIONS." The same regulation is also published in the California Code of Regulations at Title 8, Section 11040.

The regulation governing the professional exemption begins by stating: "A person employed in a professional capacity means any employee who meets all of the

following requirements: "(a) Who is licensed or certified by the State of California and is primarily engaged in the practice of one of the following recognized professions: law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting…." Cal. Code Regs., Tit. 8., Sec. 11040(1.)(A)(3)(a).

GT cannot argue that the license requirement is satisfied as to *any* class member, because the class is defined, using objective criteria, to eliminate that possibility for an entire ascertainable class of GT employees. This means that readily available class wide proof of the existence or nonexistence of a CPA license from the State of California is capable of resolving the linchpin common question of whether class members qualify for the professional exemption. The answer, which is the same for every class member, is that they do not qualify, because a necessary condition for qualification -- a license -- is lacking.

GT will likely argue that a license is not required under the applicable wage order and that, instead, it can satisfy the exemption by showing the class members are part of a "learned profession." However, the question of whether the governing statute and regulation require a license in recognized professions is a matter of statutory construction that applies equally to all members of the proposed class. Whether a license is required for the professional exemption turns solely on a common issue of statutory construction that can be resolved as to the entire class by summary adjudication based on what will be undisputed "license" facts. This is how the issue must be litigated and was, in fact, litigated in *Campbell v. PricewaterhouseCoopers* where the court found that a license was, in fact, required under the applicable Wage Order. (Talley Dec. at Ex. 4.)

For purposes of class certification, the essential point is that no matter how the issue is ultimately resolved on the merits, that resolution will have equal application to all members of the proposed class. Employers, like PwC, have argued that the issue of whether a license is required for the professional exemption is one of extraordinary significance. GT cannot reasonably disagree. Standing alone, this significant and

-11-

1  common aspect of the case fully supports a finding of predominance. *See Hanlon*, 150
2  F.3d at 1022.

3        Even if the subdivision (a) license requirement is not dispositive on the
4  professional exemption, the subdivision (b) test for learned professions is also well
5  suited for class treatment. That exemption for learned professions does not apply where
6  the work being performed is in the nature of an apprenticeship. Cal. Code Regs., Tit. 8.,
7  Sec. 11040(1.)(A)(3)(b)(i). It does not apply unless the occupation is "commonly
8  recognized as learned." *Id.* Here, the occupation of statutory assistant to CPAs is not
9  commonly recognized as learned, does not require a prolonged course of specialized
10  instruction, and is in the nature of apprenticeship. The facts showing that unlicensed
11  audit associates are not members of a commonly recognized profession are the same for
12  the entire class and also support a finding of predominance.

13        **c. *The Administrative Exemption Presents Common Issues.***

14        The administrative exemption does not apply unless GT can show that the
15  "duties" test under subsection (a) of the exemption has been satisfied. The duties test is
16  used to determine whether the job duties of an employee are actually "administrative" in
17  nature. Specifically, the duties test requires that the employee be engaged in "the
18  performance of office or non-manual work directly related to management policies or
19  general business operations of his/her employer or his/her employer's customers." Cal.
20  Code Regs. Tit. 8, Sec. 11040 at (1.)(A)(2)(a)(i). To qualify for the administrative
21  exemption the employee must also be "primarily engaged in duties that meet the test of
22  the exemption." *Id*. at (1.)(A)(2)(f). Under California law, this means that more than
23  fifty (50) percent of the employee's work time must be spent engaged in exempt work.
24  *See, e.g., Nordquist v. McGraw-Hill Broadcasting Co.*, 32 Cal. App. 4th 555, 563
25  (1995).

26        Section 11040 of the California Regulations specifically points to the former
27  Federal Regulations for interpretation of the duties test, and former section 541.205
28  provides examples of what type of work would qualify as being "administrative" in

nature. "The administrative operations of the business include … 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." Former 29 C.F.R. § 541.205(b).

The leading Ninth Circuit case on this issue is *Bratt v. County of Los Angeles*, 912 F.2d 1066 (9th Cir. 1990). In *Bratt,* the court recognized that service to customers could be viewed as administrative work, but only if it was directed to "matters that involve policy determinations, *i.e.*, how a business should be run or run more efficiently, not merely providing information in the course of the customer's daily business operations." *Bratt*, 912 F.2d at 1070. Common evidence will show that none of GT's unlicensed associates perform work that involves "running the business" of GT's clients, nor are they responsible for "determining [the client's] overall course or policies." *See id.*

Even assuming the services GT provides to its customers can be characterized as administrative, the exemption is limited to the actual persons "who perform work of substantial importance to the management or operation of the business of … his employer's customers … [i.e.] those whose work affects policy or whose responsibility it is to execute or carry it out." 29 C.F.R. § 541.205(a),(c). Put another way, the employees who qualify are those who actually "perform important functions as advisers and consultants but are employed by a concern engaged in furnishing such services for a fee." *Id.* § 541.205(d). Class wide evidence will demonstrate that unlicensed associates do not themselves provide the kind of advisory services that would qualify for the administrative exemption. As one might expect, it is the licensed CPAs who can legally provide advice of this kind, not unlicensed accounting associates. *See Dalheim v. KDFW-TV*, 918 F.2d 1220, 1231 (5th Cir. 1990) (discussing how the substantially important work of news producers is performed by the executive producer and news director, not staff news producers). All unlicensed associates are prohibited by California law and GT's own internal policies from actually advising, consulting, or

-13-

planning for GT's customers. *See* Cal. Bus. & Prof. Code §§ 5033, 5033.1, 5051.

To be exempt as an administrative employee, GT must also show that its unlicensed associates perform work under "only general supervision." *See* Cal. Code Regs. Tit. 8, Sec. 11040 at (1.)(A)(2)(d) or (e). Put differently, if an employee is subject to more than general supervision, *i.e.*, a closer supervision that is task specific, then that employee cannot qualify as an exempt administrator.

The role of unlicensed associates in the accounting industry serves as a paradigm for the kind of non-general and task specific supervision and review that defeats a claim of administrative exemption. No significant decision by an unlicensed associate occurs without specific review and supervision. Unlicensed associates, who are statutory assistants, must be "controlled and supervised" by a certified public accountant. Cal. Bus. & Prof. Code § 5053. Professional rules governing the work of non-CPAs fully reinforce this statutory mandate. (*See* Ueltzen Dec.) GT's policies, procedures and practices also conform with the statutory mandate and demonstrate, as to the entire proposed class, that their work is supervised and controlled in a way that is utterly incompatible with the "general supervision" requirement for administrative exemption. This issue is ideally suited for class treatment and, in other cases, has been found dispositive (on a class-wide basis) for unlicensed audit associates employed as assistants under Cal. Bus. & Prof. Code § 5053. (Talley Dec. at Ex. H.)

**d. *Common Proof is Capable of Establishing that GT's Unlicensed Associates do not Customarily and Regularly Exercise Discretion and Independent Judgment on Matters of Significance.***

The additional requirement that an exempt employee must "customarily and regularly exercise discretion and independent judgment in performing duties" is found in California Labor Code section 515(a). The DLSE has stated in its manual that it follows federal law, 29 CFR § 541.207, to determine what is meant by the phrase "discretion and independent judgment." *See* DLSE Manual at 52.2, 52.3.8, 52.3.8.4. Section 541.207 of the federal regulations has since been revised, but remains the relevant guidance for what counts as discretion and independent judgment under

-14-

California law. One necessary feature of discretion and independent judgment is that it "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." 29 C.F.R. § 541.202(c). Whether or not GT has given its audit associates the authority to make independent judgments about matters of significance presents a common and predominating question as to the entire class. The focus is necessarily on the authority given by GT, and the issue is well suited for class treatment.

Unlicensed associates, who work as supervised and controlled assistants to certified public accountants, are not unmistakably and primarily engaged in exercising discretion and *independent* judgment as required by statute to qualify as exempt employees. To the contrary, they are supervised and *controlled* as required by GT's own standardized policies and practices, which are the necessary product of the mandatory statutes, regulations and professional standards governing the practice of public accountancy. (Ueltzen Dec. ¶ 45.) Common evidence will show that GT's policies and procedures specifically prohibit unlicensed associates from exercising the type of independent judgment and discretion that qualifies for the exemption.

### e. *Common Proof is Capable of Establishing the Right to be Paid Overtime and Class Wide Evidence can be Used to Calculate Each Class Members Damages.*

Class members are entitled to receive overtime compensation whether or not they agree to work for a lesser wage. Cal. Labor Code § 1194; *Ghory v. Al-Lahham*, 209 Cal. App. 3d 1487, 1492 (1989). Class-wide proof will establish that class members were not paid overtime.

Here, proof of unpaid overtime and the quantum of damages can be easily accomplished using GT's timekeeping records, which accurately and meticulously recorded the hours worked by class members, and its payroll records, which show the applicable rate of pay.[4] This permits a straightforward, formulaic calculation of the

---

[4] Where a salary is paid, the hourly rate of pay is "computed by dividing the total weekly salary by no more than 40 hours, regardless of the number of hours actually worked." *Ghory*, 209 Cal. App. 3d at 1490; Cal. Labor Code § 515(d).

amount of unpaid overtime due to each class member.

**f.** ***Common Issues of Fact and Law Predominate on the Claims for Relief Under California Labor Code Section 226.7.***

**Rest Breaks**:  California law requires employers to authorize and permit non-exempt employees to take a paid 10-minute rest break for every four hours worked or major fraction thereof.  Cal. Labor Code § 226.7; Cal. Code Regs. Tit. 8, § 11040(12).  The law specifically requires that "[a]uthorized rest period time shall be counted as hours worked for which there shall be no deduction from wages."  Cal. Code Regs. Tit. 8, § 11040(12).  Because GT treated all of its unlicensed associates as exempt employees, it had a uniform policy and practice of not paying for any time that may have been taken for rest breaks.  GT cannot show compliance with the legal requirement to authorize and permit *paid* rest periods, because it deliberately and uniformly failed to *pay* class members for rest periods.  Therefore, common and class wide proof is capable of showing that GT violated the Section 226.7 rest period requirements as to the entire class and of identifying each instance of violation.

**Meal Periods**:  The California Labor Code and applicable Wage Order prohibit an employer from employing a non-exempt employee for more than five hours per day without providing an employee with an unpaid meal period of not less than 30 minutes.  Cal. Labor Code § 512(a); Cal. Code Regs. Tit. 8, § 11090(11); *Cal. Manufacturers Assn. v. Industrial Welfare Com*., 109 Cal. App. 3d 95, 114-115 (1980).  If an employee works over 10 hours per day, then he or she must be given a second meal period.  Cal. Labor Code § 512(a); Cal. Code Regs. Tit. 8, § 11090(11).  Because an employer has a duty to record their employees' meal periods and to maintain time records of when meal periods begin and end, employers should know whether their employees are taking their assigned meal breaks and, in fact, are charged with such knowledge.  *See* Cal. Code Regs. Tit. 8, § 11090(7)(A)(3); *Cicairos v. Summit Logistics, Inc.*, 133 Cal. App. 4th 949, 962-963 (2005).

GT has an obligation to provide meal periods, as described above, unless the

-16-

employee is properly classified as exempt. *See Alba,* 2007 WL 953849 at *4 ("An employee classified as 'exempt' based on all these elements is not covered by California's overtime and meal and rest period laws."). GT concedes that it treated all class members as exempt employees. Plaintiffs have alleged that GT failed to provide first and second meal periods to class members as required by law. Common proof will be sufficient to show that GT did not believe it needed to provide meal periods to class members and that it failed to satisfy this requirement as to the entire class.

### g. *Common Issues of Fact and Law Predominate on the Claims for Relief Under California Labor Code Section 226.*

The California Labor Code and Wage Orders require employers to keep accurate records of the time that its employees work. Cal. Labor Code § 226; Cal. Code Regs. Tit. 8, § 11090(7). The required records include (a) time records showing when the employee begins and ends each work period, (b) meal period taken during the day, and (c) the actual hours worked during the day and the total hours worked during the pay period. *Id.* California law imposes a specific duty on GT to provide its non-exempt employees with accurate itemized statements. Cal. Labor Code § 226; *see also Cicairos*, 133 Cal. App. 4th at 954-955, 960-961.

In this proposed class action the evidence will show that GT had a uniform policy and practice of intentionally failing to provide class members with itemized statements satisfying the requirements of Section 226. This occurred systematically and intentionally because GT's itemized statements *always* reflected the salaried 40-hour week and *never* reflected the hours actually worked by class members or the overtime pay that was due to them. Because GT separately tracked the amount of overtime worked by class members, even though they did not use this documented time for purposes of providing an accurate itemized statement, this will provide a straightforward proof of liability and injury in fact to each class member.

### h. *Common Issues of Fact and Law Predominate on the Claims for Relief Under California Labor Code Section 203.*

California Labor Code section 203 provides: "If an employer willfully fails to pay

-17-

… any wages of an employee who is discharged or who quits, the wages of such employees shall continue as a penalty from the due date thereof … but such wages shall not continue for more than 30 days…." Violation of Section 203 requirements can be established by showing that GT failed to pay overtime wages as required to the non-exempt class members. It naturally follows that if overtime wages that are due have not been paid, then all wages that are due have not been paid. This inevitable relationship between the failure to pay overtime and nonpayment under Section 203 has been recognized by the courts. *See Ghory,* 209 Cal. App. 3d at 1492.

### 2. Class Resolution Is Superior To Other Methods

Rule 23(b)(3) also requires that class resolution be "superior to other available methods for the fair and efficient adjudication of the controversy." The relevant inquiry is whether the objectives of the class procedure will be achieved in the case. This is determined by analyzing the four factors in Rule 23(b)(3)(A-D). *Hanlon*, 150 F.3d at 1023. Each factor is covered below.

**Rule 23(b)(3)(A):** The first factor evaluated is "the interest of members of the class in individually controlling the prosecution or defense of separate actions." In examining this factor, courts focus on the ability of class members to pursue their claims on an individual basis. *See Valentino v. Carter-Wallace, Inc*., 97 F.3d 1227, 1234 - 1235 (9th Cir. 1996). "A class action is the superior method for managing litigation if no realistic alternative exists." *Id*. No realistic alternative exists for the proposed class to control their own individual actions for at least two reasons.

*First*, class members may fear reprisal or be otherwise disinclined to pursue individual claims against their employer. *See Scott v. Aetna Services, Inc.*, 210 F.R.D. 261, 268 (D. Conn. 2002). One of the purposes of class actions is to "protect the rights of those reluctant or unable to file individual actions against defendants for fear of jeopardizing continuing necessary relationships." *Abron v. Black & Decker (U.S.), Inc.*, 654 F.2d 951, 973 (4th Cir. 1981) (surveying cases on this issue).

*Second*, the cost of individual litigation against a well-funded defendant would be

1  cost prohibitive. *See Scott*, 210 F.R.D. at 268. Even with the potential for significant

2  damage awards on behalf of individual class members, individual litigation will be cost

3  prohibitive against a determined litigation opponent. Both of these reasons for class

4  treatment are consistent with the fundamental principle that class actions are needed to

5  vindicate the rights of groups of people who would otherwise lack the effective strength

6  to bring the opponents into court at all. *See Amchem*, 521 U.S. at 617.

7  In addition, the California Supreme Court has recently articulated the many

8  reasons why class actions are so often superior in overtime cases. *Gentry v. Superior*

9  *Court*, 42 Cal. 4th 443, 455-465 (2007). The reasons include vindicating the public

10  policies underlying overtime laws, including the desire to spread employment through

11  the work force and to avoid the evil of overwork. *Id.* at 456. The reasons also include

12  the amount of recovery relative to the cost of individual litigation, the risk of retaliation

13  when an employee individually sues his or her employer, the employees lack of

14  awareness as to their legal rights, and the need for effective enforcement to deter

15  employers from profitably violating the law. *Id.* at 456-462.

16  **Rule 23(b)(3)(B):** The second factor to be considered is "the extent and nature of

17  any litigation concerning the controversy already commenced by or against members of

18  the class." Plaintiffs' counsel are not aware of any other current litigation against GT to

19  recover for the claims alleged on behalf of the proposed class. The lack of other

20  litigation supports a finding of superiority under Rule 23(b)(3)(B). *Zinser*, 253 F.3d at

21  1191.

22  **Rule 23(b)(3)(C):** The third factor to be examined is "the desirability or

23  undesirability of concentrating the litigation of the claims in the particular forum."

24  Continuing the litigation in this forum is desirable because the parties and the court are

25  fully engaged in litigating the important issues raised by this proposed class action.

26  **Rule 23(b)(3)(D):** Finally, courts should also consider "the difficulties likely

27  to be encountered in the management of a class action." Although defendants often

28  raise the issue of manageability, this factor rarely precludes class certification. *In*

-19-

1 *re Seagate Technology II Securities Litigation*, 843 F. Supp. 1341, 1352 (N.D. Cal.
2 1994); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1272 (11th Cir. 2004). "[D]ifficulties
3 in the management of class actions should not lead to a conclusion that class actions
4 are not superior to other available means for the fair and efficient adjudication of
5 the controversy. Manageability problems are significant only if they create a
6 situation that is less fair and efficient than other available techniques." *In re Sugar*
7 *Industry Antitrust Litigation*, 73 F.R.D. 322, 358 (E.D. Pa. 1976). The Ninth
8 Circuit has long recognized that "[w]here class-wide litigation of common issues
9 will reduce litigation costs and promote greater efficiency, a class action may be
10 superior to other methods of litigation." *See Valentino*, 97 F.3d at 1234. A
11 comparison of what must be done to prove the allegations of plaintiffs' case, if it
12 were to proceed individually rather than on behalf of the entire class, demonstrates
13 the magnitude of the economies that can be achieved by class treatment in this
14 action.

15 **IV. <u>CONCLUSION</u>**

16 Plaintiffs respectfully request that the court enter an order: (1) certifying the
17 proposed class, (2) appointing Russell Wirth as class representative and (3) appointing
18 William A. Kershaw, Lyle W. Cook, and Stuart C. Talley of Kershaw, Cutter &
19 Ratinoff, LLP as class counsel.

20 Dated: May 20, 2009.                    KERSHAW, CUTTER, & RATINOFF, LLP
21
22
23                                        By: _____/s/_____
24                                             STUART C. TALLEY
                                              *Attorneys for Plaintiffs*
25
26
27
28

BINGHAM MCCUTCHEN LLP
James Severson (SBN 67489)
james.severson@bingham.com
Alan R. Berkowitz (SBN 50112)
alan.berkowitz@bingham.com
Jessica S. Boar (SBN 263049)
jessica.boar@bingham.com
Hoddy Potter (SBN 238507)
hoddy.potter@bingham.com
Three Embarcadero Center
San Francisco, CA 9411-4067
Telephone: 415.393.2000
Facsimile: 415.393.2286

Attorneys for Defendant
Grant Thornton LLP

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL WIRTH, an individual,<br><br>        Plaintiff,<br><br>        v.<br><br>GRANT THORNTON LLP, an Illinois limited liability company; and DOES 1-10, inclusive,<br><br>        Defendant. | No. CV 09-0832 RGK SSx<br><br>**GRANT THORNTON LLP'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:     July 20, 2009<br>Time:     9:00 a.m.<br>Place:    850<br>Judge:   Hon. R. Gary Klausner |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................... 1

II.   FACTS ............................................................................................ 3

    A.    The Proposed Class Is Inappropriate ................................... 3

    B.    The Nature And Purpose of Audits Inherently Call For The Exercise of Discretion And Independent Judgment On The Part Of Associates And Seniors ................................................ 5

    C.    The Regulatory Framework Does Not Preclude Associates and Senior Associates From Exercising Discretion and Independent Judgment; It Requires It ............................................... 6

    D.    Wirth's Unique Background And Spotty Work Record Make Him An Unsuitable Class Representative ............................ 7

III.  ARGUMENT .................................................................................. 8

    A.    Plaintiff Bears The Burden On This Motion ......................... 8

    B.    Plaintiff Has Not And Cannot Meet His Burden ................... 9

        1.    Wirth Is Neither A Typical Nor An Adequate Representative .......................................................... 9

        2.    Nor Can Plaintiff Satisfy Rule 23(b)(3)'s "Predominance" Requirement .................................... 9

            a.    Plaintiff's First Alleged "Common Question:" The Employees Are Considered "Exempt" ......................... 10

            b.    Plaintiff's Second Alleged "Common" Question: The "Learned Professional" Exemption Presents A Single Common Issue of Statutory Interpretation ........ 13

            c.    Plaintiff's Third Alleged "Common" Question: The "Administrative" Exemption Does Not Apply To The Work Done By Purported Class Members ....... 16

            d.    Plaintiff's Final Alleged "Common" Issue: Whether These Associates and Seniors Can Or Do Exercise Discretion And Independent Judgment .......... 18

        3.    Plaintiff Cannot Satisfy Rule 23(b)(3)'s "Superiority" Requirement Either .................................................. 19

IV.  CONCLUSION ............................................................................. 20

1

# TABLE OF AUTHORITIES

2 Page

3 CASES

4
5    *Abed v. A.H. Robins Co.*,
        693 F.2d 847 (9th Cir. 1982) .............................................................. 10

6
7    *Amchem Products, Inc. v. Windsor*,
        521 U.S. 591 (1997) ............................................................................ 10

8
9    *Azoiani v. Love's Travel Stops and Country Stores, Inc.*,
        2007 WL 4811627 (C.D. Cal. Dec. 18, 2007) .................................... 20

10
11   *Benner v. Becton Dickinson & Co.*,
        214 F.R.D. 157 (S.D.N.Y. 2003) ........................................................ 20

12   *Bothell v. Phase Metrics, Inc.*,
        299 F.3d 1120 (9th Cir. 2002) ...................................................... 12, 17

13
14   *Cima v. WellPoint Health Networks, Inc.*,
        250 F.R.D. 374 (S.D. Ill. 2008) .......................................................... 20

15
16   *Dunbar v. Albertson's, Inc.*,
        141 Cal.App.4th 1422 (2006) .............................................................. 11

17
18   *Eisen v. Carlisle & Jacquelin*,
        417 U.S. 156 (1974) ............................................................................ 10

19
20   *Hanlon v. Chrysler Corp.*,
        150 F.3d 1011 (9th Cir. 1998) ............................................................... 8

21
22   *Hanon v. Dataproducts Corp.*,
        976 F.2d 497 (9th Cir. 1992) ................................................................. 9

23   *Jimenez v. Domino's Pizza, Inc.*,
        238 F.R.D. 241 (C.D. Cal. 2006) ............................................. 8, 12, 19

24
25   *Lozano v. AT&T Wireless Services, Inc.*,
        504 F.3d 718 (9th Cir. 2007) ................................................................. 8

26
27   *Marlo v. United Parcel Service*,
        251 F.R.D. 476 (C.D. Cal. 2008) ............................... 10, 11, 12, 19

28

GRANT THORNTON LLP'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES
(continued)

Page

*Mathews v. Book-of-the-Month Club, Inc.*,
   62 F.R.D. 479 (N.D. Cal. 1974) ........................................................................ 20

*Moore v. Hughes Helicopters, Inc.*,
   708 F.2d 475 (9th Cir. 1983) ............................................................................. 10

*Piscione v. Ernst & Young, L.L.P.*,
   171 F.3d 527 (7th Cir. 1999) ............................................................................. 17

*Sepulveda v. Wal-Mart Stores, Inc.*,
   237 F.R.D. 229 (C.D. Cal. 2006) .................................................................. 12, 19

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ............................................................................ 9, 11

*Vinole v. Countrywide Home Loans, Inc.*,
   246 F.R.D. 637 (S.D. Cal. 2007) ....................................................................... 11

*Walsh v. IKON Office Solutions, Inc.*,
   148 Cal.App.4th 1440 (2007) ............................................................................ 11

*Zinser v. Accufix Research Institute, Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ...................................................................... 9, 11, 20

**STATUTES**

28 U.S.C. § 1292(b) ............................................................................................ 14

Cal. Bus. & Prof. Code § 5053 ........................................................................ 6, 17

**OTHER AUTHORITIES**

29 C.F.R. § 541.202(c) ....................................................................................... 17

29 C.F.R. §541.301(e)(1), (f) (1993-2004) ...................................................... 14

8 Cal. Code Regs. § 11040 ............................................................................. 14, 17

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. Proc. 23 ............................................................................... 8, 9, 10, 19

GRANT THORNTON LLP'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

## I.   INTRODUCTION

Plaintiff Russell Wirth, who never worked in one of the key jobs he hopes to represent, who came to Grant Thornton with specialized experience that most other associates did not have, took and passed the CPA exam and could have easily become fully licensed but was in "no rush" to do so, and was put on a performance plan and later fired because his work did not satisfy the requirements of the job, asks the Court to certify him to represent a class of <u>every</u> associate, at every level, who worked in the Audit Division of any of Grant Thornton's six California offices at any time during the past four years.

<u>Every</u> associate includes employees in five distinct positions -- associate level one (A1), associate level two (A2), senior associate level one (S1), senior associate level two (S2) and senior associate level three (S3).  These positions range from individuals who have just graduated from college and have yet to "learn the ropes" to those who have taken and passed the CPA exam and are fully qualified to receive their license, but have just not gotten around to it.

Plaintiff is neither a typical nor adequate class representative, nor is this case appropriate for class treatment.

Plaintiff is not a typical or adequate representative because his employment at Grant Thornton, from his being hired as an A2 with immediate supervisory responsibilities in a highly specialized area, to his being put on a performance improvement plan and then terminated for poor performance, was not typical of any other associate, and because his poor work record and failure to meet job expectations raises defenses unique to him that will be the focus of this litigation.

This case is not appropriate for class treatment because the claim Wirth asserts -- that neither he, nor any of the A1s, A2s, S1s, S2s or S3s he hopes to represent, was properly classified as "exempt" under California law -- is not the type of claim that is amenable to class treatment.  It is well-settled law that a determination of the exempt or non-exempt status of an employee must be made on

1

an individual basis that considers all of the pertinent facts relating to the actual work performed by each employee.

That is especially so with respect to the jobs at issue here. For example, Wirth, because of his specialized background, was given immediate supervisory responsibilities over A1s, a job he never held. A1s rarely have those responsibilities; A2s more often have them, but not always; senior associates (S1s, S2s and S3s) virtually always have them, although often in specialized areas. A2s perform other duties A1s do not; seniors perform duties neither A1s nor A2s perform; and within the senior ranks, S3s do different things than S2s or S1s.

But the problem here is even more fundamental than that. Even within the same job category, given the detail and complexity that auditing work involves, the duties of one person materially differ from the duties of another. Accounting associates, like law firm associates, develop the ability to perform complex auditing tasks and prove they are able to accept responsibility at different rates.

As a result, some get more complex work, some less; some are given greater responsibility and autonomy by their managers, others less; and, in performing different tasks for different supervisors, all are called upon to exercise discretion and judgment at different levels of complexity depending on, among other things, (i) the nature of the assignment; (ii) the manager's supervisory style; and (iii) the associate's expertise, knowledge of the particular client, prior experience with the type of audit, and basic talent.

There is nothing "cohesive" about A1s and A2s, junior associates and senior associates, or one associate and another in terms of technical knowledge, career development, expertise and actual job duties. All these factors must be considered in determining whether an accountant is "exempt." Those issues "predominate" in this case. A class action is not an appropriate vehicle for resolving them.

Wirth's motion for class certification should be denied.

GRANT THORNTON LLP'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

## II.    FACTS

### A.    The Proposed Class Is Inappropriate

Plaintiff's proposed class purports to lump together many different groups of associates in Grant Thornton's Assurance Division, all of whom perform different duties.  The first group, known as "A1s," are entry level associates, who come to Grant Thornton with a college degree either in accounting or with a focus or emphasis in accounting, or a masters degree in accounting, but little actual experience.  *See* Declaration of Ryan Dillard ("Dillard Decl.") ¶ 5; Deposition of Michael Rebholtz ("Rebholtz Dep.")[1] 18:23-19:16.

For that reason, the A1 year is a learning year.  Dillard Decl. ¶ 5; Declaration of Angela Garcia-Lopez ("Garcia-Lopez Decl.") ¶ 8.  A1s spend the majority of their time working with a team of other associates, senior associates, managers and/or partners, or some combination thereof, on specific audit engagements which expose them to the details of how an audit for that particular type of client is conducted.  Dillard Decl. ¶ 5.  The more exposure an A1 obtains working on audits for a particular type of client, the more valuable that associate is in offering ideas for planning and conducting that type of audit, identifying risks and problems, and proposing solutions.  *Id.* ¶ 6.  Wirth never worked as an A1. Deposition of Russell Wirth ("Wirth Dep.") 161:14-18.

An associate who shows promise will, in about a year, be given a "rank change" to A2, depending on merit.  Dillard Decl. ¶ 10.  The level change occurs only after the A1 has proven that he or she has advanced, both in substantive knowledge and in his or her exposure to various types of audits and audit "cycles," subject matter areas covered in an audit for a particular client type, to the point where he or she can take on additional responsibility.  *Id.*  A2s handle the more

---

[1]    Pages from the Depositions of Michael Rebholtz and Russell Wirth are attached as Exhibits A and B, respectively, to the Declaration of James Severson.

GRANT THORNTON LLP'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1  complex audit cycles -- the cycles where the risk of material misstatement is

2  increased.  *Id*.; Declaration of Nancy Wong ("Wong Decl.") ¶ 6.  In addition to

3  receiving specialized training, an A2 who has demonstrated specific subject matter

4  expertise can also be chosen to "in-charge" an audit.  *Id*. ¶¶ 10, 13.  The "in-

5  charge" runs the audit on-site at the client, has substantial direct interaction with

6  the client, and is the "face" of Grant Thornton vis-à-vis the client during the

7  progress of the audit.  *Id*. ¶ 13.  A1s who have shown they can handle the job have

8  served as the "in-charge".  *See* Declaration of Edelyn Pareno ("Pareno Decl.") ¶ 5;

9  Garcia-Lopez Decl. ¶ 10; Wong Decl. ¶ 5.

10      A2s who continue to show good progress can, a year or so later, be

11  promoted to "senior associate," or "SA;" the three ranks, S1, S2 and S3, are each

12  approximately a year apart, and, again, depend solely on merit.  Dillard Decl., ¶14.

13  The work of an SA of any level is "qualitatively different" from the work of an A1

14  or A2 in several major respects: (i) SAs "routinely" "in-charge" audits, which

15  means SAs are occupied virtually full time supervising A1s and A2s and reviewing

16  their work; and (ii) as SAs move up the ranks from S1 to S3, they act as the "in-

17  charge" on more complex and larger audits, work on progressively more complex

18  audit cycles, help "tailor" the audit, and are expected to take on increasing

19  responsibilities.  *Id*. ¶¶ 14-16.  *See also* Rebholtz Dep. 97:25-99:20.  The

20  "tailoring" process, which is unique to the work of an SA (versus a junior

21  associate), involves assessing the various risk factors that might be encountered in

22  the audit process and communicating with the client about what may have changed

23  in the client's business activities since the prior audit, such as changes in

24  management, changes in the client's "internal controls," and changes in the

25  industry including competitive pressures, and how those changes increase risk

26  factors.  Dillard Dec. ¶¶ 16-17.  SAs also prepare audit budgets.  *Id*. ¶ 18.

27      Two conclusions emerge from these facts: (i) the supervisory responsibilities

28  of an SA, and occasionally the A2 or A1, qualitatively distinguish the work that

person does from the work of a junior (A1) associate; and (ii) as the person progresses from A1 to A2 to SA, the complexity of the tasks he or she works on, and the amount of discretion and independent judgment he or she is expected to exercise, increase materially.  Judge Karlton so recognized in refusing to include senior associates in the *Campbell v. PricewaterhouseCoopers* case cited by plaintiff.  *See* Dkt. No. 20 (Declaration of Stuart Talley in Support of Motion to Certify Class) Ex. 3 at 39-41.

### B. The Nature And Purpose of Audits Inherently Call For The Exercise of Discretion And Independent Judgment On The Part Of Associates And Seniors

As described in the accompanying declarations of Grant Thornton associates and managers, and in the Declarations of John Majors ("Majors Decl.") and Professor Ruben Davila, Clinical Professor of Accounting, University of Southern California ("Davila Decl."), it is simply implausible, contrary to plaintiff's claim, that A1s, A2s, S1s, S2s and S3s can successfully perform their job duties without exercising discretion and independent judgment.

In addition to the supervision and review functions exercised by some A2s and all SAs, which involve inherently discretionary job functions, each associate and senior associate working on a given audit has not only ample opportunity, but also a clear mandate, to exercise discretion and independent judgment.  Dillard described how, as an A1, he was expected to make meaningful decisions "as to how to test the accuracy of the client's financial reporting," including "determin[ing] how best to execute the testing and decide how many and which checks to trace to ensure that the client properly accounted for them."  Dillard Decl. ¶ 9.  Allustiarti explained that on each engagement he worked as an A1 he judged the client's credibility and confronted the client when he found discrepancies.  Declaration of Daniel Allustiarti ("Allustiarti Decl.") ¶ 6.  Dillard described how, as an A2, he was "expected to suggest various 'tests' that should be performed and to propose solutions to problems, rather than simply alerting a

senior associate or manager." Dillard Decl. ¶ 12; *see also* Garcia-Lopez Decl. ¶ 9, Allustiarti Decl. ¶ 5. As an A2, DaSilva uncovered that a client failed to account for a million dollar payment it owed pursuant to a purchase agreement. Declaration of Anderson DaSilva ("DaSilva Decl.") ¶ 10. DaSilva reviewed the purchase agreement, researched proper accounting treatment and drafted a memorandum with his recommendation, with which the client agreed and changed its accounting. *Id.* Dillard further explained that the amount of supervisory responsibility differed between A2s, depending on the size of the audit team and the A2's particular skill levels. Dillard Decl. ¶ 11. These discretionary responsibilities increase as an associate or senior progresses through the ranks. *Id.* ¶¶ 15-18; *see also* Garcia-Lopez Decl. ¶¶ 8-17; Pareno Decl. ¶¶ 5-8; DaSilva Decl. ¶¶ 8-10; Allustiarti Decl. ¶¶ 5-9.

**C. The Regulatory Framework Does Not Preclude Associates and Senior Associates From Exercising Discretion and Independent Judgment; It Requires It**

Nothing in California Business & Professions Code § 5053's "control and supervision" formulation, nor the principles enunciated by AICPA, precludes unlicensed accounting personnel from regularly exercising discretion and independent judgment in connection with matters of substantial importance in conducting auditing activities for Grant Thornton's clients. Davila Decl. ¶¶ 18-19, 44-47. In fact, Professor Davila notes, non-licensed audit staff are required to conduct their work in accordance with professional standards, which in turn require that they exercise discretion and independent judgment when performing audit field work, planning an audit engagement, and supervising audit staff. *Id.*

With respect to plaintiff's claim that Business & Professions Code § 5053's "control and supervision" provision precludes such exercise, Professor Davila notes that professional standards, statutes, and regulations comprehend that non-licensed audit staff operate under only generalized supervision when performing field work. *Id.* ¶¶ 19, 44, 47, 49. These same standards permit unlicensed audit

6

staff with appropriate education, training, and experience to supervise audit work. *Id.* ¶¶ 19, 44, 48.

Russell Wirth's employment at Grant Thornton provides evidence of this. Within three weeks of being hired, he was designated as the "in-charge" for an employee benefit plan audit due to his prior experience in that specialized field for another accounting firm, and he served as the "in-charge" on several subsequent audits. Wirth Dep. 47:11-23, 54:18-22, 124:23-125:11, 137:7-13, 169:2-10, 199:8-11. Of necessity he worked "independently," as he was the most senior person present at the client's premises during the day-to-day progress of the audits, and was therefore not subject to "close," "immediate" or even "routine" supervision. Tabakh Decl. ¶ 12; *see also* Pareno Decl. ¶ 4; Wong Decl. ¶ 5.

### D. Wirth's Unique Background And Spotty Work Record Make Him An Unsuitable Class Representative

Wirth was hired by Grant Thornton with an economics degree with emphasis in accounting, over two years' experience with another accounting firm performing audits of employee benefit plans, and two of the four parts of the CPA exam successfully behind him. Wirth Dep. 34:19-35:13, 83:12-25, 104:22-105:7. Because of his unique specialty, Wirth was hired in as an A2, bypassing the A1 position completely, which is rare at GT. Tabakh Decl. ¶ 8; Declaration of Theresa Sentino ("Sentino Decl.") ¶ 3.

Within weeks, Wirth "in-charged" an employee benefit audit and was later assigned to "in-charge" several other audits. Wirth Dep. 124:23-125:11; Tabakh Decl, ¶¶ 10-11. He was responsible for direct client communication and for running the audit. Tabakh Decl. ¶ 11. He was later promoted to S1, got a rank increase to S2, served only five months, and was terminated. Sentino Decl. ¶¶ 3, 5. He never made it to S3. *Id.* ¶ 5.

While employed with Grant Thornton, Wirth took, and passed, the two remaining sections of the CPA exam; he was therefore prepared, upon passing the

open-book ethics exam, to get his license.  Tabakh Decl. ¶ 18; Wirth Dep. 117:11-17.  He did not do so, however, until a year later, after he had been fired (despite Grant Thornton's desire that its associates become licensed as soon as possible); he testified there was no reason for him to do so -- he "would not receive any bonus from Grant Thornton," nor would he be promoted; and he would be doing exactly the same work.  Wirth Dep. 123:2-12.  As he put it, "there was really no reason, I guess, for me to rush."  *Id.* at 123:12-13; Tabakh Decl. ¶ 18; Severson Decl. ¶ 4, Ex. C.

According to his managers, when Wirth was motivated, his work was fine; when he was not motivated, his work showed it.  *See, e.g.*, Tabakh Decl. ¶¶ 13-17; Garcia-Lopez Decl. ¶¶ 20-21.  His managers noted that he failed to take initiative; he spent a fair amount of time surfing the Web and listening to his iPod; he was put on a performance plan (a rare event at Grant Thornton); when his work did not improve and nobody wanted to staff him on their audits, he was temporarily transferred to a different group, where he also did poorly; and he was terminated.  Tabakh Decl. ¶¶ 13-17, 20-21; Dillard Decl. ¶ 22; Garcia-Lopez Decl. ¶¶ 19-21.

## III.  ARGUMENT

### A.  Plaintiff Bears The Burden On This Motion

Plaintiff bears the burden of establishing that the requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy of representation) are met.  *Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718, 724 (9th Cir. 2007).

He also bears the burden of showing that one of the requirements of Rule 23(b) is met.  *Id.*  His motion focuses on Rule 23(b)(3).  That provision requires him to show that common questions of law or fact "predominate over any questions affecting only individual members," and that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998); *see also Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 250 (C.D. Cal. 2006).

Before certifying a class, "the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1233 (9th Cir. 1996)).

### B. Plaintiff Has Not And Cannot Meet His Burden

#### 1. Wirth Is Neither A Typical Nor An Adequate Representative

Wirth's experience was not "typical" within the Rule 23(a)(3) definition. He never worked in two of the jobs of the proposed class he seeks to represent (A1 and S3); was an S2 only a short time; and there are both quantitative and qualitative differences between A1s and A2s and junior associates and seniors.

Regardless of whether analyzed under the typicality (Rule 23(a)(3)) or adequacy (Rule 23(a)(4)) prong, the circumstances of Wirth's employment and separation from employment (his spotty work record, delayed promotion to senior due to performance issues, failure to see or even be interested in the big picture, failure to take the initiative, performance improvement plan, involuntary termination, and failure generally to satisfy the requirements of his position) illustrate that this litigation will focus on defenses unique to Wirth at the expense of the A1s, A2s, S1s, S2s and S3s he seeks to represent. *See, e.g., Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992) ("We agree that a named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'") (internal citation omitted). Plaintiff's motion should be denied for this reason alone.

#### 2. Nor Can Plaintiff Satisfy Rule 23(b)(3)'s "Predominance" Requirement

Even if plaintiff could satisfy Rule 23(a)'s requirements, he comes up well short regarding Rule 23(b)(3)'s "predominance" and "superiority" requirements.

"[P]redominance is a comparative concept that calls for measuring the relative balance of common issues to individual ones." *Marlo v. United Parcel Service*, 251 F.R.D. 476, 483 (C.D. Cal. 2008) (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). The "superiority" requirement asks, among other things, whether a class action is "manageable;" "[t]he greater the number of individual issues to be litigated, the more difficult it will be for the court to manage the class action." *Marlo,* 251 F.R.D. at 487 (citing *Abed v. A.H. Robins Co*., 693 F.2d 847, 856 (9th Cir. 1982)). Plaintiff meets neither prong.

Plaintiff identifies four "common issues" which he contends "predominate" over any individual issues: (1) that Grant Thornton's unlicensed associates and senior associates are classified as "exempt;" (2) that the "learned professional" exemption cannot apply as a matter of law to unlicensed professional accountants; (3) that the "administrative" exemption cannot apply to the type of work these accountants perform; and (4) that the regulatory and statutory scheme governing the accounting profession precludes these employees from exercising the discretion and independent judgment required by either exemption. In other words, what plaintiff wants the Court to do is "put the cart before the horse" and decide the merits of plaintiff's exemption claims first.

Plaintiff's merits-focused approach is both improper at this stage and wrong on its own merits. "[I]t is improper to advance a decision on the merits to the class certification stage." *Moore v. Hughes Helicopters, Inc*., 708 F.2d 475, 480 (9th Cir. 1983) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974)). Once plaintiff's faulty approach is abandoned, it is clear that a host of individual factual issues, whose collective weight overwhelm any remaining common issue, emerge. We consider plaintiff's alleged four "common" questions in order.

        a.    **Plaintiff's First Alleged "Common Question:" The Employees Are Considered "Exempt"**

Plaintiff's first alleged "common issue" is not an issue at all -- at least not

one that assists in the resolution of this motion. "The existence of a uniform policy classifying the [job positions at issue] as exempt does not necessarily establish that the policy was misclassification. It is possible to have a classification policy that properly classifies some employees as exempt and improperly classifies others as exempt." *Marlo*, 251 F.R.D. at 484; *see also Dunbar v. Albertson's, Inc*., 141 Cal.App.4th 1422, 1427-28 (2006) ("[T]he Court cannot determine whether Defendant's policy of designating GMs as exempt is unlawful in the abstract. If the Court found that the policies were appropriate as applied to 70% of the GMs and inappropriate with respect to the remaining 30%, that finding would not permit the conclusion that the policies are unlawful.").

Plaintiff knows this to be true, as he attaches Judge Karlton's decision in *Campbell* to his papers. In that case, Judge Karlton held, "[t]he fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties." *See* Dkt. No. 20, Ex. 3 at 36; *see also Vinole v. Countrywide Home Loans, Inc*., 246 F.R.D. 637, 641 (S.D. Cal. 2007); *Walsh v. IKON Office Solutions, Inc*., 148 Cal.App.4th 1440, 1461-62 (2007) (defendant not estopped from asking court to consider individual circumstances of class members to determine whether each is subject to claimed exemption). Judge Karlton and these courts maintain that the "rigorous analysis" called for in *Zinser* and *Valentino* is required notwithstanding an employer's classification.

That "rigorous analysis," when undertaken, reveals at least the following individual issues: (i) whether the work performed by any given employee satisfies the provisions of either the learned professional or administrative exemption; (ii) whether the employee spends more than 50% of his or her time performing duties that satisfy the exemptions; (iii) whether, in performing his or her duties, the employee exercises discretion and independent judgment; (iv) whether that

1   exercise of discretion and judgment is with respect to matters of substantial

2   importance; (v) whether that exercise is regular and customary or only sporadic;

3   and (vi) whether the employee performs his or her duties under only "general," as

4   opposed to "specific" or "immediate," supervision. *See, e.g., Jimenez,* 238 F.R.D.

5   at 251-52 (refusing to certify class due to need to address these factual issues in

6   determining whether employees are "exempt"); *Sepulveda v. Wal-Mart Stores,*

7   *Inc*., 237 F.R.D. 229, 246-50 (C.D. Cal. 2006), *aff'd in part, rev'd in part on other*

8   *grounds*, 275 F. App'x 672 (9th Cir. 2008) (same); *Marlo*, 251 F.R.D. at 486-87

9   (decertifying class in "exemption" case noting "[t]here is a significant risk that the

10   trial would become an unmanageable set of mini-trials on the particular individuals

11   presented as witnesses"); *see also Bothell v. Phase Metrics, Inc*., 299 F.3d 1120,

12   1128 (9th Cir. 2002) (in applying the administrative exemption, "[a] fact-specific

13   inquiry is needed" and "[i]t is impossible to determine whether Bothell's work was

14   exempt . . . until the nature of his daily activities is resolved by the factfinder.").

15      Judge Karlton recognized this also. He pointed out, "[i]f the duties between

16   class members are similar, the exemption inquiry is likely susceptible of common

17   proof . . . but if the duties are not sufficiently similar, then the inquiry is unlikely to

18   be susceptible to common proof . . . ." Dkt. No. 20, Ex. 3 at 37.

19      As applied to this case, that "rigorous analysis" requires consideration of the

20   factual differences, described in detail in the declarations submitted by Grant

21   Thornton with this opposition, between the day to day duties and responsibilities of

22   A1s versus A2s, and of A1s and A2s versus SAs. Those declarations further show

23   that even within those categories, the "developmental continuum" that professional

24   accounting associates, like law firm associates, exhibit means that one employee's

25   duties, responsibilities and exercise of discretion will differ substantially from

26   another's, due to the person's unique background, particular auditing experience,

27   performance level, basic smarts, and even luck of the draw, regarding the

28   management style of the particular manager(s) to whom they are assigned.

GRANT THORNTON LLP'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Judge Karlton, in conducting that analysis in the *Campbell* case, concluded that the job duties of senior associates were substantially different from the job duties of junior associates, and on that basis declined to certify a class that included senior associates. Grant Thornton has presented the same type of proof here.

Judge Karlton also concluded, however, again based on the evidence presented to him, that the entire group of junior associates -- and there appeared to be no distinction presented to him regarding differences between first year and second year associates such as exist at Grant Thornton -- were sufficiently similar to warrant certifying a class that included them.

In that respect, this case is different. Here, Grant Thornton has presented specific evidence that establishes not only the significant differences between junior and senior associates, but also between A1s and A2s, and even between individual employees within those classifications, in ways that are material to the issue presented: is any given individual "exempt?"

The proper analysis, as stated above, is that the determination of the exempt or non-exempt status of an employee must be made on an individual basis that takes into account all of the pertinent facts relating to the actual work performed by the employee. Under this test, the Court must determine whether all, some or none of the employees in each job classification meet the requirements of the exemptions. That is not the type of inquiry for which class treatment is suitable.

### b. Plaintiff's Second Alleged "Common" Question: The "Learned Professional" Exemption Presents A Single Common Issue of Statutory Interpretation

Here, plaintiff attempts to end the "rigorous analysis" before it begins. His argument -- again based purely on the merits -- is that, solely as a matter of statutory interpretation, the "learned professional" exemption simply does not apply. He claims it does not apply because the only issue presented is whether the employees have a CPA license, which by definition the purported class members

1  do not.  *See* Dkt. No. 19 (Plaintiff's Memorandum in Support of Class

2  Certification) at 11.

3      This argument is premised on the notion that the word "or" found between

4  subsection (a) of 8 Cal. Code Regs. § 11040(1)(A)(3) and subsection (b), *see*

5  Severson Decl. ¶ 5, Ex. D, does not really mean "or," and instead means that if an

6  employee is engaged in an occupation for which a license is <u>possible</u> under (a), that

7  employee cannot, without said license, qualify for the alternative exemption

8  provision in subsection (b), regardless of what actual duties the employee performs

9  and regardless of whether those duties fully satisfy the terms of subsection (b).[2]

10     It is an argument that Judge Karlton seems to have accepted, in spite of the

11  facts that (i) federal law has long recognized that unlicensed accountants can

12  qualify for the "learned professional" exemption captured in subsection (b) of the

13  California Wage Order[3], *see* fmr. 29 C.F.R. § 541.301(e)(1), (f) (1993-2004);

14  § 541.301(e)(5) (2004-present); and (ii) the Department of Labor Standards

15  Enforcement, the California agency responsible for interpreting and enforcing the

16  Wage Order, has recognized since the 1980's that unlicensed accountants qualify

17  for the learned professional exemption.  *See* Severson Decl. ¶ 6, Ex. E at 49.1 ("it

18  [is] clear that certain accountants who are not CPAs may still qualify as

19  professionals if they meet the alternative requirements of the professional

20  exemption").  This language is virtually identical to the federal provision.[4]

21     As is readily seen, plaintiff's is purely a "merits"-based argument -- and

22

23  [2]    This is equivalent to saying that the work performed by a law firm associate
24  licensed in New York who appears *pro hac* at trial in this Court is engaged in non-
    exempt work or that a judge's law clerks awaiting their bar results are non-exempt.
    To state that proposition is to refute it.
25  [3]    California Wage Order 4-2001 is codified as 8 Cal. Code Regs. § 11040.
    [4]    Judge Karlton, realizing that "substantial grounds for difference of opinion"
26  existed as to his conclusion and others in his order, certified his ruling for
    immediate discretionary appeal under 28 U.S.C. § 1292(b).  *See* Dkt. No. 20, Ex. 3
27  at 43.  As of this writing, the Ninth Circuit has not yet acted on the petition.

28

while we think it is flat wrong, it is certainly premature. For purposes of this motion, it must be assumed that the merits <u>could</u> be decided the other way. It is not appropriate for plaintiff to predicate his argument in favor of certification on the notion that he will win on the merits that the learned professional exemption cannot possibly apply, especially where the long-standing state and federal interpretations have resolved that issue against him.

Applying the proper standard -- that is, refusing prematurely to consider and effectively resolve plaintiff's argument on the merits -- it is apparent that if the merits were resolved in favor of recognizing the decades of federal and state law that has accepted that unlicensed accountants can qualify for the subsection (b) "learned professional" exemption, plaintiff's allegedly single "common" question evaporates, and numerous individual issues leap out. Those include: is the employee engaged in work that fits the requirements of the exemption (e.g., is the employee engaged in "work requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study"), does the employee spend more than 50% of his or her time doing that work, and does he or she exercise the requisite discretion and independent judgment?

As we demonstrated above (*see* Section II, B), the work performed, and the amount of discretion and independent judgment being exercised in performing it, varies, certainly as between associates and seniors (as Judge Karlton also recognized), and also as between A1s and A2s (the former are still in the learning phase and, of necessity, certainly exercise a lesser degree of discretion and judgment than the latter). With regard to seniors, in addition to the fact that the evidence shows that they spend the majority of their time acting as the "in-charge" persons on audits, preparing the audit plan, interacting directly with clients, communicating with Grant Thornton managers and partners, and supervising and reviewing the work of junior associates, one only needs recognize the undisputed

GRANT THORNTON LLP'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

fact that some seniors have their CPA licenses and others, while fully qualified for the license but for whatever reason opt not to get it (like plaintiff), do not. The former are excluded from the class; the latter are not. That is not rational.

Furthermore, Grant Thornton's declarations also show that the degree of "supervision" employees receive varies from person to person, task to task, and manager to manager. But it goes deeper than that: literally, to determine whether a given employee meets the eligibility criteria for the exemption, it is necessary to know, on an individual basis, the actual work performed and how it is performed.

These questions, each of which must be answered to determine whether any given employee is "exempt," completely predominate the analysis, rendering class treatment inappropriate.

### c. Plaintiff's Third Alleged "Common" Question: The "Administrative" Exemption Does Not Apply To The Work Done By Purported Class Members

Plaintiff's approach here is identical to his treatment of the "learned professional" exemption issue: he claims he is (allegedly) likely to prevail on the merits; hence, there is a single common issue.

Again, plaintiff's merits-based approach is premature. In addition, the conclusions he purports to reach using that approach -- that purported class members are not performing "administrative" work as defined in the exemption and that even if they were, they are subject to greater than "general supervision" disqualifying them from the exemption -- are both incorrect.

As to the former, Grant Thornton has submitted evidence showing that unlicensed auditors -- the very people plaintiff wishes to include in the purported class -- do work that is directly related to the management policies or business operations of Grant Thornton's clients. *See* Davila Decl. ¶¶ 16, 26-30. Auditors (including unlicensed purported class members) either directly provide, or perform work that is "directly and closely related" to providing, advice and feedback to

clients' boards of directors, audit committees and management regarding the clients' internal control systems and financial reporting compliance and policies. *Id.*; *see also* 8 Cal. Code Regs. § 11040(1)(A)(2)(f) (exempt work and work that is "directly and closely related" to exempt work both qualify); *see also Bothell*, 299 F.3d at 1127 n.4 (citing *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 540 (7th Cir. 1999)) (noting that "tax auditor was not production worker" and was therefore eligible for "administrative" exemption).

As to the latter, plaintiff's theory is predicated on his interpretation of Business & Professions Code § 5053's statement that unlicensed accounting professionals must work under "control and supervision." As the arbiter of what the statute allegedly means, he claims (without support in the statutory language) that "supervised" means more than "general supervision," the phrase included in the administrative exemption, even though the statute does not say that. Plaintiff is wrong again. First, the meaning of "general supervision" is illustrated by a federal regulation the IWC incorporated in the state exemption, 29 C.F.R. § 541.202(c): that provision refers to the employee being free from "immediate" supervision. Thus, it is a reasonable conclusion that where the employee is not subject to "immediate" supervision, he or she is performing his or her work under only "general" supervision, and meets the exemption's requirements. As the evidence Grant Thornton has presented illustrates, that is the case with its associates.

Second, as explained by Professor Davila, nothing in the Business & Professions Code section, the professional standards set forth by the AICPA, or any other source of law or regulation, requires anything more than "general supervision" of unlicensed auditing personnel, and the clear industry practice in the auditing profession as it is practiced today is to provide only such "general supervision." *See* Davila Decl. ¶¶ 19, 44, 47, 49.

Of course, as Professor Davila also recognizes, the quantum of actual supervision varies from manager to manager, associate to associate, and task to

task, with the more complicated tasks likely calling for greater supervision than the simpler ones. Applicable professional standards, *e.g.*, AU 311A.11, recognize and specifically provide for these differences. *Id.* ¶ 49. Wirth's personal experience -- and that of numerous other A2s and SAs who have served as the "in-charge" on an audit -- prove this point: there is no on-site supervision, much less "immediate" supervision. In this context, supervision is, by definition, only "general." Even with respect to A1s under the supervision of an A2 or senior, their supervision is also "general:" they are assigned specific tasks and their work is only reviewed later; no one is reviewing or checking everything they do (or fail to do). DaSilva Decl. ¶11; Rebholtz Dep. 46:17-20; Allustiarti Decl. ¶11; Wong Decl. ¶ 5.

### d. Plaintiff's Final Alleged "Common" Issue: Whether These Associates and Seniors Can Or Do Exercise Discretion And Independent Judgment

Plaintiff's claim here is similar to his claim about "supervision." He appears to claim that because the Business & Professions Code requires "control and supervision," and because Grant Thornton's policies allegedly "specifically prohibit" associates and seniors from exercising autonomy in performing their work (of which plaintiff offers no evidence), *see* Dkt. No. 19 at 15, this seemingly fact-intensive question can be answered on a blanket basis.

Not so. Grant Thornton's policies do no such thing, and plaintiff offers no evidence that they do. Plaintiff claims, without proof, that the audit software Grant Thornton uses is so detailed, specific, and "cookbook," that no discretion or judgment is left to be exercised. This is tantamount to saying that literally anybody can perform a financial audit; that so doing is so rote and formulaic that an associate does not need to have his or her "head in the game" at all to do it.

As the declaration of John Majors and the attachments thereto illustrate in graphic detail, plaintiff's "cookbook" theory -- while convenient for his argument here -- is absolutely false. *See* Majors Decl. ¶¶ 5-9, 11-12, 16-22. The audit

program provides only general direction. *Id.* ¶¶ 5, 12, 16-22. The conduct of an audit requires constant discretionary and judgmental decision-making. *Id.* ¶¶ 12-22. All of the declarations submitted by Grant Thornton, from a variety of accountants at various levels, amply illustrate this rather obvious proposition.

The evidence provided by Grant Thornton establishes not only that audit associates are expected to exercise discretion and independent judgment, but also that they are absolutely required to do so if they are to do their jobs properly. That is not to say that more junior associates do not have questions, receive guidance, or that the matters on which they exercise judgment and discretion may not be as critical or complex as those assigned to seniors. Rather, associates and seniors exercise judgment and discretion at varying levels. Whether the differences in the exercise of that judgment and discretion are material to either exemption, and whether that exercise pertains to a matter of substantial importance, can only be determined by individual inquiry.

### 3. Plaintiff Cannot Satisfy Rule 23(b)(3)'s "Superiority" Requirement Either

Even if "predominance" existed, which is does not, plaintiff is required to show that a class action is the "superior" method for litigating the issues presented. Two "superiority" factors -- difficulty in managing the action, and the interest of absent purported class members in "individually controlling" their own claims -- are particularly relevant here. Neither supports "superiority."

The former is obvious: because the analysis of whether an employee is "exempt" or not requires detailed consideration of each individual's job duties, degree of supervision and degree of discretion and judgment, manageability is impossible. *Marlo*, *Sepulveda* and *Jimenez* all reached this same conclusion.

With respect to the second factor, absent class members have two main reasons to control their own litigation. First, Mr. Wirth's unique experience at Grant Thornton, including that he was hired at the A2 level, did specialized work,

never held the job many of them held, never worked with most of them, never worked in the offices they worked in, never worked for the managers they worked for, and demonstrated such a poor work record that he was put on a performance plan and involuntarily terminated, render him entirely unsuitable as class representative. He is hardly "representative."

Second, these associates and senior associates are highly paid and their potential damages, were there liability, would be substantial. *See, e.g.,.* Sentino Decl. ¶ 2. That raises a presumption they would prefer to control their own litigation. *See, e.g., Zinser,* 253 F.3d at 1190-91 (superiority not established where damages exceeded $50,000 per class member); *Cima v. WellPoint Health Networks, Inc.,* 250 F.R.D. 374, 384 (S.D. Ill. 2008) (same where damages were in tens of thousands); *Benner v. Becton Dickinson & Co.,* 214 F.R.D. 157, 173 (S.D.N.Y. 2003) (same). Further, that attorneys' fees are recoverable for claims like these negates concern that a willing plaintiff might go unrepresented. *Azoiani v. Love's Travel Stops and Country Stores, Inc.,* 2007 WL 4811627 at *3 (C.D. Cal. Dec. 18, 2007); *Mathews v. Book-of-the-Month Club, Inc.,* 62 F.R.D. 479 (N.D. Cal. 1974). Both factors defeat "superiority."

## IV. CONCLUSION

Defendant Grant Thornton respectfully requests that the Court deny Plaintiff's Motion for Class Certification with prejudice.

DATED: June 23, 2009                    Bingham McCutchen LLP


By: _____/S/_____
                     James Severson
               Attorneys for Defendant
               GRANT THORNTON LLP

GRANT THORNTON LLP'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

William A. Kershaw, State Bar No. 057486
Lyle W. Cook, State Bar No. 148914
Stuart C. Talley, State Bar No. 180374
**KERSHAW, CUTTER, & RATINOFF LLP**
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 448-9800
Facsimile:  (916) 669-4499

Attorneys For Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL WIRTH, an individual, | Case No.: CV09-0832 RGK SSx |
| Plaintiff, | **PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| vs. | |
| GRANT THORNTON LLP, an Illinois limited liability company; and DOES 1-10, inclusive, | Date:  July 20, 2009 Time: 9:00 a.m. Location: Courtroom 850 Hon. R. Gary Klausner, United States District Judge |
| Defendants. | |

## I.    **INTRODUCTION**

Defendant Grant Thornton LLP ("GT") contends in its opposition that the class should not be certified because the question of whether it misclassifies its associates "requires, as a matter of law, an individualized inquiry." To support this contention, GT points to many alleged "differences" in the day to day duties of audit associates and asserts that these differences make it impossible to decide this case through class wide evidence.

However, the many "differences" cited by GT are not relevant to the outcome of this litigation. The ultimate outcome of this case will not be determined through an examination of the day to day activities of class members but, rather, can be decided on behalf of the entire class by examining just two issues: 1) is a CPA license required to satisfy the Professional Exemption; and 2) do the extensive policies and procedures used by GT to review and supervise the work of Class Members constitute the type of "general supervision" that is necessary to satisfy the Administrative Exemption?

With respect to the first issue, there is no dispute that it can be decided on a class wide basis. In fact, it can be decided for the entire class by merely examining the statutory language underlying the Professional Exemption.

With respect to the second issue, this too can be decided through common evidence since the work of all class members is supervised in a uniform way pursuant to standard written policies and procedures. As explained more fully below, the *minimum* level of supervision outlined in these policies and procedures occurs with respect to *all* class members working on *all* assignments for *every* client. As such, GT's repeated mantra that "every audit is different" and "each employee is different" is irrelevant. The truth is that although the day-to-day duties of class members may differ depending on the client etc., the manner by which their work is supervised is *always* the same.

*Campbell v. PricewaterhouseCoopers,* provides the perfect example of how this case can be decided on a class wide basis. After certifying a class of audit associates, the Court then granted summary judgment in favor of the class on the misclassification

-1-

question. *See Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586 (E.D. Cal. 2008); *Campbell v. PricewaterhouseCoopers, LLP*, 602 F. Supp. 2d 1163 (E.D. Cal. 2009). In reaching its decision on Summary Judgment, the court did not extensively examine the day-to-day duties of class members or their level of education. Rather, it simply interpreted the statutory language of the Professional Exemption and determined that a license was required to satisfy the exemption. With respect to the Administrative Exemption, the court looked to the uniform polices and procedures the defendant utilized to extensively review the work of class members. The court found that these policies precluded the performance of work under "general supervision." As such, the Administrative Exemption did not apply. The facts and issues presented here are absolutely identical to those addressed by the court in *Campbell*.

## II. THE PROPOSED CLASS SATISFIES THE RULE 23(b)(3) PREDOMINANCE REQUIREMENT

GT devotes virtually its entire opposition to exploring the differences in the day-to-day duties of class members. GT contends that common issues do not predominate in this case because there is a "developmental continuum," that affects the duties, responsibilities, and the exercise of discretion throughout the class. Although plaintiff would concede that a "developmental continuum" exists and that there is variance in the day-to-day work of an auditor, GT simply fails to recognize that it is the manner of *supervising* these day-to-day duties that matters in this case. The real question is not what class members do; but rather, how they do it. If every class member is subject to something more than "general supervision" this is an outcome determinative issue that can be decided on behalf of the entire class. Likewise, the issue of whether a license is required is also an outcome determinative issue in this case. As demonstrated in the *Campbell* decision, if common evidence can be used to decide either of these two issues alone, then the class should be certified.

### A. The Professional Exemption

The issue on the merits is whether *unlicensed associates* qualify for the

-2-

Professional Exemption. This, in turn, presents the substantive issue for class certification. GT's opposition brief argues that there is no license requirement for the recognized profession of accounting. However, this argument applies equally to all members of the proposed class. In fact, it is difficult to conceive of an issue more suited to or deserving of class treatment than the issue of whether a license is required for the Professional Exemption in the recognized profession of accounting. The significance of the license issue supports a finding of predominance. *See Hanlon*, 150 F. 3d at 1022.

After arguing that it can avoid the specific license requirement found in subdivision (a), for reasons that apply equally to the entire class, GT then argues that the learned exemption, found in subdivision (b), is not suitable for class adjudication. Not so. As the *Campbell* court correctly recognized, under California law the defendant employer "would need to prove that the class members are primarily engaged in an 'occupation commonly recognized as a learned or artistic profession.'" *Id.* The predicate for the learned exemption is, therefore, a "qualifying occupation;" not some individual level of educational attainment. Therefore, the necessary inquiry focuses on whether the individual *is employed in a qualifying occupation*. There is no doubt that an examination of the class members' "occupation" does not require an individual inquiry. The "occupation" is the same for the entire class.

## B. The Administrative Exemption

### 1. General Supervision

In order to qualify for the Administrative Exemption, GT is required to show that the work of class members is *subject to only general supervision*. *See* Cal. Code Regs. tit. 8, §11040(1)(A)(2)(d). Accordingly, the primary inquiry for class certification will be "how" are class members supervised on a day to day basis and is this method of supervision uniform throughout the class.

The evidence in this case overwhelming demonstrates that the question of "how" class members are supervised is constant, uniform, and carried out in a way that has absolutely no bearing on the individual characteristics, experience, education, or work

history of any particular class member.  (Reply Declaration of Stuart C. Talley filed herewith ("Talley Dec."), Ex. 2 at 21:25-22:15.)  GT's written policies are specifically in place to comply with the law and professional standards requiring all class members to be "supervised and controlled."  (Ex. 5 at GTW-001047; Ex. 3 at 16:1-17:17; Ex 5 at GTW-001047.)  Moreover, this supervision is required regardless of whether the class member is an A1 or S3, has 10 years experience or 1 day experience, and regardless of whether the audit is of a small non-profit entity or a Fortune 500 company.  (Ex. 2 at 21:25-22:15; 29:4-21; 46:3-24; Ex. 3 at 11:14-22; 19:8-20:25; Ex. 4 at 14:6-18.)

Specifically, it is undisputed that GT has uniform written policies and procedures that spell out in great detail exactly how and when class member's work will be reviewed and supervised.  (Ex. 3 at 53:25-54:23.)  These procedures stress, in no uncertain terms, the importance of adequate supervision.

> "Supervision is vital to engagement planning and is essential to audit effectiveness and the satisfactory accomplishment of all assignments. Supervision includes directing and reviewing the work of subordinates by the person responsible.
> . . .
> Supervision is always required to make any plan effective.  Inadequate *control* over personnel performing work or poor timing or quality of work, in relationship to the engagement plan and risk assessments, negates the advantage of planning."  (Ex. 6 at GTW-002583.)

In order to achieve the required level of "control," GT's written policies lay out a uniform detailed procedure whereby *all* the work of Class Members is subject to a highly detailed review.  (Ex. 3 at 11:6-13; 53:25-54:23.)  Again, the importance of complying with these review procedures with respect to *all* work performed by Class Members is stressed throughout these manuals and in GT's training materials.

> "Review procedures are an integral part of applying due professional care, and their importance cannot be overemphasized.  *Every financial reporting engagement*, regardless of its nature or size, is subject to appropriate review."  (Ex. 7 at GTW-002807.)

GT's written policies lay out a detailed unvarying review process that assigns various roles for every audit engagement.  In the performance of the audit, all Class

-4-

1  Members are expected to document, in detail, all work performed and any significant

2  decisions made in the performance of an audit step.  (Ex. 6 at GTW002579; Ex. 3 at

3  10:10-21; Ex. 4 at 13:17-14:5.)  All of these work papers are then subject to immediate

4  review by a superior.  (Ex. 3 at 10:10-21; Ex. 4 at 15:2-20; Ex. 5 at GTW-001047.)  In

5  fact, GT's written polices specifically provide that the work of Associates will always be

6  "directly supervised" and reviewed by a superior.  (Ex. 6 at GTW-002581.)  All of the

7  work of the Senior Associate, including his review of subordinate employees, is then

8  reviewed by the Engagement Manager.  (Ex. 2 at 23:19-24:10; Ex. 4 at 18:2-19:15.)  If

9  potential fraud or other problems are encountered by the Senior Associate during the audit

10  they are expected to promptly notify the engagement manager or partner.  (Ex. 3 at 28:1-

11  18.)

12  The review that takes place at each level involves looking at *all* of the work

13  performed by the class member.  This includes ensuring that appropriate procedures were

14  followed to checking math, data entry, and grammar.  (Ex. 2 at 19:5-20:4; Ex. 4 at 16:6-

15  18:1.)  This review occurs with respect to *all* audit steps performed by Class Members and

16  occurs throughout the audit process.  (Ex. 2 at 26:22-27:7; 28:15-29:3; Ex. 3 at 11:6-13;

17  Ex. 4 at 19:16-20:20.)  Specifically, GT's written policies provide:

18
19  "Review of work papers should not be done at the end of the audit.  While
    the immediate supervisor is *continuously exercising control* over the
20  members of the audit team, his or her own direct application of procedures
    or other responsibilities should not take precedence over the need to review
21  completed sections. *All reviewers should review each audit section as soon
    as possible after its completion to minimize inefficiencies and adequately
22  address issues."*  (Ex. 6 at GTW-002583; see also Ex. 8 at GTW-001016.)

23  Additionally, the evidence establishes that this "review process" applies to Senior

24  Associates (of all levels) as well as Associates.  Although Senior Associates spend more

25  time supervising those below them, all of the work of the Senior Associates, including

26  their review of the work completed by subordinates, is reviewed by the Engagement

27  Manager.  (Ex. 2 at 23:19-24:10; Ex 3 at 21:16-30:13.)  GT's written policies state, as part

28  of this review, that the Manager is expected to verify that "the audit documentation is

-5-

complete, appropriately reviewed, and supports that auditor report." (Talley Dec., Ex 6 at GTW-002580.) Additionally, the Manager is required to ensure that all review notes issued by the Senior Associate to the individual below them were properly cleared by the Associate. (*Id*.) It is this multilayered review process that is the cornerstone of GT's Quality Assurance Policies.

Ignoring the policies outlined above, GT's opposition attempts to argue that the work of class member is not subject to "general supervision" because the work of some class members is not subject to "immediate supervision." Citing to a Federal Regulation addressing the exercise of independent judgment and discretion, GT argues that "supervision" can only be one of two things: "immediate" or "general." GT's argument misses the point.

As the court in *Campbell* recognized, there is a difference between the "immediate supervision" referenced in the subsections dealing with "discretion and judgment" and the separate independent requirement in the Administrative Exemption that employees perform work under "general supervision." Specifically, the court found that there is much more to the meaning of "general supervision" than the "immediacy" by which the supervision occurs. *Campbell v. PricewaterhouseCoopers, LLP*, 602 F.Supp.2d 1163, 1184 (E.D.Cal. 2009). Common sense dictates that an inevitable detailed review occurring with respect to *all* the work performed by an individual is not "general supervision" whether it is "immediate" or not. This understanding is entirely consistent with the dictionary meaning of the word "general" as "involving only main features, not detailed or specific." *Oxford American Dictonary*, 1986 Ed. Here, GT's uniform policies and procedures expressly require a detailed, specific, and inevitable review of *all* the work performed by *all* Class Members. The review is, in any event, immediate in the relevant sense because no work can go forward *until* the work is cleared by means of a detailed review.

### C. Independent Judgment On Matters of Significance

In order to satisfy either the Professional or Administrative Exemptions, GT must

also show that Class members "customarily and regularly exercise discretion and independent judgment in performing duties." As one might expect, the regulations expressly provide that the level and type of *supervision* exercised over the employee is critical for purposes of determining whether the judgment and discretion they exercise is truly "independent." Specifically, the law provides that the exercise of discretion and independent judgment "implies that the person has the authority or power to make an independent choice, *free from immediate direction or supervision* and with respect to matters of significance." 29 C.F.R. § 541.202(c). *See* Cal. Labor Code § 515(a).

As described above, the manner in which the work of class members is supervised and directed is uniform and constant throughout the class. As one might expect, these policies and procedures are designed to ensure that class members, who are often in their early 20s and have little to no experience, are not the ones making important final decisions with respect to matters of significance. Although they may make decisions on a day-to-day basis, GT's policies require *every* decision of significance to *always* be reviewed by a superior. (Ex. 2 at 17:8-18; 20:5-9; 49:20-23.) In fact, GT's uniform policies and procedures do not even permit class members to sign their names or send any type of written communication to the client (even transmittal letters), unless the letter is first approved by a superior. (Ex. 7 at GTW002837.)

It is undisputed that this review process, applies to *all* decisions made by *all* class members on *all* audits. In fact, nowhere in GT's opposition does it point to even a single instance where a class member has made a decision on a "matter of significance" that was made "*free from immediate direction or supervision."* The reason for this is clear. The professional rules and standards regulating GT's business expressly require class members to be "controlled and supervised;" the antithesis of performing work "free from immediate direction and supervision."

The situation here is like that of the legal profession. By law, both accountants and attorneys must be licensed if they are to legally provide professional services. In both professions the licensed professionals may provide their clients with advice on matters of

-7-

significance.  Likewise, in both professions the licensed professionals routinely receive the highly skilled support of their unlicensed staff.  But the delegated and supervised work of assistants to licensed CPAs cannot be understood as independent any more than can the delegated and supervised work of legal assistants or paralegals.  In a U.S. Department of Labor letter this precise issue was raised in the context of work performed by a senior legal analyst.  (RJN, Ex. 1.)  The essential point of the letter was that performing work, using particular skills and knowledge in researching and preparing reports, does not qualify as exempt work because "it is the [licensed] attorneys who exercise discretion and independent judgment because they receive and decide whether and how to act on the information in the [senior legal analysts] reports."  *Id.* at p. 3.  The same is admittedly true with respect to unlicensed associates assisting licensed CPAs, none of whom are given authority to "waive or deviate from established policies, provide expert advice, or plan business objectives in accordance with the dictates of § 541.202(b)."  *Id.*

## III.  PLAINTIFF IS AN ADEQUATE REPRESENTATIVE AND HIS CLAIMS ARE TYPICAL OF THE CLASS

In what can only be described as a mean spirited and baseless attack on plaintiff's work performance, GT argues that the plaintiff is not a typical or adequate class representative because 1) he did not work in every single classification within the Associate and Senior Associate positions and 2) he had a "spotty work record" and "generally [failed] to satisfy the requirements of his position."  Both of these arguments are without merit.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  The Ninth Circuit has consistently held that "[u]nder the rule's *permissive* standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical."  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).  "It is enough if their situations share 'a common issue of law or fact' and are 'sufficiently parallel to insure a vigorous and full presentation of all claims for relief.'"  *California. Rural Legal*

1  *Assistance, Inc. v. Legal Services Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990) (citations
2  omitted).

3      The typicality requirement has been found to be satisfied where the challenged
4  conduct is a policy or practice that affects all class members. *See Armstrong v. Davis,* 275
5  F.3d 849, 868-869 (9th Cir. 2001). That is surely the case where GT has allegedly
6  misclassified all members of the proposed class. Plaintiff has the same claims as the
7  proposed class for overtime and other wage and hour damages and penalties and these
8  claims arise from the same predicate allegation of misclassification. "It is sufficient for
9  plaintiffs' claims to 'arise from the same remedial and legal theories' as the class claims."
10 *Cornn v. United Parcel Service, Inc.*, 2005 WL 588431 (N.D. Cal. 2005) at *7, quoting
11 *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 449 (N.D. Cal. 1994); *see*
12 *also Kurihara v. Best Buy Co., Inc.*, 2007 WL 2501698 at *7 (N.D. Cal. Aug. 30, 2007).

13     Additionally, the defendant has demonstrated no practical difference in the claims
14 of any of the various grades of Associates and Senior Associates. The plaintiff contends
15 that *everyone* from A1 through S3 was unlicensed. Hence, with respect to the
16 Professional Exemption, the legal theory on which it is based for all class members is
17 identical. With respect to the Administrative Exemption, the evidence shows that *all* of
18 the work of Associates (A1 through A2) and Senior Associates (SA1 through SA2) is
19 subject to the same supervisory review process outlined above. (Ex. 2 at 54:3-19.)

20     With respect to GT's claim that the work performance of the plaintiff somehow
21 makes him inadequate, its reasoning is flawed for two reasons. First, plaintiff's work
22 history entirely fails to demonstrate the lack of performance that GT claims. Throughout
23 his employment, plaintiff received consistent pay raises, was promoted, and received
24 satisfactory performance reviews. (Talley Dec. at ¶¶ 3-7; Ex. 1; Ex 3 at 40:13-22.)
25 Second, even if the evidence showed that plaintiff was somehow less than the optimal
26 employee, *nowhere* does the defendant explain how his alleged poor performance has any
27 bearing on his claims in this case. It is undisputed that poor, as well as good, performers
28 did not have a license during the class period. It is also undisputed that poor, as well as

1  good performers, were subject to the same immediate and detailed supervision. (Talley

2  Dec. Ex. 3 at 52:21-53:3.) Plaintiff's supervisor, Ryan Dillard, said it best:

3      "Q: Now it's true that if you have an associate who exercises sound judgment all
4      the time, you as the senior associate are still going to review all their work; is that
       true?
5      A: Yes.
       Q: And so an associate who's a bad associate who rarely exercises good judgment,
6      you're still going to look at his work too, correct?
       A: Yes.
7      Q: So whether an associate has good or bad judgment has no impact on whether
       their work will be reviewed by a senior associate; is that true?
8      A: It - - yeah. It will need to be reviewed by someone." (Ex. 2 at 69:5-18.)

9      As such, any alleged performance issues are entirely irrelevant to any of the class

10 claims in this case.

11 **IV.   CLASS RESOLUTION IS SUPERIOR TO OTHER METHODS**

12     This proposed wage and hour class action is superior for all the reasons recently

13 given by the California Supreme Court. *See Gentry v. Superior Court*, 42 Cal. 4th 443,

14 457-65 (2007). GT does not address these reasons or the case authority cited by Plaintiff

15 in support of a superiority finding.

16
17 **V.   TO THE EXTENT THE COURT IS INCLINED TO DENY PLAINTIFF'S**
       **MOTION, HE SHOULD BE GIVEN ADDITIONAL TIME TO CONDUCT**
18     **DISCOVERY**

19     As explained in plaintiff's Ex Parte Motion to Continue Hearing Date, plaintiff has

20 been unable to depose the defendant's expert, obtain a list of class members, or depose all

21 of the class members who submitted declarations in this case. Therefore, to the extent the

22 court is inclined to deny plaintiff's motion based on any of the evidence submitted by

23 defendants, fundamental fairness requires that it should, instead, grant plaintiff additional

24 time to complete the discovery that has been sought in this case.

25 Dated: July 10, 2009.              KERSHAW, CUTTER, & RATINOFF, LLP

26

27                                    By: _____/s/ Stuart C. Talley_____
                                          STUART C. TALLEY
28                                        *Attorneys for Plaintiff*

-10-

# EXHIBIT C

William E. Harris (SBN 76706) wharris@harriskaufman.com
Matthew A. Kaufman (SBN 166986) mkaufman@harriskaufman.com
Arin Norijanian (SBN 260936) anorijanian@harriskaufman.com
HARRIS & KAUFMAN
15260 Ventura Blvd, Suite 2250
Sherman Oaks, CA 91403
Tel: (818) 990-1999

ADDITONAL CO-COUNSEL LISTED ON THE NEXT PAGE

Attorneys for Representative Plaintiffs Brandy Blaske,
David Lee, Julia Longenecker, Svetlana V. Murphy,
and all individuals similarly situated including the
putative class member Stepan Mekhitarian

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPAN MEKHITARIAN, an individual, BRANDY BLASKE, an individual, DAVID LEE, an individual, JULIA LONGENECKER, an individual, SVETLANA V. MURPHY, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>DELOITTE & TOUCHE, LLP, a Delaware Limited Liability Partnership; and DELOITTE TAX, LLP, a Delaware Limited Liability Partnership,<br><br>DEFENDANTS. | Case No.: CV 07-0412 DSF (MANx)<br><br>**PLAINTIFFS' SUPPLEMENTAL POINTS AND AUTHORITIES IN SUPPORT OF CLASS CERTIFICATION [INFORMATION SUBJECT TO JULY 10, 2007, PROTECTIVE ORDER REDACTED]**<br><br>[Filed concurrently with the declarations of Matthew A. Kaufman and Marc L. McCulloch]<br><br>Hearing Date: October 19, 2009<br>Time: 1:30 pm<br>Courtroom: 840<br><br>Assigned for all purposes to the Hon. Dale S. Fischer |

**ADDITIONAL CO-COUNSEL THAT COULD NOT FIT ON THE CAPTION:**

Armond Marcarian, Esq. (SBN 213883) armond@marcarianlaw.us
Marc L. McCulloch, Esq. (SBN252526) marc@marcarianlaw.us
MARCARIAN LAW FIRM
15260 Ventura Boulevard, Suite 2250
Sherman Oaks, CA 91403
Telephone: (818) 995-8787
Facsimile: (818) 995-8817

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................1

II.     THE CONTINUUM THEORY IS BASED ON THE FALSE ASSUMPTION THAT MORE COMPLEX DUTIES MEANS THE DUTIES ARE MORE LIKELY EXEMPT.................................... 2

III.    SUMMARY OF ARGUMENT:  THE EXEMPTIONS DO NOT CONSIDER COMPLEXITY OF DUTIES OR THE CONTINUUM.  THE SAME EVIDENCE SHOWS ALL CLASS MEMBERS ARE NON-EXEMPT. ...............................................................................4

IV.     THE PROFESSIONAL EXEMPTION REQUIRES THE COURT TO EXAMINE THE SAME FACTS FOR EVERY CLASS MEMBER, AND THEREFORE THE CONTINUUM THEORY IS IMMATERIAL. ..............6

        A.    As A Matter Of Law, Accounting Employees Cannot Be Exempt Under The Learned Professions Exemption. ........................................7

        B.    Alternatively, The "Learned Professions" Exemption Cannot Apply To Any Class Member Because Not One Practices Public Accountancy. ..................................................................8

V.      THE ADMINISTRATIVE EXEMPTION REQUIRES THE COURT TO EXAMINE THE SAME FACTS FOR EVERY CLASS MEMBER...........11

        A.    The Heavy Supervision Of All The Class Members Defeats The Application Of The Administrative Exemption. .................................12

              1.    The "engagement team" process ensures constant supervision of all class members. .................................................13

              2.    Deloitte's discharge of its legal and ethical duties ensures constant supervision. .................................................15

              3.    Deloitte provides constant supervision to all class members notwithstanding their place on the Continuum. .......................17

        B.    Contrary To The Administrative Exemption, Class Members Do Not Perform Work "Directly Related" To The Management Policies Or General Business Operations Of Deloitte Or Its Clients.  Rather, They Are "Learning A Profession." ..................................................18

        C.    Where Class Members place on the Continuum Spectrum depends on the Development of their skills, not their Discretion and Independent Judgment ......................................................................19

VI.     SINCE DEFENDANTS CANNOT ESTABLISH ANY DEFENSE TO THE OVERTIME EXEMPTIONS, THIS ACTION SATISFIES ALL OF THE REQUIREMENTS OF Rule 23. ...............................................20

VII.    PLAINTIFFS ARE ADEQUATE REPRESENTATIVES .........................23

VIII.   PLAINTIFFS ARE TYPICAL OF THE CLASSES ..................................24

i

1

IX.   CONCLUSION ..................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

# TABLE OF AUTHORITIES

**FEDERAL STATUTES**

26 U.S.C. §6694(a*)* ................................................9

**FEDERAL REGISTER**

"List of Subjects in 29 CFR 541," 69 Fed. Register 22260 (April 23, 2004) ....8

**CODE OF FEDERAL REGULATIONS**

29 CFR 541.205(a) ................................................18

29 CFR 541.205(c) ................................................18

29 CFR 541.205(d) ................................................18

29 CFR 541.207(a) ................................................19

29 CFR 541.207(b) ................................................20

29 CFR 541.207(c) ................................................20

29 CFR 541.207(d) ................................................18

29 CFR 541.207(g) ................................................19

29 CFR 541.308(b) ................................................8

29 CFR 541.310 ................................................9

**FEDERAL CASES**

*Campbell v. Pricewaterhouse- Coopers, LLP*, 602 F. Supp. 2d 1163 (E.D. Cal. 2009) ................................................passim

*Campbell v. PricewaterhouseCoopers, LLP,* 253 F.R.D. 586 (E.D. Cal. 2008). ................................................24, 25

*Hanlon v. Chrysler Corp.* 150 F.3d 1011, 1026 (9th Cir. 1998)................23, 24

*Mevorah v. Wells Fargo Home Mortg. (In re Wells Fargo Home Mortg.)* 571 F.3d 953, 958 (9th Cir. Cal. 2009) ................................................20, 21, 22

*Vinole v. Countrywide Home Loans, Inc.* 571 F.3d 935, 946 (9th Cir. Cal. 2009) ...................................................................................................21, 22

**CALIFORNIA STATUTES**

*Business & Profession Code* §5050 ......................................................9

*Bus. & Prof. Code* §5053 .............................................................9, 19

*Business & Professions Code* §5051 ...........................................9, 13, 18

*Business & Professions Code* §5052 .................................................18

*Business & Professions Code* §5120 ...................................................9

**CALIFORNIA CODE OF REGULATIONS**

8 CCR §11040 1.(A)(2)(b) ..............................................................19

8 CCR §11040 1.(A)(2)(c) ..............................................................19

8 CCR §11040 1.(A)(2)(d) ..............................................................12

8 CCR §11040 1.(A)(2)(f) ........................................................11, 12, 18

8 CRC §11040(1)(A)(3)(a) ...............................................................6

8 CRC §11040(1)(A)(3)(b) ............................................................6, 8

**CALIFORNIA CASES**

*Nordquist v. McGraw-Hill Broadcasting Co.*, 32 Cal. App. 4th 555 (1995)....7

*Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785 (1999) .................................7

*Sav-On Drug Stores, Inc. v. Sup. Ct.*, 34 Cal. 4th 319 (2004) ........................2

## I. INTRODUCTION

The issue on this motion is whether, notwithstanding defendants' "Continuum" theory asserted in its Opposition, plaintiffs can prove under FRCP Rule 23 adequacy of representation, typicality, and a predominance of common facts and issues. The answer is a resounding "Yes!"

This brief supplements Plaintiffs' second motion for class certification. On the first motion for class certification, plaintiff Stepan Mekhitarian moved to certify two classes of defendant, Deloitte & Touche, LLP, and defendant, Deloitte Tax, LLP's (collectively "Deloitte") California employees, i.e., "Tax Associates" ("TAs") and "Tax Seniors" ("TSs") who are not licensed Certified Public Accountants ("CPAs") or licensed attorneys. Plaintiff contended that the classes should receive judgment against Deloitte for overtime pay under California's Wage Order No. 4-2001 ("Wage Order 4"), 8 CCR §11040. The Court found that plaintiff Mekhitarian proved the elements of Rule 23 except that he was inadequate as a representative plaintiff, so the Court denied the motion without prejudice with leave to plaintiff to find an adequate representative.

On the second motion for class certification, plaintiff proposed new class representatives, but defendants advanced a new theory, namely that each TA's and TS's career evolved on a "developmental continuum." Opp. 1:12. To Deloitte, this meant that some class members performed "more complex and more clearly exempt duties" than others. Id. 1:13. Deloitte further argued that based on their "Continuum" theory, plaintiffs could not establish adequacy, typicality, or a predominance of common legal and factual issues under Rule 23. The Court found that Deloitte sought a "do-over" of class certification by presenting a new theory, and the Court permitted Plaintiffs to take discovery and address Deloitte's new showing.

The Continuum theory does not relate to predominance because it does not consider the evidence required to fulfill the overtime exemptions. The class

1

members' range of responsibilities from simple to complex— the pillar of the Continuum theory – is not relevant to the exemption analysis. When compared to the exemptions' requirements, the Continuum theory does not address many important elements. On the other hand, evidence applicable to all class members will defeat the exemptions. Thus, predominance exists under Rule 23(b)(3). All class members should receive summary judgment as did a near identical class of accounting employees in *Campbell v. Pricewaterhouse- Coopers, LLP*, 602 F. Supp. 2d 1163 (E.D. Cal. 2009) ("*Campbell*").

Plaintiffs moreover are adequate and typical of the putative classes. Plaintiffs can show all the requirements of Rule 23. The Opposition should be ignored.

## II. THE CONTINUUM THEORY IS BASED ON THE FALSE ASSUMPTION THAT MORE COMPLEX DUTIES MEANS THE DUTIES ARE MORE LIKELY EXEMPT.

The parties agree that "the ultimate issue to be decided in this litigation is whether Plaintiffs and each member of the purported class are exempt or non-exempt." Opp, 3:1-3. Deloitte contends that the class members are exempt "under the professional and/or administrative exemptions or a combination of these exemptions." Exh. 2 at 23:7-8 & 24:27-28.[1] Exemptions are an affirmative defense, and Deloitte has the burden to prove each element of an exemption. *Sav-On Drug Stores, Inc. v. Sup. Ct.*, 34 Cal. 4th 319, 338 (2004) ("*Sav-On*").

In defense to class certification, the Continuum theory highlights competing visions of the TA and TS positions. For the TA position, Deloitte contends that TAs prepare tax returns for sophisticated entities, but plaintiffs contend they format spreadsheets, input data and make copies. Opp. 14. For TSs, Deloitte' contends that "Seniors spend the bulk of their time supervising Associates, answering questions, evaluating their performance, and reviewing and analyzing

---

[1] Unless otherwise noted, all exhibits are attached to the declaration of Matthew A. Kaufman.

tax returns," Opp. 15:6-7, and to a lesser extent, performing administrative duties. Opp. 15. On the other hand, plaintiffs portray the TS position only marginally different from the TA position. Moreover, Deloitte contends that since class members' skills develop at different rates, they are on a developmental continuum. As a result, not every class member does the same work; the opposition uses examples like explaining "the tax basis of fixed assets cost basis roll-forwards," Opp. 15:17, reading trial balances, administrative tasks related to engagements, Opp. 16:3, and identifying tax issues to prepare "compliant" tax returns. Opp. 17:23-24. Some employees performed these tasks, others didn't. Moreover, the class members' work varies based type of return, the client, the length of the engagement, the industry, etc. Opp 17. Deloitte concludes that such differences in duties require individual trials because every person had a different experience.

Deloitte uses this Continuum to argue that individual issues predominate under Rule 23(b)(3). The Opposition assumes that the exemptions only examine duties, and more complex duties means they are more likely exempt. Opp. 11:10-12. The basic reasoning is that in examining duties, someone who inputs data does not have the same overtime case as someone explaining "the tax basis of fixed assets cost basis roll-forwards." As will be shown, this is wrong; the exemptions do not examine complexity of work.

The Continuum theory misleads the Court. In an effort to make the Continuum significant, Deloitte portrays the class members as perilously close to practicing public accountancy without a license – a misdemeanor.[2] Secondly, Deloitte had definite expectations that particular skills would be developed within specific time frames. Bustamonte depo. 219:4-21. Secondly, Deloitte appears to have demanded that one witness, Seo, change her testimony; Seo voluntarily

---

[2] For example, the Opposition takes plaintiff Blaske to task because she did not have any "discretion over the final approval of the (Deloitte) work product." Opp. 16:15-17. Approving work product is practicing accountancy without a license, a misdemeanor. *Bus. & Prof. Code* §§5051, 5120.

1    contacted plaintiffs' counsel to discuss her work.  After this was disclosed in

2    discovery, Deloitte took her declaration which gave a different version of the same

3    work.  *Cf.* Seo decl. *with* McCulloch decl.¶¶2-8.  This implies an impropriety on

4    Deloitte's behalf.  Finally, a large number of TSs have a CPA license.

5    Frimershtein depo. 64:18-65:14, Minter depo. 73:13-74:6.  The class definition

6    excludes CPAs, and California permits them to practice accountancy.  But the

7    Continuum's evidence makes no distinction between employees with and without a

8    CPA license.  Deloitte's Continuum appears based in part on people excluded from

9    the classes, *per se* irrelevant evidence.[3]  Based on how Deloitte presented its

10   evidence, it is impossible to tell whether or not the evidence describes CPAs.

11         Setting this issue aside, the Court should ignore the Continuum theory's

12   challenge to predominance under Rule 23(b)(3), because the Continuum theory

13   does not relate to the exemption analysis.  Exemptions are affirmative defenses,

14   and Deloitte must prove all of an exemption's elements.  Importantly, none of the

15   exemptions examine the complexity of the class members' skills.  The Opposition

16   fails to explain why the Continuum theory affects any exemption.   As shown

17   below, every exemption issue can be resolved by proof applicable to all class

18   members, and this proof does not rely on any aspect of the Continuum theory.  The

19   Opposition should be ignored.  This motion should be granted.

20   **III.   SUMMARY OF ARGUMENT:  THE EXEMPTIONS DO NOT**
21   **CONSIDER COMPLEXITY OF DUTIES OR THE CONTINUUM.**
22   **THE SAME EVIDENCE SHOWS ALL CLASS MEMBERS ARE**
     **NON-EXEMPT.**

23         Under California's Professional Exemption, Deloitte must prove that the

24   class members are exempt under the "Learned Professions" exemption.  Two

25   alternative grounds defeat this exemption.  First, as a matter of law, employees

26

27   [3] For example, Shen's declaration ¶¶8-13 discusses her work as a TS extensively
     during which time she was a CPA.  Cf. Shen decl. ¶¶1, 2 with Exhibit 5.  Hanna ¶3
     talks about her work as a TS, but she was a CPA throughout the entire time.
28   Exhibit 5.  Choi's declaration ¶6 is the same; she was a CPA the entire time she
     was a TS.  Choi depo. 9:3-10:5.

                                          4

1  practicing in a field covered by the "Licensed Professions" Exemption of Wage
2  order 4 cannot be exempt under the "Learned Professions" Exemption. *Campbell*
3  adopted that position in granting summary judgment to a near identical class of
4  accounting employees against a Big 4 accounting firm.

5      A second, alternative ground defeats the "Learned Professions" Exemption,
6  *i.e.*, no class member can actually perform the profession, accountancy. California
7  law defines accountancy broadly, and the law forbids its practice without a CPA
8  license. But the "Learned Professions" Exemption covers only employees
9  "engaged in" the profession. Moreover, the exemption excludes "apprentices,"
10  people "learning a profession," or "trainees," and these phrases aptly describe the
11  class members. Since no class member can practice the profession
12  notwithstanding their place on the Continuum, the Continuum fails to create
13  individual issues.

14      The Continuum theory fails to generate individual issues in the analysis of
15  the Administrative Exemption. Among other things, Administrative Exemption
16  requires that exempt employees work under only "general supervision." Deloitte
17  has duties under California law and the ethical guidelines of the profession to
18  "control and supervise" its unlicensed employees. To discharge these duties,
19  Deloitte ensures that all class members receive significant supervision in all of
20  their work through "engagement teams." All class members worked in
21  engagements teams that used the same standards of supervision. The Continuum
22  is irrelevant here; no matter where Class members place on the Continuum, they
23  cannot freelance outside of an engagement team and work unsupervised.
24  *Campbell* adopted this position as well.

25      The Administrative Exemption requires exempt employees to perform work
26  "directly related" to the management policies or general business operations of the
27  employer or its clients. This work must be of "significance." Since the class
28  members cannot practice public accountancy, Deloitte cannot show this

5

1    requirement class-wide.

2         Both the Learned Professions and the Administrative Exemption require

3    exempt employees to exercise discretion and independent judgment in matters of

4    importance.  This requires that employees can make independent choices, "free

5    from immediate direction or supervision and with respect to matters of

6    significance" on a near daily basis.  The engagement team structure ensures that

7    class members receive constant immediate supervision.  Alternatively, the

8    Continuum merely highlights the application of skill, and the application of skill is

9    not the exercise of discretion and independent judgment.  Additionally, a common

10   question exists on whether an unlicensed employee can permissibly make

11   decisions on matters of importance.  This analysis does not examine the

12   Continuum.

13        The Continuum avoids the exemption analysis.  Therefore, it fails to show

14   that individual issues predominate under Rule 23(b)(3).  Moreover, adequacy and

15   typicality exist under Rule 23.  The Opposition should be disregarded and this

16   motion granted.

17   **IV.    THE PROFESSIONAL EXEMPTION REQUIRES THE COURT TO**
18   **         EXAMINE THE SAME FACTS FOR EVERY CLASS MEMBER,**
     **         AND THEREFORE THE CONTINUUM THEORY IS IMMATERIAL.**
19

20        The Professional Exemption contains two relevant exemptions; the first,

21   which this brief refers to as the "Licensed Professions" Exemption at 8 CRC

22   §11040(1)(A)(3)(a), exempts employees licensed by California and engaged in the

23   practice of accounting; the second, which this brief (and the Code of Federal

24   Regulations ("CFR")) refers to as the "Learned Professions" Exemption at 8 CRC

25   §11040(1)(A)(3)(b), exempts employees engaged in commonly recognized learned

26   professions.

27        Under the Class Definition, class members are not licensed CPAs or

28   attorneys, so the Licensed Profession Exemption does not apply.  Therefore, the

6

Court should only be concerned with the Learned Professions Exemption.

### A.    As A Matter Of Law, Accounting Employees Cannot Be Exempt Under The Learned Professions Exemption.

Under the rationale of *Campbell v. PricewaterhouseCoopers, LLC*, *supra*, plaintiffs contend that the Learned Professions Exemption does not apply to the class members.  *Campbell* is nearly identical to our case; plaintiffs sued on a class action basis for unpaid overtime on behalf of associates in the "attest" division of PricewaterhouseCoopers, LLC, the world's largest accounting firm.  602 F. Supp. 2d at 1167.  Like our case, the class members worked on "engagement teams" under a hierarchy of associate, senior associate, manager, senior manager, director, managing director, and partner.  *Id.*  All class members assisted CPAs but did not have a CPA license, and they primarily verified financial statement items by reviewing documentation.  *Id*. at 1168.  All work of the associates was subject to at least one level of detailed review.  *Id.*

*Campbell* held that, as a matter of law, the Learned Professions Exemption excluded fields covered by the Licensed Professions Exemption.  *Campbell* found the Wage Order ambiguous as to whether it excluded the professions in the Licensed Professions Exemption from the Learned Professions Exemption.  602 F. Supp. 2d at 1180.  After examining the Wage Order 4's development and various agency interpretations, *Campbell* found the Learned Professions Exemption was intended to exempt professions not in the Licensed Professions Exemption.  *Id*. Since the California Supreme Court instructed courts to construe statutes to avoid surplusage and to construe the Wage Order in favor of employees,[4] *Campbell* held that employees engaged in accounting cannot be exempt under the Learned

---

[4]California's Wage Orders are remedial and are to be liberally construed to promote for the protection and benefit of employees." *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 794-795 (1999).  Exemptions are narrowly construed against the employer and their application is limited to those employees plainly and unmistakably within their terms.  *Nordquist v. McGraw-Hill Broadcasting Co.*, 32 Cal. App. 4th 555, 562 (1995).  Since the exemptions are conjunctive, Deloitte must establish every element of each exemption.

7

1  Professions Exemption. *Id.* at 1181.  Otherwise, the Licensed Professions

2  Exemptions would be meaningless. *Id.*  *Campbell* granted summary judgment for

3  the class of attest associates on the Professional Exemption.

4      The important facts in *Campbell* are that the class members worked in

5  accounting without a CPA license.  602 F. Supp. 2d at 1173-1174.  Beyond that,

6  *Campbell* did not consider the class' duties, complexity of duties or any aspect of

7  the Continuum theory.  If *Campbell* applies to the instant case, then the

8  Professional Exemption will be disposed of notwithstanding the Continuum theory.

9  The issue on this motion is not whether *Campbell* is correct, but whether common

10  issues or individual issues predominate under Rule 23(b)(3).  The *Campbell*

11  rationale applies to the entire class.  There are no individual issues.  Therefore,

12  predominance exists under Rule 23(b)(3).

13  **B.  Alternatively, The "Learned Professions" Exemption Cannot**
14         **Apply To Any Class Member Because Not One Practices Public**
       **Accountancy.**

15      Alternatively, a separate ground that defeats the Learned Professions

16  Exemption based on evidence outside of the Continuum theory, namely, no class

17  members can practice the profession of public accountancy.  But the Learned

18  Professions Exemption requires employees to be engaged in the profession.

19  Therefore, no class member can be exempt under Learned Professions Exemption.

20      To be under the Learned Professions Exemption, employees must be

21  qualified to and actually practice the profession.  Wage Order 4 provides that to be

22  in a "Learned Profession," the employee must be "engaged in an occupation

23  commonly recognized as a learned."  8 CCR §11040 1.(A)(3)(b).  To be so

24  engaged, employees must perform, among other things, "work requiring

25  knowledge of an advanced type in a field . . . customarily acquired by a prolonged

26  course of specialized intellectual instruction and study, as distinguished from a

27  general academic education and from an apprenticeship." *Id.* 1.(A)(3)(b).  The

28

1   exemption excludes "those learning a profession," 29 CFR 541.308(b),[5] and

2   "trainees."  29 CFR 541.310.

3       Class members uniformly are not engaged in the accounting profession.

4   California prohibits practicing "public accountancy" without a permit.  *Bus. &*

5   *Prof. Code* §5050.  The Legislature defines the "practice of public accountancy"

6   broadly to include the entire Continuum, including a person holding themselves

7   out as skilled in the practice of accounting, providing accounting services,

8   preparing tax returns, giving tax advice, preparing investment/financial plans or

9   management consulting services.  *Id*. at §5051.  CPAs can perform these duties.

10  *Id*.  The statute permits unlicensed employees to assist CPAs if, among other

11  things, the employee "works under the control and supervision" of a CPA.  *Id*.

12  §5053.  Practicing public accountancy without a permit is a misdemeanor.  *Id*. at

13  §5120.

14      On the Continuum, all class members are learning the accounting profession

15  rather than engaging in it.  Deloitte simply does not require a CPA license for the

16  TA or TS position.  Deloitte does not require new TA hires to have accounting

17  backgrounds.  Bustamonte depo. 18:20-19:1, Choi depo. 16:14-17:20,  Davis decl.

18  ¶¶ 2 & 5, Haleblian 32:23-33:18.  TSs must guide and train TAs on all tasks and

19  assignments.  Choi depo. 88:17-90:17, 164:24-165:10 & 171:19-172:14.  TSs must

20  be in constant communication with TAs to ensure that they stay on the right path.

21  Choi depo. 224:21-225:23.

22      With little training, TAs turn out work product far below the standards of the

23  profession.  Deloitte expects class members to make mistakes in performing their

24  tasks and this is the process by which they learn their trade.  Fisher depo. 233:1-

25  _____

26  [5]  In 2004, the Department of Labor revised the CFRs interpreting section 541.
    "List of Subjects in 29 CFR 541," 69 Fed. Register 22260 (April 23, 2004), pp.

27  22260 et seq.  Wage Order 4 excludes these revisions.  Wage Order 4 states that
    the Professional Exemption shall be construed in accordance with the following

28  CFRs "as they existed as of the date of the Wage Order": 29 CFR §§541.207,
    541.301(a)-(d), 541.302, 541.306, 541.307, 541.308, and 541.310.  8 CRC
    11040(1)(A)(3)(e).  All quotes of CFRs are from CFR as they existed in 2001.

234:25.  This eyewitness account puts the TAs' qualifications in perspective:

> Q.  What did you mean by "inspecting the work of Tax Associates"?

> A.  Making sure that it was consistent with last year.  Just because an associate is preparing it the same as last year doesn't mean you are going to get the work product the same as last year.  You're going to get balance sheets that don't balance.  You're going to get equity roll-forwards that don't roll.  You're going to get allocations that don't match up with allocations.

> You're dealing with people straight out of college.  Even when I was an associate, I would give horrible work products to my seniors and they would have to clean it up.

Lynch depo. 30:24-31:15.  Deloitte cannot properly argue that this constitutes engaging in the profession.  This is training.

On the extreme end of the Continuum, even the most competent TSs are not engaged in the profession.  Notably, the Opposition does not contend that a single class member is engaged in public accounting.  Deloitte implies it though, contending (as discussed *supra*) that some class members explain "the tax basis of fixed assets cost basis roll-forwards," read trial balances, and identify tax issues to prepare "compliant" tax returns.  While this may require skill, this skill will never rise to the level of performing public accounting.  All TSs are legally unqualified to perform accounting.  Moreover, Deloitte does not see TSs as qualified because it requires multiple levels of review of TS work.  Deloitte's whole "engagement team" structure revolves around its insecurity over TS work product.  *See infra* on the engagement team process.

Desperate to justify the Continuum theory, some of Deloitte's witnesses try to masquerade the class members as de facto practicing accountants.  Some witnesses tried to disguise relating information to clients as giving advice.  Fisher depo. 109:2-111:3 [depreciable life of an asset], Choi depo. 204:3-205:24 [same]; Bustamonte depo. 183:15-184:11 [providing estimated dates of delivery of returns].  Others contended that class members gave tax advice.  Fisher depo. 109:2 -112:16, Larkin depo. 128:4-133:8 & 141:19-142:22.  Besides destroying the

10

1   deponents' credibility, such testimony does create a predominance of individual

2   facts. Wage Order 4 requires an examination of the employer's "realistic

3   expectations and the realistic requirements of the job" in determining whether

4   employees are exempt. 8 CCR §11040 1.(A)(2)(f). Deloitte cannot reasonably

5   expect class members to perform public accountancy any more than a law firm can

6   expect its best paralegals to give legal advice. Even if this testimony is truthful,

7   violations of the law cannot be reasonably expected, and therefore it is not relevant

8   to the exemption. Deloitte's arguments that class members give tax advice fails

9   based on the evidence common to all members. Therefore, common facts and

10  issues predominate under Rule 23(b)(3) on this issue.

11      Contrary to the Continuum Theory, the Learned Profession Exemption does

12  not consider the complexity of an employees work. Rather, it examines whether

13  the employee is engaged in the profession. Common evidence shows that the

14  Learned Professions Exemption will not apply to any class member. Every

15  Deloitte employee will testify that all class members have not completed earning

16  the profession's qualifications and therefore they cannot practice accountancy.

17  The Continuum is not relevant. There are no individual issues under Rule

18  23(b)(3).

19  **V.    THE ADMINISTRATIVE EXEMPTION REQUIRES THE COURT**

20  **TO EXAMINE THE SAME FACTS FOR EVERY CLASS MEMBER.**

21      The Administrative Exemption seems inappropriate due to admissions in

22  Deloitte's Opposition. According to Deloitte, "[t]he primary function of [TA's] at

23  Deloitte is tax analysis and tax return preparation." Opp. 14:8-9. To paraphrase,

24  most TAs assist in the preparation of tax returns, research tax issues, have technical

25  discussions, highlight risks and issues, and apply tax knowledge. *Id.* 14:12-15.

26  For TSs, their "primary function is tax return review, analysis and supervision."

27  Deloitte's Opp. 15:3-4. Deloitte further contends that TSs "spend the bulk of their

28  time" supervising TAs, answering questions, evaluating TAs' performance, and

reviewing and analyzing tax returns. *Id.* 15:5-7. If these duties require "the bulk of their time," then that is what the Court should focus on in analyzing the exemption. The exemption turns on whether the class members reasonably performed administrative work over half of their work time. 8 CCR §11040 1.(A)(2)(f) & 2(n). Even if the TSs' administrative tasks took up 49% of the time, the other 51% will determine if they are exempt. Therefore, when Deloitte contends that TSs, "in addition to their substantive duties," perform administrative tasks, it fails to create individual issues. From the outset, work related to this exemption appears limited.

Setting that issue aside, the Continuum theory fails to create individual issues under Rule 23(b). For Deloitte to show that class members are exempt under the Administrative Exemption, Deloitte must prove that (1) they work under only general supervision, (2) their work is "directly related" to management policies or general business operations of Deloitte or its customers, and (3) class members customarily exercised discretion and independent judgment. Plaintiffs contend Deloitte cannot establish these elements notwithstanding the Continuum.

### A. The Heavy Supervision Of All The Class Members Defeats The Application Of The Administrative Exemption.

Wage Order 4 requires that exempt administrative employees perform work "under only general supervision" along specialized or technical lines requiring special training, experience, or knowledge. 8 CCR §11040 1.(A)(2)(d). Without variance, the class members work in "engagement teams" under specific supervision. Deloitte designed these teams to fulfill the statutory mandate and the ethical requirements of the profession "to supervise and control" unlicensed employees assisting CPAs. Based on nearly identical facts, *Campbell v. PricewaterhouseCoopers, LLP*, granted summary judgment for the employees on the Administrative Exemption. Common facts and issues predominate under Rule 23(b).

1.     **The "engagement team" process ensures constant supervision of all class members.**

Deloitte's policies envision a "Review Process" for all work product. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮[6]▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

Deloitte accomplishes this review through the use of engagement teams. Engagement teams ensure that all class members receive supervision in all of their work. An engagement team is a group of Deloitte employees assembled to complete a task for a client like a tax return. *E.g.*, Bustamonte depo. 21:2-21:5, Choi decl. ¶8. Deloitte's employees in all lines of practice work in engagement teams. Kearly depo. 12:15-14:15, Frimershtein depo. 96:21-107:4. In Lead Tax, class members work exclusively in engagement teams. *E.g.*, Bustamonte 115:1-115:5 & 144:1-4, Choi 57:14-58:25, Calderon 78:9-79:6, Frimershtein 37:25-39:5, Kossick depo. 37:24-38:15.

Typically, Deloitte staffs engagement teams with a hierarchy of a partner or a director, a senior manager or manager, TSs, and TAs. [7] *E.g.*, Choi depo. 28:6-29:6, Coffey depo. 37:4-39:5, Larkin 66:25-68:11, Kossick depo. 33:19-34:9, Lynch depo. 54:16-55:14, Perrone depo. 21:5-22:6. Managers and above have a CPA license. Larkin 8:1-9:3. Partners or directors decide how the engagement team is run and always determine whether work product is final. Frimershtein 60:15-61:4, Larkin 68:24-69:17, Lynch depo. 32:8-32:21. Similar to FRCP Rule 11, a partner's signature on a return means the taxpayer's positions can reasonably

---

[6] Deloitte marked these documents as "confidential." Presently, they are subject to plaintiffs' application to exclude these documents from the protective order or alternatively file them under seal.

[7] At Deloitte, partners, directors, senior managers and managers are referred to collectively as "management." *E.g.*, Bustamonte depo. 22:16-22:18 & 109:25-110:4. TAs collectively are referred to as "Staff." Frimershtein depo. 29:4-17.

1    be justified.  26 U.S.C. §6694(a).  California prohibits class members from signing

2    tax returns or performing other acts of public accountancy.  *Bus. & Prof. Code*

3    §§5051, 5053.

4         Deloitte's engagement teams implement these policies by reviewing all class

5    member work numerous times.  The teams work in the following manner: at the

6    beginning of an engagement, the TS prepares the first draft of the return (or other

7    project) and supporting work papers.  *E.g.*, Davis depo. 62:10-63:4.  Thereafter, the

8    TS reviews the return, and supporting papers.  *E.g.*, Bustamonte depo.72:15-

9    173:13, Blaske depo. 25:24-26:17.   The TS makes "review points" on the return

10   and the TS gives the comments to the TA to make the changes.  *E.g.*, Blaske depo.

11   38:2-16, Choi depo. 157:19-158:22.  Once satisfied with the return, the TS gives

12   the materials to the Manager or Senior Manager on the team for review.  *E.g., id.* &

13   Bustamonte depo. 112:22-114:4.  The process then repeats itself, *i.e.,* the Manager

14   or Senior Manager makes review points and returns the materials to the TA to

15   make the changes.  *E.g.,* Abbas depo. 25:13 -26:15, Blaske depo. 46:2-47:12,

16   Bustamonte depo. 112:07-112:21, Choi 28:6-29:6, Fisher 55:11-56:3, Frimershtein

17   depo. 96:17 - 97:25, Foster depo. 47:6-48:9, Minter depo. 30:5-31:21,Wurtz depo.

18   17:11-20:23, 35:21-36:16.  After the work product passes muster on the Manager

19   level, it goes to the Director or Partner on the team for final review.  Bustamonte

20   depo. 112:22-114:4, Perrone depo.  46:5-23.  The product may be returned to the

21   TA for changes, or, if satisfied, the Director/Partner approves the product as final.

22   Bustamonte depo. 112:22-114:4, Minter 14:2-12, Sato depo. 41:16-42:2.  Once the

23   team completes a project, the team members work on other engagements.  *E.g.,*

24   Frimershtein depo. 57:7-17.

25        Deloitte policy ensures supervision of the class members in all aspects of

26   their employment.  The review process is inherent in the engagement team process.

27   Kossick depo. 40:8-41:10 & 43:23-45:24.  All of the work of staff and TSs gets

28   reviewed; "[o]therwise there would be no need for partners, senior managers, and

14

managers." Frimershtein 109:7-110:2. This review occurs on all teams. *E.g.,* Choi depo. 171:10-172:23. No matter the size of the engagement team, each team has a partner or director, and they are always in charge of the team. Choi depo. 84:23-86:2, Calderon depo. 113:11-114:8.

Mark Davis' testimony illustrates how strongly the teams supervised the class members. After describing his TS duties in reviewing TA work product, Davis testified:

> Q. How did you know when you had the right answer?
>
> A. It was a guess, and most of the time it was wrong.
>
> Q. So I am assuming you are being sarcastic?
>
> A. No. Because the right answer in the tax world doesn't exist until the return goes out the door. And Nikon had a staff, a senior, a manager, a senior manager and a partner. And I guarantee you, all of us got review notes.
>
> So the staff would get it wrong. I would correct it as a senior. The senior would get corrected by the manager. The manager would then get corrected by the senior manager. Then the partner would finally correct all of us and then the return would go out the door. So the right answer is – I don't know how to describe what a right answer is on a tax return.

Davis depo. 62:10-64:2.

Deloitte's use of engagement teams shows how it implemented its quality control processes to control and supervise unlicensed employees. When determining whether or not this supervision falls below the standard of the exemption, the Court does not need to refer to the complexity of duties or other aspects of the Continuum.

### 2. Deloitte's discharge of its legal and ethical duties ensures constant supervision.

The review and supervision in the engagement teams ensures compliance with California law and the ethical requirements of the profession. California's *Business & Professions Code* §5053 requires unlicensed assistants in accounting offices to remain "under the control and supervision" of a CPA. Accounting's most prominent professional society, the American Institute of Certified Public

15

Accountants ("AICPA"), issues ethical rules requiring and explaining the need for proper planning and supervision of unlicensed employees in accounting offices. The AICPA's Code of Professional Conduct is taught as part of basics toward getting a CPA. Frimershtein depo. 27:10-28:5, 83:12 - 84:17.

AICPA's standards provide that:

- Due care requires a CPA to plan and supervise adequately any professional activity for which he or she is responsible. Deloitte's management "absolutely" complies with this standard, this duty is constant and it cannot be delegated. Frimershtein 85:9-86:24 and exh. 2.

- Accounting firms must have internal quality-control procedures to ensure that services are adequately supervised. At Deloitte, these procedures include use of the engagement teams. Frimershtein 87:25-88:25 & 91:21-94:5.

- A CPA has a duty to plan and supervise unlicensed staff, and that duty continues throughout all engagements. Frimershtein 124:2-128: 16& exh. 3 thereto.

Deloitte incorporated these ethical standards into its own policies. ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

Deloitte's personnel implements these policies. Oleg Frimershtein, a Manager advanced by Deloitte in support of the Continuum, testified that on engagements, "supervision continues throughout[,]" "there's definitely interaction

and planning and discussion that continues throughout the process[,]" and there is "constant communication" between management and the class members to ensure high quality of the work product. Frimershtein depo. 126:10-128:16. ["I want to make sure we're constantly communicating. I don't want to say 'Here's the plan for the tax prep. I'll see you in three months. Make sure that their return is correct.' I'm involved."]

Deloitte's personnel complies with its ethical policies. These policies require supervision, and in practice this means constant supervision of all class members. Absent here is an analysis of the complexity of duties or other matters on the Continuum. Therefore, the Continuum does not demonstrate that individual issues predominate.

### 3. Deloitte provides constant supervision to all class members notwithstanding their place on the Continuum.

Deloitte supervises all class members notwithstanding their place on the Continuum. Management reviews all class member work, usually twice. *E.g.,* Calderon depo. 83:14-84:17. Where TSs moved up the Continuum to assume manager duties, the engagement partner still reviewed all of the class member's work. *Id.* and Frimershtein 54:18-55:11 [review of engagement letters] & 92:6-96:16 [review of research]. Class members always work with management on engagements. Calderon depo. 76:23-77:2. [on every engagement, she worked with a manager, a director or a partner], Frimershtein 80:17-82:24 [supervision for class members will vary depending on skill and experience, but supervision is never abdicated], Larkin 193:9-22 [same level of review utilized for all engagements]. A Senior Manager at Deloitte testified that TSs **"still need guidance[,] they require hand holding" even when they have more autonomy and perform at "a higher level,"**[8] even though they "make sound decisions, have

---

[8] Testimony revealed "variances" in the Continuum to be insignificant. For example, Bustamante gave some TSs more autonomy, and this means she would delegate more research to them or let them draft a memo to summarize the results. Bustamonte depo. 200:8-201:7.

17

1    independent thinking, can form reasonable conclusions." Bustamonte 199:10-

2    200:22.

3           Deloitte cannot properly argue a single class members worked under

4    "general supervision."  To satisfy Deloitte's legal and ethical obligations, all class

5    members worked exclusively in engagement teams, all received the same level of

6    supervision, and therefore all class members can prove liability under the

7    administrative exemption with the same core evidence.  Therefore, common facts

8    predominate under Rule 23(b)(3) notwithstanding the Continuum theory.

9          **B.    Contrary To The Administrative Exemption, Class Members Do
              Not Perform Work "Directly Related" To The Management
10            Policies Or General Business Operations Of Deloitte Or Its
              Clients.  Rather, They Are "Learning A Profession."**

11          On an alternative ground, Deloitte's Administrative Exemption defense fails

12   because class members do not perform work "directly related" to the management

13   policies or general business operations of Deloitte or its clients contrary to the

14   Administrative Exemption.  8 CCR §11040 1.(A)(2)(f).   The "directly related"

15   requirement can only be shown through work of "substantial importance.  29 CFR

16   541.205(a). [9]   Such work includes employees whose work affects policy, whose

17   responsibility is to execute or carry it out, who carry out major assignments in the

18   operations of the business, or whose work affects the business operations to a

19   substantial degree.  29 CFR 541.205(c) & (d).

20          A common legal fact and issue defeats a finding of "directly related":  To

21   meet the standards of 29 CFR 541.205, Deloitte cannot contend that the class

22   performed any work constituting accounting.  California prohibits class members

23   from preparing taxes, preparing financial plans or acting as a management

24   consultant.  *Bus. & Prof. Code* §5051(g), (h) & (i).  Class members can assist

25   licensed CPAs.  Such assistance amounts to bookkeeping, and bookkeeping is non-

26

27   ───────────────
     [9]Under Wage Order 4, the Administrative Exemption is construed under the
28   following CFR's as of the effective date of the wage order: 29 CFR. 541.201-205,
     541.207-208, 541.210, and 541.215.   8 CCR §11040 1.(A)(2)(f).

exempt.[10]  There is no work left that meets the exemption.  If properly supervised and controlled, class members can act as an employee or assistant to a CPA, *Bus. & Prof. Code* §5053, but this cannot be reasonably construed to permit class members to perform CPA duties.  If class members cannot perform accounting work, they cannot be construed as performing work "directly related to management policies" of "substantial importance" to Deloitte's clients.   On this basis, the Administrative Exemption fails based on common facts.

## C.   Where Class Members place on the Continuum Spectrum depends on the Development of their skills, not their Discretion and Independent Judgment

Employees exempt under both the Administrative Exemption and Professional Exemption must "customarily and regularly exercise discretion and independent judgment."  8 CCR §11040 1.(A)(2)(b) & 1.(A)(2)(c).  The phrase "discretion and independent judgment" refers to:

> the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered.  The term . . . implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.

29 CFR 541.207(a). "Customarily and regularly" means "greater than occasional" but "less than constant."  29 CFR 541.207(g).

Viewed against this standard, the Continuum theory does not create individual issues.  Under the engagement team concept, Deloitte cannot prove that a single class member makes a decision "free from immediate direction or supervision and with respect to matters of significance" as required by the CFR.  This is discussed *infra* in Point IV.A.

Alternatively, the Continuum uniformly fails to demonstrate that individual

---

[10]  Bookkeeping operations include keeping books, making trial balances, statements, making audits or preparing reports that are not issued over a CPA's name.  *Bus. & Prof. Code* §5052.  Bookkeepers are considered nonexempt. 29 CFR 541.205(c)(1)[bookkeeper's work not "directly related" to the employer's management policies or business operations because it is not of "substantial importance" to the management or operation of the employer], 29 CFR 541.207(d) [do not exercise discretion, make decisions in matters of significance].

19

issues predominate in the use of discretion and judgment.  Rather, the Continuum contends that class members unevenly perform ever more complex tasks based on their development.  While this highlights different levels of skill among class members, the CFR cautions against confusing the exercise of discretion and independent judgment with the "use of skill in applying techniques, procedures, or specific standards[.]"  29 CFR 541.207(b).  An employee who merely applies "knowledge in following prescribed procedures or determining which procedure to follow," is not exercising discretion and independent judgment, even if "there is some leeway in reaching a conclusion."  29 CFR 541.207(c)(1).

The Continuum demonstrates only differences in the class members' skills.  For example, Deloitte emphasizes that differences in engagements cause individual issues to predominate.  Engagements vary for class members because some are more complex that others, but, for the employees, the greater complexity of these engagements requires only better tax skills.  Bustamonte depo. 191:22-194:5.  Better tax skill does not relate to the exercise of "discretion and independent judgment."  In this area, the Continuum fails to create individual issues.

## VI. SINCE DEFENDANTS CANNOT ESTABLISH ANY DEFENSE TO THE OVERTIME EXEMPTIONS, THIS ACTION SATISFIES ALL OF THE REQUIREMENTS OF Rule 23.

Viewed in light of each exemption's requirements, the Continuum theory fails to demonstrate a predominance of individual issues under Rule 23(b)(3).  As Points IV. and V. discuss, *supra*, plaintiffs can prove their case on liability using evidence applicable to all class members without referencing the spectrum of their skills.  This will achieve economies in time, effort and expense.

Rule 23(b)(3) focuses on whether class certification will promote judicial economy.

Rule 23(b)(3)'s predominance and superiority requirements were added to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.  Thus, the notion that the adjudication of common issues

will help achieve judicial economy is an integral part of the predominance test.

*Mevorah v. Wells Fargo Home Mortg. (In re Wells Fargo Home Mortg.)* 571 F.3d 953, 958 (9th Cir. Cal. 2009)("*Wells Fargo*") citations, ellipsis and quotation marks omitted.

Under Ninth Circuit authority, predominance exists.  In examining predominance in overtime pay class actions, the Ninth Circuit instructs the Court to consider factors such as the employer's uniform classification of the class as exempt, whether the employer exercised some level of centralized control of employees through standardized hierarchy, corporate policy and procedure, uniform training programs, and other factors susceptible to common proof.  *Vinole v. Countrywide Home Loans, Inc.* 571 F.3d 935, 946 (9th Cir. Cal. 2009).  Moreover, plaintiffs must present evidence that the employer's policies reflect workplace realities.  *Wells Fargo,* 571 F.3d at 958-959.

*Wells Fargo* illustrates the Ninth Circuit's predominance standards in the overtime pay class action context.  *Wells Fargo* explains that the federal outside salesperson exemption, which applies to employees who work away from the employer's place of business, may militate against predominance because it requires an inquiry into each class member's situation.  *Wells Fargo,* 571 F.3d  at 959.  But a policy requiring employees to be at their desks for 80% of their workday "would change this individual issue into a common one."  In addition to a uniform policy, though, plaintiffs must prove that the employees performed in accordance with the policy.  *Id.  Wells Fargo* strongly implies if plaintiffs can show a uniform policy and the employees' compliance with the policy, Rule 23(b)(3) predominance exists.

Plaintiffs can establish Rule 23(b)(3) predominance under *Vinole*'s and *Wells Fargo*'s standards for a class-wide trial of the Administrative Exemption.  This exemption analyzes whether employees work under "general supervision."  Deloitte intended to exercise "centralized control" as in *Vinole* through policies

requiring multiple levels of review of class member work and directives to observe the standards of the industry.  As in *Wells Fargo*, plaintiffs can prove that the employees actually implemented Deloitte's expectation through the use of engagement teams, testimony of the constant supervision, and the classes' bar to practice public accountancy.  Notably, the Continuum theory does not enter into the analysis.  Under *Wells Fargo* and *Vinole,* plaintiffs can prove predominance under Rule 23(b)(3) for the Administrative Exemption.

Likewise, predominance exists for the Professional Exemption.  *Campbell*'s analysis concerns a question of law; if resolved for the employees, no class member can be an exempt professional.  Plaintiff's alternative analysis does not require evidence from the Continuum but examines the qualifications to work as a TA or TS, whether class members are "acquiring" or have "acquired" the knowledge to practice the profession, and the requirements and qualifications to practice the profession.  Under *Wells Fargo* and *Vinole,* plaintiffs can prove predominance under Rule 23(b)(3) for the Professional Exemption.

A class trial advances Rule 23(b)(3)'s goal of saving time, effort and expense and is superior.  The alternative is separate trials.  Each trial would resolve the same legal issues based on the same evidence.  The proceedings would be near identical, i.e., the same documents, the same or similar witnesses, and the same arguments (none of which refer to the Continuum theory).  This scenario frustrates the goals of Rule 23(b)(3).

The Court should be assured that trial on liability will not require the testimony of every class member.  Deloitte's uniform policies can be established by introduction of documents.  Witness testimony will be required to establish that class members complied with Deloitte's policies, but due to Deloitte's use of engagement teams, a few witnesses can testify on the working conditions for many.  Not every class member will be required to establish Deloitte's liability.  Plaintiffs have not established a trial plan for damages, but counsel believes

1 damages information can be presented by way of statistical or expert testimony.

2 Kaufman decl. ¶¶2-8. The Court should find that common issues predominate and

3 class proceedings are superior.

4 Clearly, class treatment achieves economies for the Court and the parties.

5 Revealingly, no trial would examine the Continuum. Common facts predominate

6 under Rule 23(b)(3), and a class proceeding is superior.

7 **VII. PLAINTIFFS ARE ADEQUATE REPRESENTATIVES**

8 Deloitte challenges the "adequacy" under Rule 23(a)(4) of plaintiffs Blaske,

9 Lee and Longenecker as class representatives for the TS class. Deloitte admits that

10 all four plaintiffs are adequate for the TA class. Deloitte argues that (1) they held

11 the TS position for only a brief time, and (2) each did not meet Deloitte's

12 expectations as TSs. Notably, Deloitte does not cite a single authority to support

13 its arguments or show how these positions undermine the adequacy.

14 Under Rule 23(a)(4), two issues determine adequacy: (1) Do the

15 representative plaintiffs and their counsel have any conflicts of interest with other

16 class members, and (2) will the representative plaintiffs and their counsel

17 prosecute the action vigorously on behalf of the class? *Hanlon v. Chrysler Corp.*

18 150 F.3d 1011, 1026 (9th Cir. 1998).

19 Deloitte's arguments ignore the *Hanlon* requirements and instead appear

20 intended to reinforce the Continuum theory. On the issue that plaintiffs' tenures as

21 TSs were too short, Deloitte argues that in the TS position, increased tenure means

22 increased responsibilities. Opp. 5:13-6:19. This fails to relate to the elements of

23 the exemption nor the rationale of *Hanlon*. Moreover, Deloitte does not establish

24 any standard of tenure for a TS or when TSs exit the class by getting their CPA

25 license. This argument should be ignored.

26 Deloitte's second argument – that plaintiffs failed in the TS position – does

27 not pass the straight-face test. Deloitte's evidence that Blaske "failed" as a TS is

28 an evaluation that ranks her a "2" -- "exceeds expectations." Walker ex. 27, p.

23

274.  The evaluation concludes with "Keep up the good job!"  *Id.* p. 276.  "Keep up the good job!" does not mean Blaske failed as a TS.  Most likely, Deloitte hoped the plaintiffs and the Court would not read exhibit 27.

Neither can Deloitte properly argue that Lee "failed" as a TS.  Months before his promotion to TS, Ping Choi, one of the Continuum declarants, glowingly evaluated Lee's work with Choi.  Choi rated Lee a "2" when Lee humbly ranked himself a "3" as in "meets expectations."   Exh. 1, p.1, Choi depo.  Choi stated  Lee "demonstrated" knowledge in technical tax areas, Lee was a "great example" of  "ideal staff [,]" though Lee was "busy with other responsibilities, he always pulled through[,]"  "[Lee] added great value to our team[,]" etc.  Exh. 1 in passim.  Choi implies throughout that Lee will be promoted.  This review occurred in April 2003, during the busy season, and Lee was promoted that August.  Lee depo. 44:18-45:20.  Deloitte cannot properly argue that Lee went from "ideal team member" to "failure" in months.  *Id*. 193:25-197:4.

Deloitte's evidence on Lee is dicey to say the least.  The Opposition liberally quotes a scorecard at 7:7-14, and by liberal, plaintiffs mean that the scorecard is illegible and the quote cannot be found on it.  See Walker exh. 27.

Deloitte fails to meet the standards of *Hanlon*.  The Opposition made no showing that plaintiffs will have conflicts with the class or that they will not vigorously prosecute the case.  The Court should find adequacy.

## VIII.  PLAINTIFFS ARE TYPICAL OF THE CLASSES

Deloitte challenges plaintiffs' typicality under Rule 23(a)(3).  Defendant argues that since plaintiffs do not have extensive knowledge about other class members' work, they do not meet the typicality requirement.  Opp. 8.  In support, Deloitte cites the order in certifying as a class action a near identical class in *Campbell v. PricewaterhouseCoopers, LLP,* 253 F.R.D. 586, 596 (E.D. Cal. 2008).  On the issue of typicality, the order limits the scope of the classes "to the positions that plaintiffs actually held."  *Id.*  Deloitte's citation to *Campbell* raises an estoppel

24

1  issue; if under *Campbell* at 253 F.R.D. 586, the Court in our case limits the classes

2  only to positions that plaintiffs actually held, then under *Campbell* at 602 F. Supp.

3  2d 1163, should not the Court also grant summary judgment to the class members?

4      *Campbell* explains typicality at 253 F.R.D. 586, 595:

5          Typicality requires that the claims or defenses of the representative parties

6          are typical of the claims or defenses of the class. For typicality to be met, plaintiffs need not possess identical claims to those of the putative class

7          members. Instead, plaintiffs' claims need only be "reasonably coextensive" with the claims of the putative class. The inquiry focuses on the claims

8          themselves -- not the factual predicates from which the claims arise.  The test of typicality is whether other members have the same or similar injury,

9          whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same

10         course of conduct.

11 Citations, quotation marks omitted.

12     Plaintiffs meet the typicality requirement of Rule 23(a)(3).  They all claim

13 overtime rights under the same positions arising out of the same conduct.   There is

14 extensive evidence showing their TA and TS positions held, their work producing

15 among other things tax returns, their work in engagement teams, and their overtime

16 hours.  Blaske decl. ¶¶9, 13, 15, 17-29, Bustamante depo. 164:23-165:18, Lee decl.

17 ¶¶6, 8-14, 17-24, Choi depo. 185:20-192:25, Longenecker decl. ¶7-10, 12-13, 17-

18 24, Murphy decl. ¶¶4-22.   This evidence demonstrates that Plaintiffs' claims are

19 reasonably coextensive" with the proposed classes.

**IX.   CONCLUSION**

20     Based on the foregoing, Plaintiffs respectfully request that the Court

21 disregard the Continuum theory in the Opposition and grant this motion.

22                 Respectfully submitted,

23 DATED:  September 21, 2009       HARRIS & KAUFMAN

24

25

26               By_____

27                   Matthew A. Kaufman , Attorney for
Plaintiffs, Plaintiffs Brandy Blaske, David Lee,

28                   Julia Longenecker, Svetlana V. Murphy, and
Stepan Mekhitarian

1  SEYFARTH SHAW LLP
   Kenneth D. Sulzer (State Bar No. 120253)
2  ksulzer@seyfarth.com
   Andrew M. Paley (State Bar No. 149699)
3  apaley@seyfarth.com
   Sheryl L. Skibbe (State Bar No. 199441)
4  sskibbe@seyfarth.com
   Regina A. Musolino (State Bar No. 198872)
5  rmusolino@seyfarth.com
   Peter A. Walker, admitted *pro hac vice*
6  pwalker@seyfarth.com
   Christopher H. Lowe, admitted *pro hac vice*
7  clowe@seyfarth.com
   2029 Century Park East, Suite 3300
8  Los Angeles, California 90067-3063
   Tel: (310) 277-7200
9  Fax: (310) 201-5219

10 Attorneys for Defendants
   DELOITTE & TOUCHE, LLP &
11 DELOITTE TAX, LLP

12         **UNITED STATES DISTRICT COURT**
          **CENTRAL DISTRICT OF CALIFORNIA**
13

14 STEPAN MEKHITARIAN, an          )  Case No. CV 07-0412 DSF (MANx)
   individual (formerly the proposed class )
15 representative), on behalf of himself )  **DEFENDANTS DELOITTE TAX**
   only; BRANDY BLASKE, an individual )  **LLP AND DELOITTE &**
16 on behalf of herself and all others )  **TOUCHE LLP'S OPPOSITION**
   similarly situated; DAVID LEE, an )  **TO PLAINTIFFS'**
17 individual on behalf of himself and all )  **SUPPLEMENTAL POINTS AND**
   others similarly situated; JULIA )  **AUTHORITIES IN SUPPORT OF**
18 LONGENECKER, an individual on )  **CLASS CERTIFICATION**
   behalf of herself and all others similarly )
19 situated; SVETLANA V. MURPHY, an )
   individual on behalf of herself and all )
20 others similarly situated,             )  DATE:       October 19, 2009
                                          )  TIME:       4:30 p.m.
21              Plaintiffs,               )  COURTROOM: 840
                                          )
22        v.                              )
                                          )
23 DELOITTE & TOUCHE, LLP, a             )
   Delaware Limited Liability Partnership; )
24 and DELOITTE TAX, LLP, a Delaware )
   Limited Liability Partnership,        )
25                                        )
                Defendants.               )
26 ─────────────────────────────────────  )

27

28

# **TABLE OF CONTENTS**

Table of Authorities ................................................................. iii

Preliminary Statement ................................................................1

Argument.................................................................................2

    I.    Plaintiffs Cannot Establish that Common Questions of Law or Fact Predominate as Required by Rule 23(b)(3)..................................2

        A.    Application of the Learned Professional Exemption Cannot be Determined on a Class-Wide Basis ..........................3

            1.    Unlicensed Accountants May Qualify for the Learned Professional Exemption.....................................3

            2.    Putative Class Members are Engaged in a Profession .................................................................6

        B.    Application of the Administrative Exemption Cannot be Determined on a Class-Wide Basis ...........................................8

            1.    Putative Class Members Are Not Subject to "Heavy" Supervision .......................................................8

            2.    Whether the Duties Performed Are Directly Related to Management or the General Business Operations of Deloitte's Clients Requires Individualized Inquiry ...............................................10

            3.    Whether Plaintiffs Exercise Discretion and Independent Judgment Requires Individualized Inquiry.................................................................12

               a.    The Review of Work Product Does Not Preclude Application of the Exemption ...............13

               b.    Plaintiffs Exercise Discretion and Independent Judgment and Do Not Merely Apply "Skill".................................................14

        C.    Plaintiffs Remaining "Efficiency" Argument is Unsupported ................................................................16

    II.    Plaintiffs Cannot Establish the Requirements of Rule 23(a) .............20

        A.    Plaintiffs Cannot Adequately Represent a Class of Seniors....................................................................20

        B.    Plaintiffs' Claims are Not Typical of the Class ......................21

        C.    Questions of Law and Fact are Not Common to the Class.......22

i

III. The Additional Discovery Taken by Plaintiffs Further
Undermines Plaintiffs' Motion for Class Certification........................22

    A. The Additional Evidence Reveals a Horizontal Spectrum
of Duties Across Subgroups of LTS Precluding
Certification ...................................................................................22

    B. The Additional Evidence Further Demonstrates the
Developmental Continuum Precluding Certification ..............24

CONCLUSION ......................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

Campbell v. PricewaterhouseCoopers, LLP,
    253 F.R.D. 586 (E.D. Cal. 2008) ...................................................14, 21

Campbell v. PricewaterhouseCoopers, LLP,
    602 F. Supp. 2d 1163 (E.D. Cal. 2009) ...................................... *passim*

Carberry v. State Bd. of Accountancy,
    28 Cal. App. 4th 770 (1994) ................................................................12

Cash v. Cycle Craft Co.,
    508 F.3d 680 (1st Cir. 2007)................................................................16

Cole v. Daniels, Inc.,
    7 Fed. Appx. 634 (9th Cir. 2001).........................................................14

Conary v. A.O.G. Corp.,
    10 Wage and Hour Cases, 276 (D.R.I. 1951) .....................................12

Copas v. East Bay Mun. Util. Dist.,
    61 F. Supp. 2d 1017 (N.D. Cal. 1999) ................................................14

Forrand v. FedEx Corp.,
    No. CV 08-1360, 2009 WL 648966 (C.D. Cal. Feb. 18, 2009) .........19

Garcia v. Sun Pacific Farming Co-op.,
    No. CVF 06-0871 (LJO) (TAG), 2008 WL 2073979
    (E.D. Cal. May 14, 2008).....................................................................22

Goldsby v. Adecco, Inc.,
    No. C-07-5604 (MMC), 2009 WL 262216 (N.D. Cal. Feb. 4, 2009) ...............20

Hanon v. Dataproducts Corp.,
    976 F.2d 497 (9th Cir. 1992) ..............................................................22

Heffelfinger v. Elec. Data Sys.,
    580 F. Supp. 2d 933 (C.D. Cal. 2008) ...............................................13

Ho v. Ernst & Young LLP,
    No. C-05-04867 (JF), 2008 WL 619029 (N.D. Cal. Mar. 4, 2008)....7, 10, 12, 14

In re Farmers Ins. Exchange, Claims Rep. Overtime Pay Litig.,
    481 F.3d 1119 (9th Cir. 2007) ...................................................................14

In re Wells Fargo Home Mortgage Overtime Pay Litig.,
    571 F.3d 953 (9th Cir. 2009) .............................................................2, 17

Jasper v. C.R. Eng., Inc.,
    No. CV-08-5266, 2009 WL 873360 (C.D. Cal. Mar. 30, 2009) .......................21

Jimenez v. Domino's Pizza,
    238 F.R.D. 241 (C.D. Cal. 2006)................................................................19

Kelley v. SBC, Inc.,
    No. 97-CV-2729 (CW), 1998 WL 928302 (N.D. Cal. Nov. 13, 1998).............21

Marlo v. UPS,
    251 F.R.D. 476 (C.D. Cal. 2008)................................................................19

McAllister v. Transamerica Occidental Life Ins. Co.,
    325 F.3d 997 (8th Cir. 2003) ....................................................................16

Medepalli v. Maximus, Inc.,
    2008 WL 958045 (E.D. Cal. Apr. 8, 2008) .................................................13

Moore v. Hughes Helicopters, Inc.,
    708 F.2d 475 (9th Cir. 1983) .....................................................................3

Nguyen v. BDO Seidman,
    No. SAC 07-1352 (JVS) (MLGx) (C.D. Cal. July 6, 2009)...................... *passim*

Pablo v. ServiceMaster Global Holdings, Inc.,
    No. C08-03894 (SI), 2009 WL 2524478 (N.D. Cal. Aug. 17, 2009)...........19, 22

Palacio v. Progressive Ins. Co.,
    244 F. Supp. 2d 1040 (C.D. Cal. 2002) ............................................................14

People v. Arias,
    45 Cal. 4th 169 (2008) ...............................................................................9

iv

*Perez v. Safety-Kleen Sys.,*
    253 F.R.D. 508 (N.D. Cal. 2008)..................................................................19, 22

*Perry v. U.S. Bank,*
    No. C-00-1799 (PJH), 2001 WL 34920473 (N.D. Cal. Oct. 16, 2001) .......18, 19

*Piscione v. Ernst & Young, L.L.P.,*
    171 F.3d 527 (7th Cir. 1999) ...............................................................................11

*Porush v. Anshen & Allen Architects,*
    Labor Comm. Case No. 06-74759 (June 29, 2005)...............................................4

*Renfro v. Ind. Mich. Power Co.,*
    497 F.3d 573 (6th Cir. 2007) ...............................................................................16

*Roe-Midgett v. CC Servs.,*
    512 F.3d 865 (7th Cir. 2008) ...............................................................................16

*Ruiz v. Affinity Logistics Corp.,*
    No. 05CV2125 (JLS), 2009 WL 648973 (S.D. Cal. Jan. 29, 2009)...................20

*Ruiz v. PricewaterhouseCoopers LLP,*
    Case No. BV 287920 (Cal. Sup. Ct. Dec. 8, 2003) .................................5, 10, 12

*Sepulveda v. Wal-Mart Stores, Inc.,*
    237 F.R.D. 229 (C.D. Cal. 2006).........................................................................19

*Sumuel v. ADVO, Inc.,*
    155 Cal. App. 4 1099 (Cal. App. 2007)..................................................................4

*Vinole v. Countrywide Home Loans, Inc.,*
    571 F.3d 935 (9th Cir. 2009) ..................................................................2, 16, 17

*Wirth v. Grant Thornton, LLP,*
    No. CV 09-00832 (RGK) (SSx) ................................................................2, 18

*Zalewski v. PNC Fin. Servs. Group,*
    555 F. Supp. 2d 555 (W.D. Pa. 2007)..................................................................12

**FEDERAL RULE**

Federal Rule of Civil Procedure 23(a)(2) ....................................................................22

**STATE STATUTE**

Cal. Bus. & Prof. Code § 5051(f)-(i) ...................................................................7, 11

**FEDERAL REGULATIONS**

29 C.F.R. § 201(b) ...........................................................................................11

29 C.F.R. § 541.202(a) ...................................................................................13

29 C.F.R. § 541.202(c) ..............................................................................8, 9, 13

29 C.F.R. § 541.205(c)(1) ...............................................................................11

29 C.F.R. § 541.207(c) ...................................................................................15

29 C.F.R. § 541.207(e)(2) ................................................................................8

**STATE REGULATIONS**

8 C.C.R. § 110401 (A)(2)(b) ............................................................................13

8 C.C.R. § 110401 (A)(2)(d) ..........................................................................8, 9

8 C.C.R. § 110401 (A)(2)(f) ........................................................................10, 11

8 C.C.R. § 110401 (A)(3)(b) ...........................................................................5, 6

**OTHER AUTHORITY**

Industrial Welfare Comm. Wage Order 4-2001 (A)(3)(e)......................................4

**PRELIMINARY STATEMENT**

Defendants ("Deloitte"), respectfully submit this brief in opposition to Plaintiffs' Supplemental Points and Authorities in Support of Class Certification of a class of current and former Tax Associates ("Associates") and Tax Seniors ("Seniors") who were or are employed by Deloitte in its Lead Tax Services Group ("LTS") in the State of California.

The Court rejected Plaintiffs' first attempt at certification because of Plaintiff Mekhitarian's inadequacy as a class representative. Plaintiffs' next attempt at certification with four new plaintiffs was deferred because the evidence revealed that Associates and Seniors perform a varying range of duties rendering class treatment inappropriate. The Court thus granted Plaintiffs a third chance to take additional discovery; that discovery, rather than supporting class certification, only confirms its impropriety.

Plaintiffs now acknowledge that the duties of Associates and Seniors vary dramatically and that a "developmental continuum" exists that correlates with the performance of responsibilities requiring increasing discretion and judgment. In a stark reversal, Plaintiffs argue that the predominance requirement of Rule 23(b)(3) is met despite the composition of the putative class. Plaintiffs argue that predominance exists because the Learned Professional Exemption cannot apply as a matter of law. This argument rests solely on a poorly reasoned decision, Campbell v. PricewaterhouseCoopers, LLP, which is contrary to the Wage Order's plain language, its legislative history, a 2005 Industrial Welfare Commission decision reaching a contrary result, and Nguyen v. BDO Seidman, a more recent Central District decision rejecting Campbell's construction of the Wage Order.

Plaintiffs also argue that predominance exists because the Administrative Exemption cannot apply as a matter of law because members of the putative class were subject to too much supervision, failed to perform responsibilities directly

1

related to management or general business operations of Deloitte's clients, or failed to exercise discretion and independent judgment. Plaintiffs <u>do</u> <u>not</u> <u>cite</u> <u>a</u> <u>single</u> <u>case</u> in support of these arguments. In any event, these specious arguments on the merits cannot obscure the fact that Plaintiffs have not met the requirements for class certification. Perhaps even more importantly, though, these arguments ignore <u>Vinole v. Countrywide Home Loans, Inc.</u> and <u>In re Wells Fargo Home Mortgage Overtime Pay Litig.</u>, two Ninth Circuit decisions evidencing this Circuit's disdain for certification where the duties of class members vary as significantly as they do here, and <u>Nguyen</u> and <u>Wirth v. Grant Thornton, LLP</u>, two decisions involving putative classes of tax professionals nearly identical to those here, both of which found predominance lacking.

The additional discovery, sought but now ignored by Plaintiffs, reveals that Associates and Seniors perform a wide-range of duties that vary on both a "vertical" developmental continuum by time and on a "horizontal" spectrum across distinct subgroups within LTS. Accordingly, since Plaintiffs' arguments on the merits does not withstand scrutiny, the Court should deny certification.

## **ARGUMENT**[1]

### I. PLAINTIFFS CANNOT ESTABLISH THAT COMMON QUESTIONS OF LAW OR FACT PREDOMINATE AS REQUIRED BY RULE 23(B)(3)

Plaintiffs argue on the merits that the predominance requirement of Rule 23(b)(3) is satisfied because the Learned Professional or Administrative

---

[1] We note at the outset that Plaintiffs have accused Deloitte of failing to comply with licensing requirements for tax professionals under both California law and standards promulgated by the American Institute of Certified Public Accountants. Much to the contrary, Deloitte complies fully with all of its legal and ethical obligations. In any event, if Plaintiffs are asking this Court to review such issues, it further demonstrates that class certification is not appropriate here.

2

1    Exemptions cannot apply as a matter of law.[2]   Thus, while admitting that a

2    developmental continuum exists, Plaintiffs incorrectly contend it is "immaterial."[3]

3        **A.    Application of the Learned Professional Exemption Cannot be Determined on a Class-Wide Basis**

4

5        Plaintiffs argue that the Learned Professional Exemption is inapplicable to

6    the putative class because: (i) under <u>Campbell v. PricewaterhouseCoopers, LLP</u>,

7    602 F. Supp. 2d 1163 (E.D. Cal. 2009), unlicensed accountants are foreclosed from

8    exemption; and (ii) putative class members are not "engaged in the accounting

9    profession."  These arguments are baseless.

10       **1.    Unlicensed Accountants May Qualify for the Learned Professional Exemption**

11       Plaintiffs' first argument hinges on this Court's willingness to embrace

12   <u>Campbell</u>, which is on appeal to the Ninth Circuit.  There, the District Court held

13   that unlicensed accountants  could not be exempt under the Learned Professional

14   Exemption because accounting is one of the enumerated professions under the

15   Licensed  Professionals  Exemption  of  the  Wage  Order,  8  C.C.R.  §

16   110401(A)(3)(b).  <u>See</u> <u>Campbell</u> at 1172, 1181.

17       The <u>Campbell</u> Court engaged in an unprecedented statutory construction of

18   8 C.C.R. § 110401(A)(3)(b), which is flawed.  First, the plain language of the

19   Wage Order, written in the disjunctive, supports a finding that licensed accountants

20   are eligible for exemption under the Licensed Professionals Exemption (applicable

21   to eight professions, including accounting) and unlicensed accountants are eligible

22   for the Learned Professional Exemption.  In sum, the Learned Professional

23   Exemption is an alternative ground for exemption, and applies to any employee

24

25   ───────────────
     [2]     Plaintiffs' merit-based approach is improper at the certification stage.  <u>See</u>, <u>e.g.</u>, <u>Moore v.
26   Hughes Helicopters, Inc.</u>, 708 F.2d 475, 480 (9th Cir. 1983).
     [3]     Plaintiffs address the typicality and adequacy requirements of Rule 23(a) in only the most
27   perfunctory manner and do not address the commonality requirement at all.

28

                                         3

who performs work in a "learned or artistic profession" without reference to licensure. The <u>Campbell</u> Court rejected this interpretation, despite it being set forth in a Division of Labor Standards Enforcement ("DLSE") Opinion Letter interpreting the Wage Order and holding that "certain accountants who are not CPAs may still qualify as professionals if they meet the alternative requirements for the professional exemption," DLSE Op. Ltr. (Feb. 28, 1989), because it determined that the DLSE decision was issued prior to the Wage Order amendments. <u>See</u> <u>Campbell</u>, 602 F. Supp. 2d at 1178-79. However, <u>Campbell</u> did not address <u>Porush v. Anshen & Allen Architects</u>, Labor Comm. Case No. 06-74759, a 2005, post-amendment decision, which found an unlicensed architect (one of the eight enumerated professions), to be exempt under the Learned Professional Exemption.[4] (Walker Decl. Ex. 10).[5] Accordingly, both before and after the amendments to the Wage Order, unlicensed accountants, such as Seniors and Associates here, were and continue to be exempt Learned Professionals. <u>See</u> <u>Nguyen v. BDO Seidman</u>, No. SAC 07-1352 (JVS) (MLGx) (C.D. Cal. July 6, 2009) ("[T]he plain language of this exemption indicates that an employee may qualify as a professional even without a license.").

Second, the <u>Campbell</u> Court failed to follow the Industrial Welfare Commission ("IWC") dictate that the Learned Professional Exemption be "construed in accordance with federal law as they existed as of the date of this Wage Order: 29 C.F.R. Sections 541.207, 541.301(a)-(d)." Industrial Welfare Comm. Wage Order 4-2001 (A)(3)(e). If it had done so, it would have concluded

---

[4]    California courts give the opinions of the Labor Commissioner "persuasive weight." <u>See</u>, <u>e.g.</u>, <u>Sumuel v. ADVO, Inc.</u>, 155 Cal. App. 4 1099, 1109 (Cal. App. 2007).

[5]    All references to "Walker Decl. Ex. __" are to the Declaration of Peter A. Walker, Esq. and the exhibits appended thereto, executed on October 5, 2009.

that under 29 C.F.R. § 301(a)(2001), "accountants are exempt from federal labor laws because they fall under the general 'learned professions' exemption."

Third, the <u>Campbell</u> Court's conclusion that the Licensed Professional Exemption would be rendered "surplusage" misconstrues the purpose and effect of the Wage Order and ignores <u>Porush</u>. The Licensed Professionals Exemption can be likened to a "short-test" that presumes a licensed employee meets the requirements for exemption. 8 C.C.R. § 110401(A)(3)(b). The Learned Professionals Exemption, on the other hand, can be likened to a "long-test" where, even though an employee does not hold a license, an employer may still establish the exemption by analysis of the actual duties performed by that employee. <u>See id.</u> Indeed, the <u>Campbell</u> Court ignored <u>Ruiz v. PricewaterhouseCoopers LLP</u>, No. BV-287921 (Cal. Sup. Ct. Dec. 8, 2003), where, in a matter involving overtime claims by "junior [unlicensed] accountants," the court voiced this very position, observing that possession of a license was not the only means to qualify for the Learned Professional Exemption. "Rather, the exemption may also be determined on the basis of an individual's duties and other qualifications." <u>Id.</u> at 5.

And fourth, <u>Campbell</u> ignored the legislative history of the Wage Order that evidences that unlicensed accountants are eligible for exemption under the Learned Professionals Exemption. Specifically, during a September 1988 Public Hearing of the Industrial Welfare Commission to address amendments to the exemption regulations, the following exchange occurred between Chairperson Pollock and John Benson, a representative of the Association of Certified Public Accountants:

> [Pollock]: Do you feel that this proposed change would be an overall exemption for all those people who have completed their education and are in the process of becoming certified, or do you think that there may be exceptions where some people would not qualify to be exempt?
>
> [Benson]: I think that a person who is pursing their CPA certificate is expected at all times, once they enter our profession, to act in a professional capacity and to exercise judgment in that position.

> [Pollock]: So there isn't some type of work that they may be doing that would – that you feel would not qualify them to not be exempt?
>
> [Benson]: I think not. In the old days, as we speak of them, there was a lot of routine work that was done by entry-level staff accountants. This type of work is generally done by people who are bookkeepers who are not pursuing a future career as a certified public accountant.

(Walker Decl. Ex. 12). Further, the minutes from the Hearing show that a proposed amendment to the Learned Professional Exemption, which would have included the phrase "including but not limited to the following professions" failed to pass because "the proposed wording without the amendment would permit accountants to be exempt." (Walker Decl. Ex. 11). That the intent of the Wage Order was to exempt even unlicensed accountants under the Learned Professional Exemption is apparent, a fact confirmed by Porush, supra, in 2005. Accordingly, Plaintiffs' predominance argument, which turns on Campbell, fails.

### 2. Putative Class Members are Engaged in a Profession

Plaintiffs' second argument, which is bereft of any case law support, assumes that the Learned Professional Exemption cannot apply to any member of the putative class because they are not "engaged in the profession of accounting." (Doc. No. 80 at 8-10) and that Deloitte must prove its Associates and Seniors are "public accountants." Plaintiffs are mistaken.

The Learned Professional Exemption requires that an employee be "primarily engaged in an occupation commonly recognized as a learned or artistic profession." 8 C.C.R. § 110401(A)(3)(b). Plaintiffs attempt to rewrite this provision to require that an employee "be qualified to . . . practice the profession" and insert an additional (and clearly fictitious) requirement that an employee hold a license to practice "public accountancy" under California law. (Doc. No. 80 at 9). However, whether an employee is licensed to practice "public accountancy" is at most, a requirement under the Licensed Professionals Exemption and not the Learned Professionals Exemption. See 8 C.C.R. § 110401(A)(3)(b).

6

Plaintiffs' contention here misses the mark. The duties Plaintiffs can and do perform without engaging in "public accountancy" qualify for exemption. According to the Business & Professions Code ("BPC"), Plaintiffs can permissibly keep books, make trial balances, prepare statements, make audits, prepare and sign tax returns for clients, and provide consulting services to clients without performing "public accountancy." See Cal. Bus. & Prof. Code § 5051(f)-(i). These duties are performed to a greater or lesser extent by members of the putative class. (Doc. No. 65 at 14-19). Indeed, even Campbell, recognized that uncertified accountants are engaged in the profession of accounting. See 602 F. Supp. 2d at 1174 ("In sum, it appears that California law does not prohibit class members from performing accounting work . . . and the undisputed facts demonstrate that class members are in fact engaged in such work."); Ho v. Ernst & Young LLP, No. C-05-04867 (JF), 2008 WL 619029, at *5 (N.D. Cal. Mar. 4, 2008) (non-CPA accountant with JD found exempt). Plaintiffs are thus foreclosed from arguing that members of the class are not engaged in the accounting profession.

Finally, Plaintiffs argue that putative class members are merely "learning" the profession. (Doc. No. 80 at 9).[6] This argument ignores a wealth of evidence, including that Associates draft tax research memoranda, participate in technical discussions, and apply tax knowledge, that some Associates function as Seniors reviewing the work of other Associates, and that Seniors supervise Associates and review tax returns, and often run the day to day operations of the engagement. (Doc. No. 65 at 14-19; Frim. Tr. 65:19-66:25; 121:9-124:1, 127:17-128:16, 232:3-234:9; 238:18-241:18, 256:17-257:1; Bust. Tr. 104:5-12).[7] Given this evidence

---

[6] We note the inconsistency in Plaintiffs' position that, on the one hand, Seniors have to teach Associates the profession but on the other, Seniors are unqualified to engage in the profession. (Doc. No. 80 at 9-10).

[7] All deposition transcript pages cited herein are attached to the Walker Declaration as Exhibits 1-9.

(and their concession as to the developmental continuum), Plaintiffs cannot dispute that <u>at</u> <u>least</u> <u>some</u> Associates and some Seniors have advanced beyond "learning," which is all that is necessary to defeat their predominance argument.

## B. Application of the Administrative Exemption Cannot be Determined on a Class-Wide Basis

Plaintiffs contend that the Court can resolve application of the Administrative Exemption on a class-wide basis because: (i) they were subject to "heavy supervision;" (ii) the tax work they performed is not "directly related to the management or general business operations" of Deloitte's clients; and (iii) they merely apply "skill" in discharging their duties, rather than exercising independent judgment and discretion. Incredibly, Plaintiffs <u>do</u> <u>not</u> <u>cite</u> <u>a</u> <u>single</u> <u>case</u> supporting any of these arguments.

### 1. Putative Class Members Are Not Subject to "Heavy" Supervision

Wage Order 4-2001 exempts administrative employees provided they work "under only general supervision." 8 C.C.R. § 110401(A)(2)(d). Plaintiffs misinterpret this element of the analysis to focus on the amount of review the work product of an Associate or Senior is subject to, rather than the level of control an Associate or Senior is subject to in the daily performance of his or her responsibilities. According to Plaintiffs, because the work product of Associates and Seniors is reviewed, members of the putative class work under more than "general supervision."[8] (Doc. No. 80 at 13-15). This unsupported interpretation is contrary to principles of statutory construction.

Both the California and federal regulations identify review of work product as a relevant consideration of whether an employee exercises "discretion and

---

[8] As discussed in Section I.B.3., <u>infra</u>, review of work product does not vitiate exemption. <u>See</u> 29 C.F.R. § 541.202(c).

independent judgment," and not whether an employee works under "general supervision." See 8 C.C.R. § 110401(A)(2)(d); 29 C.F.R. § 541.207(e)(2) (2003) (construing administrative exemption prior to the 2004 "white-collar" revisions, which used the phrase "general supervision" and noting that review of work informs the discretion and independent judgment analysis); 29 C.F.R. § 541.202(c) (2008). Even a glance at California's Administrative Exemption reveals that "discretion and independent judgment" and "general supervision" are separate prongs of the exemption. See 8 C.C.R. § 110401 (A)(2)(d). Such a conflation of separate elements would render a distinct prong of the test for administrative exemption entirely superfluous, a construction which courts are directed to avoid. See, e.g., People v. Arias, 45 Cal. 4th 169, 180 (2008).

Thus, the only logical interpretation is one which considers the environment the Associates and Seniors work in and the visual and immediate scrutiny their activities are subject to or how much they are "watched," rather than the extent to which their final work product is subject to review. The evidence demonstrates that Associates and Seniors function in a variety of contexts and are "watched" to varying degrees as a result of the developmental continuum and engagement team structure. On some engagements, Seniors act as managers subject to little, if any, daily scrutiny, while on others, they may be subject to more oversight. (Doc. No. 80 at 15-19; Frim. Tr. 65:19-66:25; 121:9-124:1, 127:17-128:16, 232:3-234:9; 238:18-241:18, 256:17-257:1). Likewise, on some engagements, Associates function almost autonomously, (Bust. Tr. 128:1-4; Fischer 53:17-24; Lee Tr. 134:3-17, 135:25-136:13), while on others they work under the direction of Seniors and above, (Doc. No. 65 at 14, 16-18; Bust. Tr. 152:23-153:13). Indeed, depending on the nature of a particular engagement, a Senior or Associate may be

assigned to a client site and may, at times, be the only Deloitte representative physically on site.[9]  (Longenecker  Tr. 71:24-72:2; Lee Tr. 70:22-24, 140:23-141:4).  Thus, under the only interpretation of "general supervision" that would give it meaning, there is no uniformity that would permit a class-wide resolution.  See Nguyen, No. SAC 07-1352 (JVS) (MLGx) (holding that whether tax professionals worked under general supervision to be individualized inquiry).

Plaintiffs' remaining argument, that Associates and Seniors work under more than "general supervision" because Section 5053 of the BPC subjects them to "control and supervision" of a licensed accountant and because the American Institute of Certified Public Accountants ("AICPA") requires CPA's to supervise unlicensed staff, is also unsupported.  Plaintiffs do not refer to any authority interpreting the phrase "control and supervision" under Section 5053, the AICPA standards, or otherwise construing the term "supervision" in a qualitative or quantitative manner that has application to the Administrative Exemption.  See, e.g., Ruiz v. PricewaterhouseCoopers LLP, Case No. BV 287920 (Cal. Sup. Ct. Dec. 8, 2003) (finding plaintiffs' attempt to utilize Section 5053 of the BPC to give meaning to the California Labor Code in an overtime suit impermissible because it required an "illogical leap between two completely unrelated statutory schemes"); see also Ho, 2009 WL 111729, at *4-5 (finding tax associate exempt and not subject to more than "general supervision").  Plaintiffs' argument must be rejected.

### 2.  Whether the Duties Performed Are Directly Related to Management or the General Business Operations of Deloitte's Clients Requires Individualized Inquiry

Wage Order 4-2001 requires that an exempt employee perform work "directly related" to the management policies or business operations of the

---

[9]      Moreover, the evidence also reveals that Associates and Seniors are given significant freedom to make their own hours and work from home.  (Choi. Tr. 120:15-121:23).  This further evidences that they do not work under more than "general supervision."

employer or its clients. See 8 C.C.R. § 110401(A)(2)(f). Plaintiffs contend that this issue can be resolved on a class-wide basis because "California prohibits [putative] class members from preparing taxes, preparing financial plans, or acting as [] management consultant[s]," (Doc. No. 80 at 18), and that this prevents any class member from performing work "directly related" to the management or general business operations of Deloitte or its clients.

As set forth above in Section I.A.2., supra, Plaintiffs incorrectly argue that the duties putative class members can – and do – perform that do not qualify as "public accountancy" categorically fail to qualify for the Administrative Exemption. Even assuming "public accountancy" was the test for exemption, which it is not, according to the BPC, Plaintiffs can still permissibly keep books, make trial balances, prepare statements, make audits, prepare reports, prepare and even sign tax returns for clients, and provide consulting services to clients without performing "public accountancy."[10] See Cal. Bus. & Prof. Code § 5051(f)-(i). Plaintiffs do not refer the Court to any authority demonstrating that these duties are not "directly related" to the management or general business operations of Deloitte's clients, and they cannot: the first example of what constitutes "work directly related to management or general business operations" in the Code of Federal regulations is "work in functional areas such as tax." 29 C.F.R. § 201(b); 29 C.F.R. § 541.205(c)(1). Case law is uniformly in accord. See Nguyer, No. SAC 07-1352 (JVS) (MLGx) (work of tax associates and seniors directly related to management and general business operations); see also Piscione v. Ernst & Young,

---

[10]     Plaintiffs disingenuously refer the Court to Section 5052 of the BPC for the proposition that these activities constitute non-exempt "bookkeeping" on the authority of 29 C.F.R. § 541.205(c)(1). While Plaintiffs represent to the Court, on the authority of the CFR, that "bookkeepers" are non-exempt and likens the putative class to them, Plaintiffs omit the next sentence of the regulation, which states: "a tax consultant employed either by an individual company or by a firm of consultants is ordinarily doing work of substantial importance to the management or operation of a business." 29 C.F.R. § 541.205(c)(1) (2004).

L.L.P., 171 F.3d 527, 540 (7th Cir. 1999); Ho, 2008 WL 619029 (N.D. Cal. Mar. 4, 2008); Zalewski v. PNC Fin. Servs. Group, 555 F. Supp. 2d 555 (W.D. Pa. 2007); Conary v. A.O.G. Corp., 10 Wage and Hour Cases, 276 (D.R.I. 1951); Carberry v. State Bd. of Accountancy, 28 Cal. App. 4th 770, 775 (1994) (holding that uncertified tax professionals "remain free to perform . . . [accounting] services" despite Section 5051); Ruiz v. PricewaterhouseCoopers LLP, No. BV-287921 (Cal. Sup. Ct. Dec. 8, 2003) (unlicensed accountants found exempt).

Plaintiffs' argument also fails because Associates and Seniors perform a host of duties that fall outside the BPC, but nevertheless qualify them for exemption. While Plaintiffs minimize the range of duties performed by Associates and Seniors to just "preparing taxes, preparing financial plans [and] acting as [] management consultant[s]" in an effort to have these duties fit neatly within the language of the BPC, the evidence reveals otherwise. As set forth in Section III.A., infra, many Associates and Seniors do not even perform tax preparation but are primarily responsible for audits, consulting engagements, "382" analysis, tax provision work, tax modeling, or analyzing and identifying research and development credits. Importantly, as set forth in Deloitte's prior brief, the extent to which Associates or Seniors perform these responsibilities varies significantly dependent upon a host of individual factors. (Doc. No. 65 at 16-17). Many, if not all, of these duties fall outside of the BPC and render Plaintiffs' "directly related" argument ineffective. This stark divergence of evidence renders it highly likely that, upon individualized inquiry, certain Associates and Seniors would be found to perform work "directly related" to the management or general business operations of Deloitte's clients. As such, Plaintiffs cannot meet the predominance requirement.

**3.  Whether Plaintiffs Exercise Discretion and Independent Judgment Requires Individualized Inquiry**

Wage Order 4-2001 requires that exempt employees "customarily and

regularly exercise discretion and independent judgment." 8 C.C.R. § 110401 (A)(2)(b). Plaintiffs argue that members of the putative class do not because: (i) Deloitte's engagement team model renders their work product subject to review; and (ii) the variance of duties among members of the putative class is representative of varying levels of the application of "skill" rather than the exercise of discretion and independent judgment. (Pl. Br. 19-20). Again, Plaintiffs do not cite any legal authority for these arguments.

### a. The Review of Work Product Does Not Preclude Application of the Exemption

As an initial matter, Plaintiffs are simply incorrect that the review of work product by more senior personnel forecloses application of the exemption. Much to the contrary, the applicable federal regulation expressly provides:

> [E]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level….The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment.

29 C.F.R. § 541.202(c); Heffelfinger v. Elec. Data Sys., 580 F. Supp. 2d 933, 952, 963 (C.D. Cal. 2008); Medepalli v. Maximus, Inc., 2008 WL 958045, at *7-8 (E.D. Cal. Apr. 8, 2008).

Here, while Plaintiffs summarily conclude that the engagement team model bars the exercise of discretion and judgment, the evidence ignored by Plaintiffs reveals that many Associates and many Seniors compare and evaluate possible courses of conduct and make decisions after considering various alternatives. See 29 C.F.R. § 541.202(a). For instance, Associates and Seniors are expected to think, identify issues, and react to changes in the tax laws and regulations in order to prepare compliant tax returns. (Doc. No. 65 at 17-18). Only then, after an Associate or Senior has applied his or her knowledge and completed a return

setting forth his or her recommendations as to the tax treatment of various items, is the work subject to review. (Frim. Tr. 214:13-25, 215:7-22, 218:10-25).

That this review of the work product produced by Associates and Seniors does not vitiate their exercise of "discretion and independent judgment" is even confirmed by Campbell v. PricewaterhouseCoopers, LLP, 253 F.R.D. 586, 595 (E.D. Cal. 2008), which dealt with a similar putative class. The plaintiffs in Campbell assisted CPA's in performing tax audits and their work was subject to multiple levels of review. See id. at 592. The Court held "that the fact that the work of PwC associates and senior associates is subject to review is not sufficient to prove that they are performing non-exempt work." Id. at 602; Nguyen, No. SAC 07-1352 (JVS) (MLGx) (holding tax preparation work to involve discretion and judgment); see also In re Farmers Ins. Exchange, Claims Rep. Overtime Pay Litig., 481 F.3d 1119, 1130 (9th Cir. 2007); Cole v. Daniels, Inc., 7 Fed. Appx. 634, 635 (9th Cir. 2001); Ho, 2008 WL 619029, at *3; Palacio v. Progressive Ins. Co., 244 F. Supp. 2d 1040, 1048 (C.D. Cal. 2002); Copas v. East Bay Mun. Util. Dist., 61 F. Supp. 2d 1017, 1026 (N.D. Cal. 1999). Therefore, Plaintiffs' "review" argument does not establish predominance or provide grounds for certification.

### b. Plaintiffs Exercise Discretion and Independent Judgment and Do Not Merely Apply "Skill"

Plaintiffs' mere quotation of 29 C.F.R. § 541.207(b) and its caution against confusing the "use of skill in applying techniques, procedures or specific standards" with the exercise of discretion and judgment, without even a feigned attempt at application to the facts in this case, renders their argument without merit. (Doc. No. 80 at 19-20). Plaintiffs state, without reference to the record, that "[e]ngagements vary for class members because some are more complex than others, but, for the employees, the greater complexity of these engagements

requires only better tax skills."[11]  (Doc. No. 80 at 20).

Although the federal regulations were revised in 2004 to delete illustrations of the types of work requiring skill rather than the exercise of discretion and independent judgment, they remain useful for comparison.   The pre-revision regulations identified the following as skills: (i) an inspector making recommendations based on techniques and procedures in manuals; (ii) a lumber grader looking at wood and grading it; and (iii) a personnel clerk screening applicants by reference to objective standards.  See 29 C.F.R. § 541.207(c) (2004). These tasks are simply not comparable to the work performed by Associates and Seniors: most Associates assist in the preparation of tax returns for sophisticated legal entities and perform tasks such as drafting tax research memoranda, participating in technical discussions, highlighting potential risks and tax issues, and applying tax knowledge, while Seniors and certain Associates spend the bulk of their time supervising Associates, answering questions, evaluating their performance, and reviewing and analyzing tax returns.  (Doc. No. 65 at 14, 16-18). Simply put, Associates and Seniors use their knowledge and experience to recommend varying courses of action to allow clients to meet their tax obligations.

Even if Plaintiffs were correct that tax return preparation consisted of the mere application of "skill," Plaintiffs' argument still fails because it does not account for Associates and Seniors that perform other types of work the majority of their time, such as tax research, consulting, "382" analysis, tax provision work, preparing tax models, and responding to IRS and state-entity audits.  (Frim. Tr. 99:12-102:16, 186:17-187:13, 197:10-199:21, 203:15-205:21; Larkin Tr. 50:24-51:12, 85:18-86:3, 87:1-16, 93:10, 123:8-17, 128:4-21, 147:9-14, 149:6-10; Bust.

---

[11]      We invite the Court to review Bustamante Tr. 191:22-194:5, which Plaintiffs contend demonstrate that the work of putative class members consists of "skill."  As the Court will see, there is no testimony regarding "skill" versus discretion and judgment.

Tr. 118:22-120:1, 129:3-8, 134:19-135:20, 144:24-147:20, 182:10-17; Choi Tr. 147:18-25, 177:20-178:2; Fischer Tr. 13:20-14:11, 26:12-20, 169:9-12). Because these tasks afford Associates and Seniors an opportunity to consider alternatives and recommend a course of action based on their knowledge and experience, Associates and Seniors exercise discretion and judgment and do not merely apply skill. See, e.g., Roe-Midgett v. CC Servs., 512 F.3d 865, 875 (7th Cir. 2008); Cash v. Cycle Craft Co., 508 F.3d 680, 686 (1st Cir. 2007); Renfro v. Ind. Mich. Power Co., 497 F.3d 573, 577 (6th Cir. 2007); McAllister v. Transamerica Occidental Life Ins. Co., 325 F.3d 997, 1001-02 (8th Cir. 2003).

Moreover, Plaintiffs blithely ignore the duties performed by Associates and Seniors.[12] The evidence reveals a plethora of duties that even Plaintiffs would be hard-pressed to argue constitute only application of skill, such as researching and drafting tax memoranda, participating in technical discussions relevant to client tax issues, supervising other members of the putative class, preparing evaluations of colleagues' work, developing budgets and invoices, planning and attending pre-client-engagement meetings, strengthening existing client relationships, and identifying business development opportunities. (Doc. No. 65 at 14-19). And because each Associate or Senior performs even these duties to lesser or greater degrees depending on where they fall on the continuum, a class-wide resolution of exemption status is impossible.

### C.    Plaintiffs Remaining "Efficiency" Argument is Unsupported

Finally, Plaintiffs offer the Court a generalized "efficiency" and "judicial economy" argument as a final attempt to satisfy Rule 23(b)(3). (Doc. No. 90 at 20-23). Plaintiffs refer the Court to Vinole v. Countrywide Home Loans, Inc., 571

---

[12]    Plaintiffs do not describe at all the duties of Associates or Seniors, but rather appear to implicitly contend that the duties of all members of the putative class are strictly limited to tax return preparation. (Doc. No. 80 at 20). This is simply not true.

F.3d 935 (9th Cir. 2009) and In re Wells Fargo Home Mortgage Overtime Pay Litig., 571 F.3d 953 (9th Cir. 2009), where the Ninth Circuit declined to certify the proposed classes on predominance grounds.  Plaintiffs misinterpret these cases.

In Vinole, the plaintiffs argued that certification was appropriate because the employer uniformly classified employees as exempt.  See 571 F.3d at 945.  The Court rejected this approach, noting that it "does little to further the purpose of Rule 23(b)(3)'s predominance inquiry."  Id. at 946.  Instead, the Ninth Circuit held that the certification inquiry should account for a variety of factors that may necessitate individualized inquiry, such as a variance in duties among members of the proposed class despite the existence of a uniform policy of classification.  See id. at 946-47.  And, while a concern of the Rule 23(b)(3) inquiry is efficiency and judicial economy, the Court noted that such considerations are only achieved where common and individual issues merge.  See id. at 946-47.

The Ninth Circuit went further in Wells Fargo, a companion case to Vinole.  See 571 F.3d at 957.  There, the Court held that not only was an employer's uniform exemption policy not  paramount, but also that even where an employer had uniform policies detailing job duties, a court must "ask [how] the individual employees actually spent their time."  See 571 F.3d at 958-59.  Again, the Court reiterated that "[w]hether judicial economy will be served in a particular case turns on close scrutiny of 'the relationship between the common and individual issues.'"  Id. at 958.

Here, Plaintiffs, despite the teachings of Vinole and Wells Fargo, urge this Court to turn a blind eye to the variance of duties and developmental continuum and grant certification on the basis of judicial economy.  However, this is not an independent basis to grant certification, but a mere restatement of Plaintiffs' other arguments and should be rejected.  Thus, the Court is left with Plaintiffs' admission that Associates and Seniors perform different duties and that even

within each classification, the duties of any individual are dependent upon a host of highly individualized factors. That this variation in duties prevents common questions from predominating is further supported by <u>Wirth v. Grant Thornton, LLP</u>, No. CV 09-00832 (RGK) (SSx), where the Court refused to certify a class based on facts almost identical to those found here. (Walker Decl. Ex. 13). There, the Court was faced with a putative class of unlicensed associates and senior associates employed to "assist licensed professionals in providing public accountancy services to its clients." Plaintiffs argued that the predominance requirement was met because the employer classified all employees as exempt and because both the Learned Professional and Administrative Exemptions could not apply. The Court first rejected any argument that a uniform classification policy had bearing on whether the predominance requirement was met, and then held that:

> Defendant has presented evidence that between the different levels of associates and senior associates, employees have differing duties, responsibilities, and abilities to exercise discretion. In addition, there is individual variation within each rank, based on the employee's unique background, particular auditing experience, performance level, basic smarts, etc. Since the exemptions require inquiries into levels of discretion, supervision, and independent judgment, it is necessary to discover the specifics of the actual work being done by the employee to determine whether an employee qualifies for either exemption. These questions can only be answered on an individual basis with close attention to the pertinent facts of each associate's employment. As such, individual inquiries will inevitably dominate over common questions.

<u>Id.</u> Likewise, in <u>Nguyen</u>, No. SAC 07-1352 (JVS) (MLGx), the Court was also faced with a putative class of tax associates and seniors – identical in seemingly every respect to that found here – and found predominance lacking because "job duties varied between associates and senior associates, [and] also varied even among associates of the same division." (Walker Decl. Ex. 14).

Plaintiffs also fail to address a number of cases discussed in Deloitte's prior briefs, including <u>Perry v. U.S. Bank</u>, No. C-00-1799 (PJH), 2001 WL 34920473, at *1 (N.D. Cal. Oct. 16, 2001), where the Court declined to certify a class of

18

personal bankers because individual duties effected the exemption determination, see id. at *5, and Jimenez v. Domino's Pizza, 238 F.R.D. 241 (C.D. Cal. 2006), where the Court declined to certify a class of general managers because the class members duties were not "roughly identical" and this variability went to "whether an individual class member has any claim at all for misclassification." Id. at 253. Plaintiffs also ignore Marlo v. UPS, 251 F.R.D. 476 (C.D. Cal. 2008), where the Court decertified a class of supervisors because the plaintiffs' evidence tended to establish that the supervisors were non-exempt while the employer's evidence tended to establish that they were exempt, thus preventing application of "common proof to support a class-wide judgment as to liability." Id. at 485. And most notably, Plaintiffs do not address Sepulveda v. Wal-Mart Stores, Inc., 237 F.R.D. 229, 246 (C.D. Cal. 2006), aff'd in part, rev'd in part, 275 Fed. Appx. 672 (9th Cir. 2008), where this Court refused to certify a class of assistant managers because of the employer's "voluminous evidence that there actually was a great deal of variance in [class member] duties," and concluded:

> Even if the Court were to accept Levine's conclusion that there is likely to be little variance among AM duties, this does not mean that none of the AMs were properly exempt. For each AM, Defendant is entitled to raise exempt status as a defense and to present evidence showing that the AM actually did perform primarily exempt tasks. Based on the evidence submitted thus far, such proof will probably be highly individualized. Indeed, Defendant has already submitted a number of declarations stating that individual AMs performed primarily exempt work. If these declarations are correct, then these AMs are indeed exempt employees under California law, regardless of any representational evidence to the contrary that Plaintiffs may provide. Thus the question of how much time a given AM spent on exempt or non-exempt duties remains an individual one.

Id. at 249. Perez, Jiminez, Marlo, and Sepulveda are indistinguishable from this case and compel a determination that the predominance requirement has not been met. See also Nguyen, No. SAC 07-1352 (JVS) (MLGx) (C.D. Cal. 2009); Pablo v. ServiceMaster Global Holdings, Inc., No. C08-03894 (SI), 2009 WL 2524478, at *4 (N.D. Cal. Aug. 17, 2009); Forrand v. FedEx Corp., No. CV 08-1360, 2009

WL 648966, at *3 (C.D. Cal. Feb. 18, 2009) (Fischer, J.); <u>Goldsby v. Adecco, Inc.</u>, No. C-07-5604 (MMC), 2009 WL 262216, at *5 (N.D. Cal. Feb. 4, 2009); <u>Ruiz v. Affinity Logistics Corp.</u>, No. 05CV2125 (JLS), 2009 WL 648973, at *6 (S.D. Cal. Jan. 29, 2009).   Accordingly, Plaintiffs cannot demonstrate that common issues predominate over individual issues.

## II.   PLAINTIFFS CANNOT ESTABLISH THE REQUIREMENTS OF RULE 23(A)

### A.   Plaintiffs Cannot Adequately Represent a Class of Seniors

Deloitte previously detailed and will not repeat at length the almost nonexistent experience of the representative Plaintiffs and their performance shortcomings in the Senior role, which render them inadequate representatives. (Doc. No. 65 at 4-8).  Suffice it to say, Plaintiff Murphy never held the position, (Murphy Tr. 73:19-74:6), Plaintiff Longenecker held it for just four months, (Longenecker Decl. ¶ 26), Plaintiff Lee admitted that he performed as a Senior for just nine months and received a "4," the second lowest rating possible, during that time,[13] (Lee Decl. ¶ 27), and Plaintiff Blaske resigned just five months after she became a Senior, (Blaske Decl. ¶ 16, 32).[14]

Almost as a non-sequitur, Plaintiffs now curiously state: "Deloitte does not establish any standard of tenure for a [Senior] or when [Seniors] exit the class by getting their CPA license."  (Doc. No. 80 at 23).  The import or meaning of this statement is unclear.  Nevertheless, Plaintiffs have not offered any explanation for how they could adequately represent a class of Seniors, some of whom possess as much as three years of experience as Seniors and who, even according to Plaintiffs, would likely have performed entirely different and more significant responsibilities

---

[13]    While Plaintiffs claim that Lee received other reviews as a Senior, he testified that this review is the only one he received while performing the duties of a Senior.  (Lee Tr. 13:7-12).

[14]    Deloitte further referred the Court to Plaintiffs' admissions illustrating that responsibilities and tasks evolve as tenure and/or experience increase, which further illustrates the inability of Plaintiffs to adequately represent other Seniors.  (Doc. No. 65 at 18-19).

20

based on their tenure in the role.  See, e.g., Campbell v. PricewaterhouseCoopers, LLP, 253 F.R.D. 586, 595 (E.D. Cal. 2008).

Because Plaintiffs have virtually no experience as Seniors, and because in the limited experience that they have, the evidence shows that Plaintiffs failed to perform in accordance with Deloitte's expectations, Deloitte respectfully submits that Plaintiffs cannot adequately represent a class of Seniors.

### B.  Plaintiffs' Claims are Not Typical of the Class

To establish typicality, Plaintiffs must put forth evidence demonstrating their knowledge of the circumstances of the employment of those they seek to represent. See id. at 596; see also Jasper v. C.R. Eng., Inc., No. CV-08-5266, 2009 WL 873360, at *4 (C.D. Cal. Mar. 30, 2009); Kelley v. SBC, Inc., No. 97-CV-2729 (CW), 1998 WL 928302 (N.D. Cal. Nov. 13, 1998).

Here, the entirety of Plaintiffs' argument is that "[t]hey all claim overtime rights under the same positions arising out of the same conduct."  (Doc. No. 80 at 25).  However, Plaintiffs readily admitted – with respect to both the Associate and Senior roles – that they were unaware and had "virtually no knowledge" of the job duties or employment circumstances of any other Senior or Associate at Deloitte. (Doc. No. 65 at 8-10).  Additionally, the developmental continuum that Plaintiffs expressly admit belies a finding of typicality: it is a logical impossibility for the claims of Plaintiff Lee, who for example testified that during his tenure as an Associate, "approximately 90% of [his] activities involved the assembly and data entry of client-provided information on standardized templates," to be coextensive with that of other Associates, who the evidence demonstrates prepared tax research memoranda, participated in technical discussions, identified risks, and applied tax knowledge.  (Doc. No. 65 at 14-15).

In sum, Plaintiffs' mere statement that all members "claim overtime rights under the same positions" is insufficient to establish that "other members have the

same or similar injury." <u>See</u> <u>Hanon v. Dataproducts Corp.</u>, 976 F.2d 497, 508 (9th Cir. 1992); <u>see also</u> <u>Pablo</u>, 2009 WL 2524478, at \*4.

### C.   <u>Questions of Law and Fact are Not Common to the Class</u>

Plaintiffs do not address Rule 23(a)(2), which requires that there be questions of law or fact common to the proposed class. <u>See</u> Fed. R. Civ. P. 23(a)(2). Thus, Plaintiffs implicitly concede a lack of commonality where the evidence demonstrates that members of the putative class perform exempt duties to varying degrees. <u>See</u> <u>Garcia v. Sun Pacific Farming Co-op.</u>, No. CVF 06-0871 (LJO) (TAG), 2008 WL 2073979, at \*12 (E.D. Cal. May 14, 2008) ("[D]ue to the conflicting evidence on the very wage and hour violations alleged in the complaint, within and among the various crews, the plaintiffs have not shown commonality."); <u>See</u> <u>Perez v. Safety-Kleen Sys.</u>, 253 F.R.D. 508, 518 (N.D. Cal. 2008) (noting that evidence of injuries suffered by plaintiffs is insufficient). Accordingly, for the reasons set forth in Deloitte's prior brief, Plaintiffs cannot establish commonality.

### III.   THE ADDITIONAL DISCOVERY TAKEN BY PLAINTIFFS FURTHER UNDERMINES PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs do not refer to any of the thousands of pages of documents produced after their previous efforts at certification failed and barely reference any of the five additional depositions. This evidence demonstrates that within the Associate and Senior positions there exists a vertical developmental continuum that correlates with the performance of more complex and more clearly exempt duties by some but not all members of the putative class, and a horizontal spectrum of duties within subgroups of LTS that results in putative class members in the same title performing entirely different functions altogether.

#### A.   The Additional Evidence Reveals a Horizontal Spectrum of Duties Across Subgroups of LTS Precluding Certification

Plaintiffs oversimplify the duties of putative class members as tax return preparation by Associates and review of the same by Seniors. While many

Associates and Seniors do spend the majority of their time in tax return preparation and analysis, (Larkin Tr. 49:23-25, 93:1-10; Bust. Tr. 159:3-7; Choi Tr. 147:18-25), the supplemented record reveals that within LTS, there exist multiple subgroups that specialize in different areas of tax practice, each with unique and different duties which do not involve return preparation. Within LTS, Associates and Seniors may work in Tax Management Advisory Services, Tax Controversy, Tax Accounting Services and Co-Sourcing, Research and Development ("R&D") Credits, Private Client Advisors, or Mergers & Acquisitions, or they may be managing Deloitte's R-10 team, a group of professionals located in India. (Longenecker Tr. 78:21-80:1, 90:4-22; Blaske Tr. 169:4-12; McLeod Decl. ¶ 7; Larkin Tr. 181:22-184:17; Fischer Tr. 217:9-222:13, 256:7-21, 258:22-259:16; Frim. Tr. 99:6-100:15, 237:6-11; Choi Tr. 146:18-22).

Thus, some Associates and Seniors may devote much of their time to "R&D" studies, which analyze a client's personnel, supplies, and vendor expenses to determine whether certain tax credits are available. (Larkin Tr. 182:9-12, 185:2-16, 187:4-6, 187:20-189:24; Fischer Tr. 256:3-21, 257:10-23). Others may spend the majority of their time involved in "382 studies," which involves the analysis of net operating loss a client can use. (Larkin Tr. 126:2-4; 196:5-200:21; Frim. Tr. 99:12-102:16, 186:17-187:13, 197:10-199:21, 203:15-205:21, 275:15-278:10; Fischer Tr. 257:24-259:3). There are also Associates and Seniors within LTS that specialize in "audit" work, or responding to IRS or state-agency investigations of Deloitte's clients. (Bust. Tr. 118:22-120:1, 134:19-135:4; Frim. Tr. 99:12-102:16, 186:17-187:13, 197:10-199:21, 203:15-205:21; Fischer Tr. 169:4-172:8). Some Seniors may spend significant time performing tax provision work, that is, determining the tax expense, the deferred tax assets, and the income tax payable for financial filings. (Larkin Tr. 147:9-14; Frim. Tr. 99:12-102:16, 186:17-187:13, 197:10-199:21, 203:15-205:21; Choi Tr. 146:18-147:2). Finally,

some Associates or Seniors spend the bulk of their time working on "consulting" engagements, where they are working with the client to render tax advice based upon research they perform and hypothetical tax models that they create. (Bust. Tr. 144:24-147:20; Choi Tr. 177:20-178:2; Fischer Tr. 13:20-14:11, 26:12-28:16; Frim. Tr. 99:8-101:1, 102:9-103:19). Plainly, the spectrum of duties performed by putative class members necessitates individualized inquiry to determine exemption status and defeats the instant motion.

### B. The Additional Evidence Further Demonstrates the Developmental Continuum Precluding Certification

The supplemented record also further illustrates the existence of a vertical developmental continuum – again, something that Plaintiffs expressly concede exists throughout their brief – within the Associate and Senior ranks that correlates with increased responsibility and discretion, that Deloitte detailed in its prior briefs. (Doc. No. 65 at 18-19). Thus, some Associates perform "Senior" responsibilities, including assigning and reviewing the work of other Associates, "owning" a particular engagement, and even holding responsibility for billing clients. (Frim. Tr. 166:3-18, 204:19-20; Choi Tr. 91:24-92:2; Fischer Tr. 53:17-24, 84:15-22, 155:1-6; Bust. Tr. 195:7-23, 196:2-7, 196:18-25). Other advanced Associates may be given the freedom to work directly with clients and to independently research and resolve tax issues on behalf of those clients. (Choi Tr. 199:5-24, 201:3-15; Larkin Tr. 212:14-25; Frim. Tr. 35:2-21, 178:1-14). Likewise, with Seniors, the additional discovery confirms that a more able Senior will receive assignments calling for more discretion and may be permitted to function as a manager, contacting clients, drafting invoices, approving client charges, making staffing decisions, and generally running the day-to-day operation of an engagement. (Bust. Tr. 131:19-132:2, 132:12-14, 68:14-22, 170:4-9; 176:14-20, 188:13-17, 193:10-23, 199:16-200:22; Choi Tr. 106:23-109:6, 163:24-164; 213:9-

214:7; Larkin Tr. 128:4-21, 211:11-212:17; Frim. Tr. 35:2-21, 178:1-14, 241:19-242:6; Fischer Tr. 83:12-84:4, 154:16-155:6). The developmental continuum alone, which Plaintiffs concede exists, precludes class certification and warrants denial of Plaintiffs' motion.

In sum, the additional evidence reveals that only a multiplicity of proof would be capable of identifying the duties – and classification within LTS – of each member of the proposed class since the duties of any member vary based on a host of individual factors. This variance in duties is precisely what caused the Ninth Circuit to find denial of certification appropriate in <u>Vinole</u> and <u>Wells Fargo</u>, and the Central District of California to find denial of certification appropriate in <u>Nguyen</u> and <u>Wirth</u> on facts nearly identical to those found here.

## **<u>CONCLUSION</u>**

For each of these reasons, Deloitte respectfully submits that Plaintiffs' Amended Motion for Class Certification should be denied in its entirety.

Dated:          October 5, 2009          Respectfully submitted,

SEYFARTH SHAW LLP


By: <u>/s/ Christopher Lowe</u>
Christopher Lowe
Attorneys for Defendants
DELOITTE TAX LLP and
DELOITTE & TOUCHE LLP

**EXHIBIT D**

**FILED**

UNITED STATES COURT OF APPEALS

FEB 10 2010

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

BRANDY BLASKE, an individual on
behalf of herself and all others similarly
situated; et al.,

              Plaintiffs - Petitioners,

   v.

DELOITTE & TOUCHE LLP, a Delaware
Limited Liability Partnership; et al.,

           Defendants - Respondents.

No. 09-80171

D.C. No. 2:07-cv-00412-DSF
Central District of California,
Los Angeles

ORDER



RECEIVED
CLERK, U.S. DISTRICT COURT

FEB 1 0 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Before:  CANBY and GOULD, Circuit Judges.

    Petitioners' unopposed request for judicial notice is granted.

    The court, in its discretion, denies the petition for permission to appeal the

district court's November 3, 2009 order denying class action certification. *See*

Fed. R. Civ. P. 23(f); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005)

(per curiam).

AM/MOATT